**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| ROCHE DIAGNOSTICS CORP. and ROCHE DIABETES CARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> BINSON'S HOSPITAL SUPPLIES, INC., NORTHWOOD, INC., OLYMPUS GLOBAL, LLC, DELTA GLOBAL, LLC, ALPHA XE LLC, J&B MEDICAL SUPPLY CO., INC., KENNETH G. FASSE, DONNIE E. DICKSTEIN, JAMES E. BINSON, JAMES E. BINSON II, NICHOLAS B. BINSON, ROBERT A. BINSON, CHRISTOPHER F. SHAYA, FAWZI B. SHAYA, MARY E. SHAYA, DANIEL GLADYS, JEREMIAH MANKOPF, and PHARMACY JOHN DOES 1–50, <br><br> Defendants. | Case No. 1:17-cv-0949 LJM-DML |

**FIRST AMENDED COMPLAINT**

Plaintiffs Roche Diagnostics Corp. and Roche Diabetes Care, Inc. (together, "Roche"),

for their Complaint against Defendants Binson's Hospital Supplies, Inc. ("Binson's"),

Northwood, Inc. ("Northwood"), Olympus Global, LLC ("Olympus"), Delta Global, LLC

("Delta"), Alpha XE LLC ("Alpha"), J&B Medical Supply Co., Inc. ("J&B"), Kenneth G. Fasse

("Fasse"), Donnie E. Dickstein ("Dickstein"), James E. Binson, James E. Binson II, Nicholas B.

Binson, Robert A. Binson (James E. Binson, James E. Binson II, Nicholas B. Binson, and

Robert A. Binson together, the "Binson Family," and together with Binson's, Northwood, Fasse,

and Dickstein, the "Binson's Defendants"), Christopher F. Shaya ("Chris Shaya"), Fawzi B.

Shaya, Mary E. Shaya, (together with Fawzi and Chris Shaya, the "Shayas"), Daniel Gladys

("Gladys"), Jeremiah Mankopf ("Mankopf," together with Gladys, the Shayas, J&B, Olympus,

Delta, and Alpha, the "J&B Defendants"), and Pharmacy John Does 1–50, hereby allege as follows:

## NATURE OF THE ACTION

1.      Roche, a manufacturer of medical equipment for patients with diabetes, including blood glucose test strips, brings this action seeking compensation for damages caused by Defendants' fraud and other wrongful acts.

2.      Defendants participated in a brazen scheme to defraud Roche.  Defendants conspired to obtain blood glucose test strips manufactured by Roche and intended for sale only to beneficiaries of insurance plans that cover test strips under a durable-medical-equipment benefit ("DME Plans").  Instead, Defendants diverted the test strips for retail sale to beneficiaries of insurance plans that cover test strips under a pharmacy benefit ("Pharmacy Plans").

3.      By doing this, Defendants illegally arbitraged the substantial difference in wholesale list price and insurance reimbursement rates between test strips intended for DME Plans and Pharmacy Plans.

4.      Test strips paid for by Pharmacy Plans have a substantially higher list price and are reimbursed by insurance at a correspondingly higher rate than test strips paid for by DME Plans.  However, Pharmacy Plans that pay the higher reimbursement rates receive large rebates from Roche, whereas DME Plans do not.  As a result of these rebates paid to Pharmacy Plans, Roche's net revenues from test strips paid for by the two types of plans—and the net costs to the consumers who use the two types of plans—are comparable, notwithstanding the substantial difference in list price and insurance reimbursement rates.

5.      By purchasing strips from Roche at the lower DME list price and diverting them for sale in channels where they would be reimbursed at the much higher Pharmacy Plan rate,

Defendants and their co-conspirators made millions of dollars in illicit profits. Importantly, Defendants' profits did not result from offering lower prices to consumers, the vast majority of whom pay a fixed out-of-pocket amount set by their insurance plans. Rather, the profits resulted from causing Roche to pay substantial rebates to Pharmacy Plans for products that were intended for sale through DME Plans.

6.      Because of security measures put in place by Roche, such as having separate packaging and product codes for Pharmacy and DME strips, there is no legitimate way to engage in a profitable diversion scheme as Defendants did. In order to make their illicit profits, Defendants and their business partners conspired to defraud Roche in multiple ways.

7.      For example, the Binson's Defendants and the J&B Defendants falsely induced Roche to sell them test strips intended for sale through DME channels by promising that they would distribute them only through these channels. The Binson's Defendants and J&B Defendants never had any intention of keeping these promises.

8.      Subsequently, the Binson's Defendants covered up their wrongdoing by providing Roche with fraudulent quarterly sales reports. The Binson's Defendants sent Roche fabricated quarterly sales reports that claimed, among other things, that Defendant Northwood was fulfilling a certain specified number of patient prescriptions with its sale of Roche test strips. But the Binson's Defendants simply made up these numbers. Northwood did not deliver any test strips to patients. It sold them all to the J&B Defendants, who diverted them to pharmacies.

9.      Because almost all purchasers of Roche's test strips use insurance, the pharmacies that sold the diverted Roche DME test strips to patients submitted them to insurance companies for reimbursement. In doing so, these pharmacies claimed to their patients' insurers that the Roche DME test strips being sold *were in fact retail strips*. The pharmacies thus fraudulently

obtained the higher reimbursement rate for Pharmacy Plans.  The difference between the fraudulently obtained Pharmacy Plan reimbursement rate and the rightful DME reimbursement rate is approximately $48 per box.  A share of the illicit profits from this scheme was passed back up the chain to all Defendants as part of a conspiracy among Defendants and others to profit from the insurance fraud.

10.     Profiting from this insurance fraud was the driving motivation for Defendants to divert Roche's DME test strips.  Without the outsized profits obtained by fraudulently arbitraging both the price difference and reimbursement rates between retail and DME test strips, the Defendants would never have been able to sell the volume of test strips and earn the profits that they did.

11.     Defendants' fraudulent scheme caused Roche to wrongfully pay millions of dollars in rebates and deprived Roche of over $100 million in legitimate sales of its retail test strips.  Defendants' fraud damaged Roche in an amount of not less than $89 million plus interest.

## PARTIES

12.     Plaintiff Roche Diagnostics Corp. is a corporation organized under the laws of the State of Indiana, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.  Roche Holding AG is the ultimate parent company of Roche Diagnostics Corp.

13.     Plaintiff Roche Diabetes Care, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.  Roche Diagnostics Corp. included Roche's U.S. commercial diabetes business until November 2015, when the U.S. commercial diabetes business was transferred to a separate legal entity, Roche Diabetes Care, Inc.   Roche Diabetes Care, Inc. is engaged in the business of

manufacturing and marketing blood glucose test strips.  Roche Holding AG is the ultimate parent company of Roche Diabetes Care, Inc.

14.     Defendant Binson's Hospital Supplies, Inc. is a corporation organized under the laws of the State of Michigan, with its principal place of business at 26834 Lawrence Avenue, Centerline, Michigan 48015.  Binson's is a mail-order distributor of medical equipment, including blood glucose test strips, and also maintains several brick-and-mortar stores in Michigan and Florida, where it is possible to purchase medical equipment in person.

15.     Defendant Northwood, Inc. is a corporation organized under the laws of the State of Michigan, with its principal place of business at 26834 Lawrence Avenue, Centerline, Michigan 48015.  Northwood is a subsidiary of Binson's and is a mail-order distributor of medical equipment, including blood glucose test strips.

16.     Defendant Olympus Global, LLC was a limited liability company organized under the laws of the State of Michigan, with its principal place of business at 342 West Grand River Avenue, East Lansing, Michigan 48823.  Olympus's members were Chris Shaya and Daniel Gladys, who are both citizens of Michigan.  Olympus was dissolved on January 30, 2015.

17.     Defendant Delta Global, LLC is a limited liability company organized under the laws of the State of Michigan, with its principal place of business at 336 West First Street, Suite 113, Flint, Michigan 48502.  Delta's members are Chris Shaya and Gladys, who are both citizens of Michigan.

18.     Defendant Alpha XE LLC is a limited liability company organized under the laws of the State of Wyoming, with its principal place of business at 1603 Capitol Avenue, Suite 310 A248, Cheyenne, Wyoming 82001.  Alpha's sole member is Chris Shaya, a Michigan citizen.

19.     Defendant J&B Medical Supply Co., Inc. is a corporation organized under the laws of the State of Michigan, with its principal place of business at 50496 West Pontiac Trail, Wixom, Michigan 48393.

20.     Defendant Kenneth G. Fasse is a Michigan citizen, having an address at 57580 Ridgewood Drive, Washington, Michigan 48094.  Fasse is Executive Vice President and Chief Operating Officer of Binson's and President of Northwood.

21.     Defendant Donnie E. Dickstein is a Michigan citizen, having an address at 35898 Tamarack Court, New Baltimore, Michigan 48047.  Dickstein is Director of Northwood.

22.     Defendant James E. Binson is a Michigan citizen, having an address at 22528 Statler Street, Saint Clair Shores, Michigan 48081.  James E. Binson is Chairman, President, and Chief Executive Officer of Binson's.

23.     Defendant James E. Binson II is a Michigan citizen, having an address at 1460 Glass Lake Circle, Oxford, Michigan 48371.  James E. Binson II is an owner and Manager of Binson's.

24.     Defendant Nicholas B. Binson is a Michigan citizen, having an address at 2191 South Lorenz Road, Tawas City, Michigan 48763.  Nicholas B. Binson is an owner and officer of Binson's.

25.     Defendant Robert A. Binson is a Michigan citizen, having an address at 7356 Voerner Avenue, Center Line, Michigan 48015.  Robert A. Binson is an owner of Binson's.

26.     Defendant Christopher F. Shaya is a Michigan citizen, having an address at 20838 Maybury Park Drive, Northville, Michigan 48167.  Christopher F. Shaya is an employee of J&B, was an owner and officer of Olympus, and is an owner and officer of Delta and Alpha.

27.     Defendant Fawzi B. Shaya is a Michigan citizen, having an address at 3066 Partridge Drive, Wixom, Michigan 48393.  Fawzi B. Shaya is part-owner, Director, and Chairman of J&B.

28.     Defendant Mary E. Shaya is a Michigan citizen, having an address at 3066 Partridge Drive, Wixom, Michigan 48393.  Mary E. Shaya is part-owner and President of J&B.

29.     Defendant Daniel Gladys is a Michigan citizen, having an address at 610 Caroline Street, Milford, Michigan 48381.  Gladys is an officer of Delta and the Director of Shipping and Logistics of J&B.

30.     Defendant Jeremiah Mankopf is a Michigan citizen, having an address at 342 West Grand River Avenue, East Lansing, Michigan 48823.  Mankopf was an owner and officer of Olympus.

31.     Defendants Pharmacy John Does 1–50 are retail pharmacies, their principals, and their employees that are involved in the conspiracy to commit insurance fraud and sell diverted Roche DME Strips but whose identities are presently unknown.

## JURISDICTION AND VENUE

32.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

33.     The amount of damages at issue exceeds $75,000, exclusive of interest and costs.

34.     The Court has personal jurisdiction over the Defendants because they regularly transact or have transacted business in the Southern District of Indiana by, for example, purchasing and selling Roche's blood glucose test strips and other products in the state of Indiana.

35. In addition, the Court has personal jurisdiction over the Defendants because the payments Defendants fraudulently and knowingly caused Roche to pay were made from the Southern District of Indiana.

36. Venue is proper in the Southern District of Indiana pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claim occurred in this district, and one or more of the Defendants is subject to personal jurisdiction in this district.

## FACTS COMMON TO ALL CLAIMS

### Roche's Blood Glucose Test Strips

37. Roche is one of the leading manufacturers of blood glucose test strips. Millions of people with diabetes depend on Roche's test strips to monitor their blood sugar. Diabetes patients use Roche's test strips by placing a drop of blood on a strip and inserting the strip into a meter, which provides a blood glucose reading.

38. Roche sells its blood glucose test strips in different packages sold through different distribution channels targeted to patients with different types of insurance coverage. There are two types of Roche blood glucose test strips relevant here: the test strips intended for retail sale ("Retail Strips") and test strips intended for sale by providers of durable medical equipment ("DME Strips"). Roche's Retail Strips are intended for sale at retail pharmacies. The Retail Strips may be sold to anyone, including people who do not have insurance and pay cash. However, over 90% of purchasers of Roche's Retail Strips use insurance, which reimburses the pharmacies under Pharmacy Plans.

39. Roche sells its Retail Strips to wholesalers for approximately $71 per 50-strip vial. The wholesalers sell the Retail Strips to retail pharmacies for about $75 per vial. When a Pharmacy Plan beneficiary purchases Roche Retail Strips, the patient's insurance plan

reimburses the pharmacy approximately $78 per 50-strip vial.  Under contracts with the insurers,

Roche pays rebates of about $50 for every 50-strip vial of Retail Strips that is reimbursed by a

Pharmacy Plan, so Roche's net revenue per vial of Retail Strips is substantially less than the $71

wholesale price.

40.     By contrast, Roche sells its DME Strips exclusively to mail-order distributors, all

of which are contractually obligated to sell only to DME beneficiaries or to other, specifically

approved DME distributors who will only sell to DME beneficiaries.  Insurers who cover test

strips under DME Plans include Medicare and "commercial" (non-Medicare) insurers.  Roche

sells its DME Strips to mail-order distributors for under $20 per 50-strip vial, and commercial

DME plans reimburse the mail-order distributors, on average, approximately $30 per 50-strip

vial.  Roche does not pay rebates to DME plans.

41.     Roche's DME mail-order distributors are contractually prohibited from selling the

DME Strips to Pharmacy Plan beneficiaries (or cash payers).  Because these contractual

provisions prevent DME Strips from being reimbursed by insurers that receive rebates from

Roche, Roche is able to sell DME Strips for a much lower price than Retail Strips.  These lower

prices are offered in return for and in reliance on the DME mail-order distributors' compliance

with the terms of their contracts with Roche, called "Product and Pricing Agreements."

42.     Each of Roche's test strip products has a different National Drug Code ("NDC")

printed on its package.  An NDC is a unique numerical identifier assigned by the U.S. Food and

Drug Administration, which regulates these devices.  As an example, one of Roche's most

widely used blood glucose test strip products is the Accu-Chek Aviva Plus, most commonly sold

in 50-strip vials.  The NDC for the DME version of this product is 65702-0436-10, while the

NDC for the retail version is 65702-0407-10.  The NDC is printed on each vial's package.

43.     The package for the DME version of Roche's Aviva Plus test strips features the following warnings, printed in easy-to-read, bolded black lettering on a yellow background: "Not for Sale in Retail Outlets" and "Exclusively for Mail Order Use."  These warnings are of course not printed on the package for the retail version of Aviva Plus test strips.

44.     When patients with insurance purchase Roche blood glucose test strips, sellers are paid by the patients' insurers instead of by the patients themselves.  To obtain payment, the seller must submit a reimbursement claim to the insurer.  When the patient is a DME Plan beneficiary, the seller is required to seek the appropriate DME reimbursement (around $30 per vial for non-Medicare plans).  When the patient is a Pharmacy Plan beneficiary, the seller is required to seek the appropriate Pharmacy Plan reimbursement (around $78 per vial).

45.     When the patient is a Pharmacy Plan beneficiary, the test strip seller must submit the product's NDC to the patient's insurance plan as part of the reimbursement claim.  This is necessary because Pharmacy Plans only cover specific pharmaceuticals and medical devices, listed by NDC, that are on the plan's formulary.  Products not listed on the Pharmacy Plan's formulary are not entitled to any reimbursement.[1]

46.     Because of the significant differences in how Retail Strips and DME Strips are sold and paid for, it is crucial for Roche's business that the test strips be sold only within their intended channels.  Diversion of DME Strips into the retail channel not only deprives Roche of retail sales, it also causes an out-of-pocket loss on each vial of DME Strips that is paid for

---

[1] No NDC is submitted in reimbursement claims for DME product.  This is because DME plans are "brand-agnostic," meaning that they provide the same reimbursement rate regardless of the brand the customer buys.  Instead of an NDC, the reimbursement claim includes a Healthcare Common Procedure Coding System code (an HCPCS or "Hix-Pix" code) that designates the type of equipment sold (*i.e.*, DME product), but (unlike an NDC) not the brand.  Of course, no legitimate company would submit retail product for reimbursement by a DME Plan, because the wholesale price of retail product (around $71) is substantially higher than the reimbursement rate offered by commercial DME Plans (around $30).

through a Pharmacy Plan, because the rebates Roche pays Pharmacy Plans (about $50 per vial) are higher than the price Roche receives for DME Strips (under $20 per vial).

47.     Because of this potential for harm, Roche and the insurance companies that pay for its blood glucose test strips have implemented systems that make it impossible for distributors to lawfully divert blood glucose test strips outside their intended channels.  The only way to do so is to violate a contractual obligation and/or commit fraud.

48.     Because reimbursement by a Pharmacy Plan requires that the seller submit a reimbursement claim with a valid retail NDC, it would be fraudulent for a test strip seller to obtain the $78 retail reimbursement rate by claiming reimbursement for Retail Strips (by submitting the retail NDC), when DME Strips are in fact being sold.

49.     It would also be fraudulent, as well as a breach of contract, for a DME distributor to inform Roche it was distributing to DME beneficiaries when it was in fact selling to pharmacies or pharmacy suppliers.

50.     Unfortunately, Defendants and their business partners have engaged in these acts of fraud and breach of contract.

**Roche's Agreement With Binson's/Northwood**

51.     On February 10, 2011, Roche entered into a Product and Pricing Agreement (the "Agreement") with Defendant Binson's, which contracted on behalf of itself and its subsidiary, Defendant Northwood.[2]  The Agreement was amended on February 10, 2011, July 1, 2013, October 1, 2013, February 1, 2014, and July 21, 2014.  The Agreement and its amendments permitted Binson's and Northwood to purchase DME Strips from Roche and to distribute them,

---

[2] Because Binson's contracted on behalf of Northwood, and because Defendant Fasse, Executive Vice President and Chief Operating Officer of Binson's and President of Northwood, signed the contract for Binson's "and its subsidiary" Northwood, Binson's is liable for any breach of the contract committed by Northwood.

either on their own or through certain designated "Durable Medical Equipment Providers," to DME beneficiaries only.  The contractually designated "Durable Medical Equipment Providers" included Binson's and Northwood themselves as well as certain specified affiliates of Binson's and Northwood.

52.     In exchange for Binson's and Northwood's agreement to sell Roche DME Strips to DME beneficiaries only, Roche provided a low price to Binson's and Northwood.  Roche provided Binson's and Northwood with net prices (after rebates) of between $5 and $17 per 50-strip vial.

53.     The price at which Binson's and Northwood could purchase Roche DME Strips varied with each contractual amendment and depended on Binson's and Northwood's prospective volume commitments and Roche's market share of the total sales made by Binson's, Northwood, and the other designated "Durable Medical Equipment Providers" to DME beneficiaries.  The higher Roche's market share, the higher the rebate Roche agreed to pay Binson's and Northwood per vial.

54.     Roche required Binson's and Northwood to submit two types of reports to receive their rebates: Market Share Reports and Utilization Reports (also referred to as "sales tracings"). Market Share Reports stated Roche's market share in the previous month or quarter.  The more fine-grained Utilization Reports included data on each individual sale of Roche DME Strips by Binson's, Northwood, and the other "Durable Medical Equipment Providers" to individual DME beneficiaries.  These Utilization Reports included individual patients' prescription numbers and dates of sale.  Utilization Reports verified that Binson's and Northwood's customers were in fact DME beneficiaries.

55.     Roche required Binson's and Northwood to submit Utilization Reports regarding individual sales to DME beneficiaries in part to corroborate the information in the Market Share Reports.

56.     From 2011 until July 2014, Binson's and Northwood maintained a steady business in Roche DME Strips, with average sales of approximately 5,000–10,000 vials per month.  During this time, Binson's and Northwood submitted Market Share Reports and Utilization Reports showing their sales were to DME beneficiaries.

**Roche Uncovers Northwood's Diversion**

57.     In July 2014, however, when Binson's and Northwood renegotiated the Agreement with Roche, the Binson's Defendants fraudulently induced Roche to sell DME Strips directly to Northwood (rather than through Binson's, as before) at a flat discounted price without the need for rebate claims.  The Binson's Defendants negotiated these changes so that they could divert DME Strips to third parties as part of a fraudulent scheme to arbitrage the price and reimbursement differences between DME Strips and Retail Strips.

58.     Before July 2014, most of the patients who purchased Roche DME Strips from Binson's were Medicare recipients.  However, Defendants Fasse and Dickstein repeatedly told Roche employees that Northwood had a large base of customers covered by "commercial" (*i.e.*, non-Medicare) DME plans.

59.     During a November 7, 2013 in-person meeting and a December 23, 2013 conference call, Noelle Adams, the Roche sales manager for the Binson's and Northwood account, and her supervisor, Colleen Miller, spoke with Fasse and Dickstein.  During these conversations, Dickstein told Adams and Miller that Northwood had access to a large group of commercial DME patients.

60.     During the November and December 2013 conversations and subsequently, including in conference calls on June 24 and July 14, 2014, Fasse and Dickstein told Adams and Miller that if Roche agreed to amend the Agreement so that Northwood could purchase DME Strips from Roche at a discounted flat rate—without having to submit for rebates—Northwood would sell Roche DME Strips to its customer base of commercial DME beneficiaries.  In reliance on Fasse and Dickstein's representations, Roche agreed.

61.     These conversations led to the July 21, 2014 amendment to the Agreement. During these conversations, neither Fasse, Dickstein, nor anyone else ever told any employee or representative of Roche that Northwood intended to sell Roche DME Strips to anyone besides individual DME beneficiaries.

62.     The July 2014 amendment permitted Northwood to purchase DME Strips from Roche at a discounted flat rate of $10.67 per 50-strip vial without submitting rebate claims.  As before, Northwood was contractually required to sell the DME Strips to DME beneficiaries, either directly or through the specific Northwood-affiliated "Durable Medical Equipment Providers" expressly identified in the Agreement.

63.     After the July 2014 amendment, Northwood's sales rose dramatically, growing from around 16,000 50-strip vials in July 2014 to almost 100,000 vials in January 2015. Northwood's sales averaged well over 100,000 vials per month throughout the first three quarters of 2015.

64.     After the July 2014 Amendment, Binson's and Northwood stopped providing Utilization Reports, which would have helped Roche verify they were selling DME Strips only to individual DME beneficiaries and not to third-party companies.

65.     After Binson's and Northwood submitted their Market Share Report for the third quarter of 2014, which showed that Northwood had sold over 100,000 50-strip vials that quarter, Roche sales manager Noelle Adams contacted Dickstein by telephone to ask him where Northwood's volume was coming from.  Dickstein falsely told Adams that Northwood was selling Roche's DME Strips to Northwood's customer base of DME beneficiaries, many of whom had previously purchased LifeScan test strips, a competitor of Roche's.  This was false; in fact, Northwood's sales of LifeScan test strips had increased.

66.     On multiple other occasions, Adams asked Fasse and Dickstein to explain how Northwood had achieved the rapid growth in sales of Roche's DME Strips.  Fasse and Dickstein repeatedly told Adams that Northwood was selling Roche's DME Strips to DME beneficiaries. Fasse and Dickstein claimed that some of the Roche DME Strips were being sold to pre-existing Northwood customers who had previously used different test strip brands and that Northwood had also obtained new DME beneficiary customers.

67.     Before October 2015, neither Fasse, Dickstein, nor any other employee or representative of Binson's or Northwood ever told any employee or representative of Roche that Northwood was selling Roche's DME Strips to third-party companies.

68.     Although the growth in Northwood's sales of Roche's DME Strips was fast, Roche personnel initially believed it was legitimate.  Given that diabetes patients often use about three vials of blood glucose test strips per month, Northwood's sales of about 100,000 vials per month meant that it was selling Roche's DME Strips to a customer base of approximately 30,000 people—a plausible number given that over 750,000 adults with diabetes live in Michigan.

69.     Nevertheless, because Northwood had so quickly begun to outperform other DME distributors Roche worked with, Roche decided to test the integrity of Northwood's sales figures.

-15-

In the spring and summer of 2015, Roche retained private investigators to attempt to purchase Roche DME Strips for cash at Binson's brick-and-mortar locations in Michigan and Florida. Given that the same people ran and worked for Binson's and Northwood, any misconduct on Binson's part would also cast suspicion on Northwood.

70.     The private investigators were able to make several cash buys without problems. Indeed, Roche's DME Strips were prominently displayed for sale at Binson's stores. As noted above, the packaging for Roche's DME Strips conspicuously warned that it was "Not for Sale in Retail Outlets" and "Exclusively for Mail Order Use."

71.     The ease with which the investigators were able to make cash purchases from Binson's triggered Roche's suspicions as to both Binson's and Northwood. In or about June or July 2015, Adams requested that Binson's and Northwood provide Roche with Utilization Reports showing each individual sale of Roche DME Strips by Binson's and Northwood and including unique numerical patient identifiers. When the Binson's Defendants dragged their feet, Adams repeated her request for Utilization Reports several times through July, August, and September of 2015.

72.     Finally, on September 11, 2015, Binson's sent an initial set of Utilization Reports for its own sales, covering January through July 2015. However, Northwood, which had far more sales than Binson's, did not produce Utilization Reports. When Adams asked when Roche could expect the Northwood Utilization Reports, Dickstein claimed that Northwood was "working on it" and would provide the reports in a "few weeks" but that it would not be possible to do so sooner due to the high volume of Northwood's sales and technical difficulties.

73.     Ultimately, Roche could not wait any longer.  On September 24, 2015, Roche cut off all shipments of Roche DME Strips to Binson's and Northwood until they could demonstrate their sales were legitimate.

74.     The same day, Roche's head of sales, Dan Majestic, contacted Northwood by telephone and told Defendants Fasse and Dickstein that Roche would not resume shipments unless Northwood provided the requested sales Utilization Reports.  Majestic also told Fasse and Dickstein that Roche knew that Binson's was selling Roche DME Strips for cash and asked Fasse and Dickstein to explain Northwood's high sales volumes.

75.     Dickstein claimed that Northwood had been selling Roche DME Strips to between 15 and 25 companies in Florida instead of to individual DME beneficiaries as the Agreement required.  This was false.  As alleged below, Northwood had been selling Roche's DME Strips to a single company (first Defendant Olympus, and later Defendant Delta).  Dickstein also falsely claimed that the supposed Florida companies were legitimate DME providers that sold to individual DME beneficiaries.

76.     Dickstein refused to identify to Majestic the Florida DME providers that were supposedly selling Roche's product.

77.     Dickstein's September 2015 communication with Majestic was the first time any employee or representative of Roche had ever been told that Northwood was selling or intended to sell Roche test strips to a third party instead of directly to DME beneficiaries, as required by the Agreement.

78.     On September 28, 2015, Roche's then Senior Counsel, Julie Dilts, sent Fasse a cease-and-desist letter, formally notifying Binson's and Northwood that they had violated the Agreement.  Roche demanded that within ten days, Binson's and Northwood provide Utilization

Reports for January through September 2015, a list of all individuals and entities Binson's and

Northwood had sold Roche's product to in violation of the Agreement since February 2011, and

an explanation for Northwood's explosive sales growth.

79.     On October 6, 2015, Fasse sent Dilts an email acknowledging that Binson's had

been selling Roche DME Strips for cash at its retail locations.  Fasse claimed, falsely, that

"[m]anagement was unaware of this problem prior to receiving your letter."  He wrote that "[a]ll

retail locations have removed mail order packaged products from retail sales areas" and that

"[c]ash sales of the products have been terminated including on the website.  All personnel in the

retail areas of each location and patient contact centers have been informed that the products are

not available for cash sale . . . .  Our information technology group will be deactivating these

SKU's from the point of sales system for cash transactions."[3]

80.     Fasse attached a spreadsheet to his October 6, 2015 email that he claimed was a

"complete list of all retail cash sales of [Roche] Products sold for the period February 2011 -

present."  The spreadsheet shows Binson's sold 2,557 vials of Roche DME Strips for cash

between February 2, 2011 and September 28, 2015.

81.     On October 7, 2015, Fasse sent Dilts an email attaching Binson's—but not

Northwood—Utilization Reports for January to September 2015.  Fasse claimed "Northwood

[was] unable to obtain and compile similar information.  We did not collected [sic] patient

transaction data from providers for the products supplied to patients."

82.     In his October 7 email to Dilts, Fasse admitted that Northwood had been selling

Roche DME Strips to a third party since July 2014.  Fasse re-asserted the false claim that

---

[3] "SKU" stands for "stock keeping unit," a code used to identify different products.

Northwood had sold the Roche DME Strips to various "DME providers," which in turn sold the DME Strips to individual DME beneficiaries.

**Roche Uncovers the Rest of Defendants' Fraudulent Scheme**

83.     Since October 2015, Roche has been able to uncover additional detail about Defendants' fraudulent scheme to divert Roche DME Strips and arbitrage the price and reimbursement differences between Roche's DME and Retail Strips.

84.     In or about May 2014, Defendants Fasse and Dickstein, on behalf of all the Binson's Defendants, began discussions with Defendants Chris Shaya and Mankopf regarding a plan to profit from the diversion of Roche's DME Strips.

85.     As the Binson's Defendants knew, Chris Shaya was employed by Defendant J&B, and Chris Shaya's family members owned and controlled J&B.

86.     In 2008, J&B entered into a contract with Roche under which Roche agreed to sell J&B discounted DME Strips on the condition that J&B sell the strips exclusively to members of the Blue Cross Network of Michigan ("Blue Cross"), either directly or through specified providers.  In other words, J&B's contract with Roche was substantively similar to the Agreement between Roche and Binson's/Northwood.  In 2010, after Roche learned that J&B had diverted Roche DME Strips to non-Blue Cross patients, Roche terminated its contract with J&B and cut off its supply of Roche DME Strips.

87.     On information and belief, the J&B Defendants had been looking for a way to purchase Roche DME Strips ever since.  On information and belief, in pursuit of that goal, J&B, Chris Shaya and Mankopf, with the knowledge and assistance of the other J&B Defendants, created Defendant Olympus, a shell company co-owned and managed, at least on paper, by Chris Shaya and Mankopf.

88.     In discussions between May and July 2014, Chris Shaya and Mankopf told Fasse and Dickstein that they could sell large volumes of Roche DME Strips to Medical Supply Solutions, Inc. ("MSSI"), a Florida medical supplies distributor and known diverter.  Fasse and Dickstein agreed to sell DME Strips obtained from Roche to Olympus, which would in turn sell them to MSSI.

89.     The Binson's Defendants and the J&B Defendants knew that Roche would never permit Binson's or Northwood to sell its DME Strips to third parties like Olympus or MSSI.  The Binson's Defendants and the J&B Defendants all knew that it would be easier to carry out this scheme if Northwood could purchase DME Strips at a flat, discounted price without the need to request rebates for their fraudulent sales.

90.     Once the Binson's Defendants extracted this concession from Roche in the July 2014 contract amendment, Fasse and Dickstein told Chris Shaya and Mankopf that Northwood would sell the Roche DME Strips to Olympus (and later Delta), with the understanding that they would then be sold to MSSI.

91.     Both the Binson's Defendants and the J&B Defendants understood and intended that the DME Strips would eventually be sold to pharmacies, which would in turn sell the DME Strips to pharmacy beneficiaries utilizing the Retail Strip NDC to obtain pharmacy reimbursements.  Indeed, the whole point of this diversion scheme was to profit from the wide spread between the discounted flat rate at which Northwood obtained DME Strips from Roche ($10.67 per vial) and the $78 insurance reimbursements pharmacies could obtain by falsely claiming they were selling Retail Strips.  No intermediary would otherwise have purchased the marked-up DME Strips, because they could have bought them more cheaply from Roche itself

by agreeing to contractual restrictions and checks (*e.g.*, Utilization Reports and audit rights) to ensure the DME Strips were not sold to pharmacy beneficiaries.

92.     If the Binson's Defendants believed the Roche DME Strips were being sold to legitimate DME providers, they would have told Roche.  The Agreement allowed for Binson's and Northwood to sell DME Strips to Roche-approved "Durable Medical Equipment Providers," which would in turn sell to DME beneficiaries.  Because Roche's objective in doing business with Binson's and Northwood was to increase its DME sales, it would have been receptive to obtaining new DME distributors through Binson's and Northwood.  But the Binson's Defendants hid from Roche that Northwood was selling DME Strips to Olympus/Delta (and therefore J&B), because the Binson's Defendants did not intend to legitimately sell Roche's DME Strips, they intended to defraud Roche.

93.     Between July 21, 2014 (when Binson's/Northwood amended its contract with Roche) and September 24, 2015 (when Roche terminated sales to Binson's/Northwood), Northwood sold approximately 1,526,688 50-strip vials of Roche DME Strips to Olympus and Defendant Delta, another shell company set up by the J&B Defendants.  Northwood sold the 50-strip vials at a markup of approximately $2 per vial, profiting by over $3 million.

**The J&B Defendants Divert Roche DME Strips to MSSI**

94.     The J&B Defendants assisted the Binson's Defendants in defrauding Roche, including by encouraging them to fraudulently induce Roche into amending the Agreement to permit Northwood to purchase DME Strips at a flat discounted rate, by encouraging the Binson's Defendants to fraudulently state they were selling to DME beneficiaries in Florida, and by providing names of Florida insurers for the Binson's Defendants to provide to Roche as "proof" they were selling the DME Strips to DME beneficiaries.  The J&B Defendants, through

Defendants Olympus and Delta, purchased approximately 1,526,688 50-strip vials of Roche

DME Strips.  Then, through Defendants Olympus and Alpha,[4] the J&B Defendants sold all of

these DME Strips to MSSI.  The J&B Defendants sold Roche DME Strips to MSSI for prices

ranging from $15.59 to $20.75 per vial, a substantial markup on the approximately $12.67 the

J&B Defendants paid for them. On information and belief, the J&B Defendants made a total

profit of more than $8 million by selling Roche's DME Strips to MSSI.

**MSSI Resells the diverted Roche DME Strips**

95.     MSSI, in turn, sold the Roche DME Strips to the following entities:

S.P. Distributors; NE-Medical Supply USA, Inc.; Trusted Medical Supply; Masters

Pharmaceutical Inc.; H&H Wholesale Services Inc.; Costal Medical Group, LLC; Acute

Management Group; ADW Diabetes LLC; Universal Health Alliance Corp.; Sterling

Distributors; MedPlus, Inc.; Dream Cereal; Value Wholesale Inc.; Brookport Inc.; Coastal

Medical Group; and MEDxSURG.  The largest purchaser, S.P. Distributors, paid MSSI

$18.9 million for Roche DME Strips diverted by the Binson's Defendants and J&B Defendants.

96.     MSSI made a total profit of at least $6.9 million selling Roche DME Strips

diverted by the Binson's Defendants and J&B Defendants.  MSSI's purchasers paid prices

ranging from approximately $18 to approximately $43 per 50-strip vial of Roche DME Strips.

These purchasers could have purchased the same test strips more cheaply from Roche, but they

would have been contractually required to sell it to DME beneficiaries and would be subject to

controls (*e.g.*, Utilization Reports or audit rights) to confirm that they did so.  But these prices

were markedly cheaper than what the purchasers would have to pay to obtain Roche Retail

---

[4] Initially, Olympus both purchased the DME Strips from Northwood and sold them to MSSI.  Later,
Olympus made the purchases from Northwood, and Alpha made the sales to MSSI.  As described below,
Delta later replaced Olympus in making purchases from Northwood, while Alpha continued to make sales
to MSSI.

Strips.  MSSI's purchasers, like the Binson's Defendants, J&B Defendants, and MSSI, intended to profit by diverting Roche DME Strips to retail pharmacies, which would obtain a $78 insurance reimbursement for each 50-strip vial by committing insurance fraud.

**The Binson's Defendants' Fraudulent Statements and Material Omissions**

97.     The Binson's Defendants made, caused to be made, and conspired to make numerous false statements.  Roche reasonably relied on these statements, either directly or indirectly, and was damaged as a result.

98.     In the months leading up to the July 2014 amendment to the Agreement, and several times thereafter, Fasse and Dickstein told Roche employees, including Noelle Adams and Colleen Miller, that Northwood would sell Roche's DME Strips exclusively to individual DME beneficiaries (either directly or through the specific "Durable Medical Equipment Providers" named in the contract).  In fact, before July 2014, Fasse and Dickstein were negotiating the deal whereby Northwood would divert Roche's DME Strips to MSSI through Olympus and J&B. And after July 2014, Northwood engaged in that diversion on a huge scale.

99.     In July 2014, Dickstein sent Roche a list of insurance plans he falsely claimed were going to cover the Roche DME Strips Northwood was going to sell to individual DME beneficiaries.  In fact, Dickstein and the other Binson's Defendants had no idea what plans or insurance companies would be covering the strips that were diverted to MSSI, only to be sold to unknown pharmacies and then to unknown retail beneficiaries.

100.    After the July 2014 amendment, Northwood provided Roche with falsified Market Share Reports.  Binson's and Northwood submitted Market Share Reports indicating the number of Roche 50-strip vials Northwood sold and the number of prescriptions Northwood filled with these sales.  In light of the contractual requirement that Northwood sell directly to

DME beneficiaries, along with Fasse and Dickstein's representations that Northwood was doing so, Roche reasonably and foreseeably understood the Market Share Reports to represent that Northwood was indeed selling Roche's DME Strips directly to individual DME beneficiaries. In fact, Northwood was diverting Roche's DME Strips and had no idea how many prescriptions the DME Strips would ultimately fill.

101.    Fasse asserted in his October 6, 2015 email to Julie Dilts that he and the other members of Binson's management were unaware of cash sales of Roche DME Strips at Binson's brick-and-mortar locations. Fasse stated that Roche's DME Strips had been removed from all Binson's retail locations and its website and that the product-identification code ("SKU") for Roche's DME product had been "deactivat[ed]" from Binson's sales system.

102.    In other words, until Roche complained, Binson's had sold Roche DME Strips for cash at *all* of its retail locations and online, and had entered the Roche DME Strip SKU into its sales system. None of those things could have happened without the knowledge and assent of Binson's management. The failure of Fasse or any other Binson's employee or representative to inform Roche of the cash sales constituted a material omission.

103.    In providing discounts and rebates to Binson's and Northwood, Roche relied on the Binson's Defendants' false claims that Binson's and Northwood were distributing Roche's DME Strips exclusively to DME beneficiaries. Roche also relied on those false assurances in entering into the Agreement and the amendments thereto and in not cancelling those agreements or stopping sales to Binson's and Northwood until September 2015.

104.    Until investigators working for Roche purchased Roche DME Strips for cash from Binson's brick-and-mortar locations, Roche had no reason to suspect that cash sales were happening. And until Fasse and Dickstein admitted to Majestic, on September 24, 2015, that

Northwood was diverting Roche DME Strips, Roche had no reason to suspect that Northwood was doing anything other than selling Roche's DME Strips to individual DME beneficiaries.

105.    Roche had done business with Binson's for more than fifteen years without any indication that Binson's or its affiliates were not legitimate DME distributors.  Indeed, Binson's is well known in Michigan and had a reputation for honest business practices.  Until Roche discovered Defendants' misconduct, it had no reason to believe that this reputation was undeserved.

**Acts of Fraud By All Defendants**

106.    The reimbursement claims made by the pharmacies that sold the diverted Roche DME Strips to pharmacy beneficiaries were false.  In order to profit from the $78 Pharmacy Plan reimbursement, these pharmacies had to falsely input the Retail Strips NDC in their insurance reimbursement claims.  The goal of Defendants' fraudulent scheme was to profit from these false reimbursement claims.  On information and belief, all Defendants knew and intended that such false reimbursement claims would be made.

107.    The false reimbursement claims were made directly to the Pharmacy Plans. However, Roche relied on them, and Defendants knew that Roche would rely on them.  As alleged above, Roche pays large rebates to Pharmacy Plans based on the number of Retail Strip vials reimbursed by the Pharmacy Plans.  By filing false reimbursement claims, Defendants and their co-conspirators caused the Pharmacy Plans to report false retail sales to Roche and thereby caused Roche to pay unwarranted rebates to the Pharmacy Plans.

108.    It is well known throughout the blood glucose test strip industry that manufacturers, including Roche, pay rebates to Pharmacy Plans.  As experienced players in the industry, Defendants knew that the false reimbursement claims submitted by pharmacies would

be transmitted to Roche via the Pharmacy Plans' rebate claims and would be relied on by Roche

to its detriment.  Participants in the industry understand that nothing other than these rebates

could explain the willingness of insurance companies to pay the high pharmacy benefit

reimbursements instead of insisting on only covering blood glucose test strips under a DME

benefit.  As is also widely known throughout the industry, manufacturers' payments of such

rebates to Pharmacy Plans are required and ministerial (*i.e.*, not discretionary) when Pharmacy

Plans cover blood glucose test strips on behalf of pharmacy beneficiaries.

109.    Until September 2015, Roche had no reason to suspect that rebate claims made by

Pharmacy Plans were based on false information provided by Defendants and their co-

conspirators.

**The Individual Defendants' Involvement in the Fraudulent Scheme**

110.    On information and belief, the individual Binson's Defendants and J&B

Defendants were personally involved in the fraudulent scheme described above.

111.    Fasse is President of Northwood and Executive Vice President and Chief

Operating Officer of Binson's.  Along with Dickstein, he was also a main contact with Roche.

Fasse signed the Agreement and all of its amendments.  He approved of Binson's cash sales of

Roche's DME Strips and personally negotiated with Olympus, Delta, Alpha, Chris Shaya, and

J&B to divert Roche's DME Strips to MSSI and ultimately to retail pharmacies.  Fasse made

numerous false statements to Roche, as detailed above.

112.    Dickstein is a Director of Northwood and, along with Fasse, was a main contact

with Roche.  Dickstein made numerous false statements to Roche, as detailed above.  Dickstein

sent Roche the fraudulent Binson's and Northwood Market Share Reports.  Dickstein negotiated

with Olympus, Delta, Alpha, Chris Shaya, and J&B to divert Roche's DME Strips to MSSI and ultimately to retail pharmacies.

113.    The Binson Family owns and runs Binson's, which owns Northwood.  On information and belief, as such, the members of the Binson Family were personally involved in running both companies and knowingly approved of Binson's cash sales of Roche's DME Strips and Northwood's diversion.

114.    On information and belief, none of the individual Binson's Defendants could have missed Northwood's diversion of Roche's DME Strips.  In total, Northwood sold 1.5 million vials of diverted Roche DME Strips through Olympus and Delta to retail pharmacies that committed insurance fraud.  The Binson's Defendants made a profit of at least $3 million.  These profits were highly material to the Binson's Defendants' business and were obvious to management and ownership.

115.    When the diversion began in the third quarter of 2014, Roche's market share of Binson's and Northwood's combined sales of blood glucose test strips (*i.e.*, from all manufacturers) was between 60 and 75%.  Of those, at least 85% were made up by the sales Northwood was making to Olympus.  In other words, Northwood's diversion of Roche DME Strips comprised the majority of Binson's and Northwood *total* sales of all test strip brands.

116.    Selling blood glucose test strips was one of the most profitable parts of both Binson's and Northwood's businesses.  On information and belief, the individuals who ran and owned those companies—Fasse, Dickstein, and the Binson Family—must have known about Northwood's diversion, given how important it was to their business.

**The J&B Defendants' Role in the Scheme**

117.    On information and belief, the individual J&B Defendants (Mankopf, Gladys, and the Shayas) intentionally participated in a scheme to purchase Roche DME Strips that they knew were intended and packaged for DME beneficiaries and divert them to retail pharmacies, which would commit insurance fraud in order to profit from the $78 Pharmacy Plan reimbursement. They were the owners and managers of J&B, Olympus, Delta, and/or Alpha, the shell companies J&B created for the purpose of engaging in the diversion scheme.  As such, they were fully aware of and acted to support the scheme.

118.    Defendant Chris Shaya has been continuously employed by J&B since at least 2009 and was an agent and employee of J&B at the time of the acts alleged herein.  He is the son of Defendants Fawzi and Mary Shaya.  As detailed above, Chris Shaya was intimately involved in the fraudulent scheme alleged here.

119.    Defendant Daniel Gladys was and is J&B's Director of Purchasing, Shipping, and Logistics.  He was an employee and agent of J&B at the time of the acts alleged herein.  As detailed above, Gladys was intimately involved in the fraudulent scheme alleged here.

120.    Defendant J&B was founded by Fawzi and Mary Shaya, who continue to own and hold executive positions at J&B.  J&B is a family business run by the Shaya family.  Fawzi B. Shaya is a part-owner, Director, and the Chairman of J&B.  Mary E. Shaya is a part-owner and the President of J&B.

121.    On information and belief, Chris Shaya and Gladys participated in the fraudulent diversion scheme described above with the knowledge, assistance, and resources of J&B and its owners, Fawzi and Mary Shaya.

122.     MSSI, the entity to whom Chris Shaya and Gladys sold diverted test strips through their shell companies Olympus and Alpha, was introduced to them through J&B.  Before purchasing Roche DME Strips from Olympus and Alpha, MSSI had been a J&B customer.  Chris Shaya was MSSI's contact at J&B.

123.     When Roche conducted an audit to investigate J&B's diversion of DME Strips, Chris Shaya was one of the auditors' primary contacts.  As such, Chris Shaya's knowledge of Roche's contracts concerning the sale of DME Strips comes from his work on behalf of J&B.

124.     During the course of carrying out the fraudulent scheme described herein, Chris Shaya took steps to cut out an outside partner and replace him with J&B insiders.  Defendant Olympus was established as a Michigan limited liability company on March 12, 2013.  Chris Shaya and Mankopf were its members and officers.  From about July 2014 until about January 2015, Olympus was Northwood's sole purchaser of Roche DME test strips, all of which it sold to MSSI.

125.     Defendant Delta was established as a Michigan limited liability company on January 16, 2015 (originally registered as Invicta LLC).  Chris Shaya and Daniel Gladys are Delta's owners and officers.  From about January 2015 to the termination of Northwood's Roche Agreement in September 2015, Delta was Northwood's sole purchaser of Roche DME Strips, which were sold to MSSI through Alpha.

126.     On information and belief, Olympus was dissolved and Delta established because J&B and the Shayas desired to cut Mankopf out of the diversion scheme to keep the profits for themselves.

127.     J&B was sued for Medicare fraud in 2008.  In 2014, J&B was implicated in a corruption scheme involving Michigan Governor Rick Snyder.  As stated above, Roche

terminated sales of DME Strips to J&B in 2010 after J&B diverted Roche's DME Strips in breach of its contract with Roche.

128.     After learning that J&B employees Chris Shaya and Gladys had orchestrated an illegal scheme to divert Roche DME Strips to a J&B customer (MSSI), Roche informed J&B, Fawzi Shaya, and Mary Shaya.  They denied participating in the scheme and asserted that Chris Shaya had not acted on their behalf.  However, J&B and Fawzi and Mary Shaya have rejected repeated requests from Roche to substantiate these assertions.  On information and belief, these assertions are not true.

129.     On information and belief, Chris Shaya and Gladys lack the financial resources to execute multimillion dollar transactions such as those at issue here without outside financing. On information and belief, Chris Shaya and Gladys obtained this financing from, or with the assistance of, J&B and Fawzi and Mary Shaya.

130.     Despite being informed that Chris Shaya and Gladys participated in a multimillion dollar fraud in concert with a J&B customer (MSSI), J&B and Fawzi and Mary Shaya have not terminated Chris Shaya or Gladys's employment or taken any disciplinary action against them.  Rather, both Chris Shaya and Gladys continue to be employees in good standing of J&B.  This is inconsistent with the conclusion that Chris Shaya and Gladys acted without the participation of the other J&B Defendants.

131.     On information and belief, J&B and Fawzi and Mary Shaya, as the employers of Chris Shaya and Gladys (and the parents of Chris), have the ability to direct Chris Shaya and Gladys to provide Roche information pertinent to the allegations herein.  If information existed that would substantiate their assertion that they were uninvolved in the actions taken by their

employees and customers—for example, information about where Chris Shaya and Gladys obtained financing—J&B and Fawzi and Mary Shaya would have provided it to Roche.

132.    Roche has repeatedly requested that J&B and Fawzi and Mary Shaya provide documentary evidence showing that Chris Shaya and Gladys acted without their participation. Roche told J&B and Fawzi and Mary Shaya of its belief that given the close ties between Chris Shaya and Gladys and J&B, Roche found their unsubstantiated assertion that they were uninvolved to be unbelievable.

133.    In response, J&B and Fawzi and Mary Shaya have refused to provide any evidence or provide any assurance to Roche that their employees acted without their participation.  On information and belief, J&B and Fawzi and Mary Shaya have refused to provide this evidence because no such evidence exists; they participated in the scheme alleged herein.

**Binson's and Northwood Breached the Agreement**

134.    The Agreement required Binson's and Northwood to distribute Roche's DME Strips either to individual DME beneficiaries or to certain identified affiliates of Binson's and Northwood (the "Durable Medical Equipment Providers"), which would distribute the product to individual DME beneficiaries.  (Agreement § 6.6; *see also id.*, "Whereas" clauses, §§ 1.7–1.8, 1.19, 2.5.)[5]

135.    Specifically, the Agreement and its amendments contemplated that Binson's and Northwood (or the enumerated Durable Medical Equipment Providers) would sell Roche DME

---

[5] Binson's/Northwood needed Roche's "prior approval" for a new provider to be permitted to sell Roche product under the Agreement, and the provider was required to afford Roche audit rights.  (Agreement § 1.19.) Binson's/Northwood could add additional "Participating Durable Medical Equipment Providers . . . by providing [Roche] with written notice" of proposed additions, to which Roche had 60 days to object.  (*Id.* ¶ 2.5(a).)  As these provisions make clear, it is extremely important to Roche to control its distribution channels to prevent the type of diversion that happened here.

Strips to "Eligible Members," that is, DME beneficiaries of certain insurance companies. (*Id.*) The contract unambiguously prohibited Binson's, Northwood, and the other Durable Medical Equipment Providers from selling Roche product "to entities or persons not specifically contemplated by this Agreement." (*Id.* § 6.6.)

136.   Binson's and Northwood violated section 6.6 of the Agreement by selling Roche DME Strips to cash payers and to Olympus/Delta, the shell companies formed by the J&B Defendants in order to divert Roche's product.

137.   The Agreement also prohibited Binson's or Northwood from distributing Roche DME Strips "in any manner that might expose [Roche] to financial risk via duplicate discounting." (*Id.* § 5.10 (as amended by §2.7 of the July 1, 2013 Amendment).) By diverting Roche's DME Strips to pharmacy beneficiaries, Northwood caused Roche to pay rebates to Pharmacy Plans. This amounted to "duplicate discounting," since Roche had already given Northwood a steep discount on the same DME Strips.

**Damages Caused by Defendants' Fraudulent Scheme**

138.   Between July 2014 (when Northwood began diverting Roche DME Strips) and September 2015 (when Roche cut off sales to Binson's and Northwood), Roche sold Northwood 1,526,688 50-strip and 51-strip vials of DME Strips. Northwood diverted all of those vials.

139.   The DME Strips that Defendants conspired to divert was passed off as Retail Strips and sold to pharmacy beneficiaries. These patients intended to buy, and believed they were buying, Roche's Retail Strips.

140.   Had Roche known that its heavily discounted DME Strips would be diverted for retail sale, it would not have sold them to Northwood. The retail beneficiaries who ultimately purchased the diverted DME Strips would have instead purchased Retail Strips. Each sale of

diverted DME Strips would have therefore been replaced by a sale of Retail Strips absent Defendants' fraud.

141.    Roche is therefore entitled to damages in the amount of the difference between the price for which it sold the diverted DME Strips to Northwood ($10.67 per vial) and the price it would have received for the Retail Strips the patients would otherwise have purchased (about $65 per vial in 2014 and about $71 per vial in 2015).  This amounts to no less than $89 million.

## FIRST CLAIM FOR RELIEF

### Fraudulent Inducement
### (Against the Binson's Defendants)

142.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 141 above as if set forth fully herein.

143.    As alleged above, the Binson's Defendants intentionally made or caused to be made knowingly false representations to Roche in order to induce Roche to enter into the July 2014 amendment to the Agreement.

144.    Namely, before July 2014, the Binson's Defendants made or caused to be made statements to Roche that Binson's and Northwood were only distributing Roche DME Strips to individual DME beneficiaries (either directly or through the approved Durable Medical Equipment Providers) and would continue to do so after the amendment, when in fact Binson's and Northwood intended, along with the J&B Defendants, to divert Roche's DME Strips to third parties, ultimately to be sold to pharmacy beneficiaries.

145.    Before July 2014, the Binson's Defendants falsely informed Roche it had a large base of DME beneficiaries who would purchase Roche DME Strips if Roche eliminated the need for Northwood to submit rebate requests.  In fact, the Binson's Defendants intended to divert

Roche's DME Strips to retail pharmacies for sale to retail beneficiaries, and they needed to eliminate the rebates to mask their fraud and contract breaches from Roche.

146.     The Binson's Defendants made or caused to be made these false representations and material omissions with the intent of defrauding Roche.  Specifically, Defendants made or caused to be made these false representations and material omissions (i) to continue to be able to purchase Roche DME Strips, (ii) to continue to receive substantial discounts from Roche, (iii) to eliminate the need for Northwood to submit rebate requests, allowing them to commit fraud and contractual breaches undetected by Roche, and (iv) to profit from retail pharmacies' insurance fraud by selling Roche DME Strips at a markup no buyer would pay but for the intended insurance fraud.

147.     The Binson's Defendants intended that Roche would rely on their false representations and material omissions and, as a result, would enter into the July 2014 amendment to the Agreement.

148.     Defendants never informed Roche or the Pharmacy Plans of the scheme to obtain Roche DME Strips and divert them to cash payers and pharmacy beneficiaries, and Roche was unaware of the scheme.  Roche justifiably relied on the Binson's Defendants' misrepresentations and material omissions and was unaware of the Binson's Defendants' fraud.

149.     Had Roche known the true facts regarding the Binson's Defendants' fraud, it would not have entered into the July 2014 amendment to the Agreement.

150.     As a result of Defendants' conduct, Roche was injured in an amount not less than $89 million.

## SECOND CLAIM FOR RELIEF

### Fraud
### (Against all Defendants)

151.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 141 above as if set forth fully herein.

152.    As alleged above, Defendants intentionally made or caused to be made knowingly false representations to Roche and the Pharmacy Plans that covered the diverted Roche DME Strips and intentionally omitted material facts from Roche and those Pharmacy Plans.

153.    Namely, the Binson's Defendants, with the assistance of the J&B Defendants, made or caused to be made statements to Roche that Binson's and Northwood were only distributing Roche DME Strips to individual DME beneficiaries (either directly or through the approved Durable Medical Equipment Providers) when in fact Northwood diverted over 1.5 million Roche 50-strip vials to Olympus and Delta.

154.    The Binson's Defendants made or caused to be made these false representations and material omissions with the intent of defrauding Roche.  Specifically, the Binson's Defendants made or caused to be made these false representations and material omissions (i) in order to continue to be able to purchase Roche DME Strips, (ii) in order to continue to receive substantial discounts from Roche, and (iii) to profit from retail pharmacies' insurance fraud by selling Roche DME Strips at a markup no buyer would pay but for the intended insurance fraud.

155.    All Defendants intended that the ultimate sellers of the diverted Roche DME Strips, the Pharmacy John Does, would fraudulently claim to Pharmacy Plans that Retail Strips were being dispensed, when in fact it was DME Strips.  As all the Defendants knew, these false statements were passed along by the Pharmacy Plans to Roche, which paid the Pharmacy Plans millions of dollars in rebates.

156.   Defendants never informed Roche or the Pharmacy Plans of the scheme to obtain Roche DME Strips and divert them to pharmacy beneficiaries.

157.   All Defendants knew and intended that Roche would rely on their false representations and material omissions and, as a result, would incorrectly provide Binson's and Northwood with discounts, lose sales of Retail Strips, and make rebate payments to the Pharmacy Plans.  The entire scheme depended upon Roche continuing to supply heavily-discounted DME Strips to Northwood and paying rebates to Pharmacy Plans, which would not have happened but for the false representations and material omissions of all Defendants.

158.   Roche justifiably relied on Defendants' misrepresentations and material omissions and was unaware of Defendants' fraud.

159.   Had Roche known the true facts regarding Defendants' fraud, it would not have continued to sell DME Strips to Binson's and Northwood and therefore would not have paid Pharmacy Plans rebates on the DME Strips diverted to pharmacies, and it would have made additional sales of Retail Strips.

160.   As a result of Defendants' conduct, Roche was injured in an amount not less than $89 million.

**THIRD CLAIM FOR RELIEF**

**Aiding and Abetting Fraud**
**(Against all Defendants)**

161.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 141 above as if set forth fully herein.

162.   In advancing the fraud against Roche, all Defendants intentionally provided substantial assistance to the other Defendants and the ultimate sellers of the diverted Roche DME Strips.

-36-

163.     All Defendants knowingly hid the fraud from Roche by making or authorizing the false statements to Roche and omitting to inform Roche of the fraud.

164.     Defendants could not have perpetrated and expanded their fraud without the substantial and material assistance of each other Defendant.  Each Defendant benefited from the success of the fraud, until it was discovered.

165.     All Defendants had actual knowledge of and substantially assisted in the fraudulent scheme to divert Roche DME Strips to cash payers and pharmacy beneficiaries.

166.     As a result of Defendants' conduct, Roche was injured in an amount not less than $89 million.

## FOURTH CLAIM FOR RELIEF

### Criminal Deception Under Ind. Code §§ 34-24-3-1 & 35-43-5-3
### (Against all Defendants)

167.     Roche hereby repeats and realleges the allegations in paragraphs 1 to 141 above as if set forth fully herein.

168.     Defendants knowingly or intentionally made false or misleading written statements with intent to obtain property, in violation of Ind. Code § 35-43-5-3(a)(2).  Roche is therefore entitled to treble damages, attorney's fees, costs, and other specified expenses under Ind. Code § 34-24-3-1.

169.     As alleged above, Defendants knowingly or intentionally made or caused to be made false or misleading written statements to Roche and the Pharmacy Plans that covered the diverted Roche DME test strips and intentionally omitted material facts from Roche and those Pharmacy Plans.  Those false or misleading written statements were made with the intent to obtain property, including Roche DME Strips, proceeds from the sale of Roche DME Strips, and insurance reimbursements for the sale of Roche DME Strips.

170.    Namely, the Binson's Defendants, with the assistance of the J&B Defendants, knowingly or intentionally made or caused to be made false or misleading written statements to Roche that Binson's and Northwood had a large base of commercial DME patients that would purchase Roche DME Strips if Roche amended the Agreement with Binson's and Northwood to permit Northwood to purchase DME Strips at a discounted flat price without rebates.  These false or misleading written statements were made with the intention of obtaining Roche DME Strips and the proceeds from the sale of DME Strips to Olympus and Delta.

171.    The Binson's Defendants, with the assistance of the J&B Defendants, knowingly or intentionally made or caused to be made false or misleading written statements to Roche that Binson's and Northwood were only distributing Roche DME Strips to individual DME beneficiaries (either directly or through the approved Durable Medical Equipment Providers) when in fact Northwood diverted over 1.5 million 50-strip vials to Olympus and Delta.

172.    The Binson's Defendants, with the assistance of the J&B Defendants, knowingly or intentionally made or caused to be made these false or misleading written statements with the intent of defrauding Roche.  Specifically, they were made (i) in order to continue to be able to purchase Roche DME Strips, (ii) in order to continue to receive substantial discounts from Roche, and (iii) to profit from retail pharmacies' insurance fraud by selling Roche DME Strips at a markup no buyer would pay but for the intended insurance fraud.

173.    The Pharmacy John Does made or caused to be made false or misleading written statements to Pharmacy Plans that the product being dispensed was Roche Retail Strips for the purpose of obtaining Pharmacy Plan reimbursement payments.  All Defendants intended that the Pharmacy John Does would make or cause to be made these false or misleading written statements for the purpose of obtaining Pharmacy Plan reimbursement payments.  As all the

Defendants knew, these false or misleading written statements were passed along by the Pharmacy Plans to Roche, which paid the Pharmacy Plans millions of dollars in rebates.

174.    Defendants never informed Roche or the Pharmacy Plans of the scheme to obtain Roche DME Strips and divert them to pharmacy beneficiaries.

175.    All Defendants knew and intended that Roche would rely on their false or misleading written statements and, as a result, would incorrectly provide Binson's and Northwood with discounts, lose sales of Retail Strips, and make rebate payments to the Pharmacy Plans.  The entire scheme depended upon Roche continuing to supply heavily-discounted DME Strips to Northwood and paying rebates to Pharmacy Plans, which would not have happened but for the false or misleading written statements of all Defendants.

176.    Roche justifiably relied on Defendants' false or misleading written statements and was unaware of Defendants' criminal deception.

177.    Had Roche known the true facts regarding Defendants' criminal deception, it would not have continued to sell DME Strips to Binson's and Northwood and therefore would not have paid rebates on the diverted DME Strips to Pharmacy Plans, and it would have made additional sales of Retail Strips.

178.    As a result of the Defendants' violation of Ind. Code § 35-43-5-3(a)(2), Roche has been injured in an amount not less than $89 million.  Roche is entitled to recover treble damages, attorney's fees, costs, and other specified expenses under Ind. Code § 34-24-3-1.

### FIFTH CLAIM FOR RELIEF

**Negligent Misrepresentation**
**(Against the Binson's Defendants)**

179.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 141 above as if set forth fully herein.

180.     The Binson's Defendants misrepresented to Roche that Binson's and Northwood were distributing Roche DME Strips only to individual DME beneficiaries, when in fact Binson's sold thousands of Roche 50-strip vials of DME Strips for cash and Northwood sold over 1.5 million 50-Strip vials to Olympus and Delta.

181.     The Binson's Defendants never told Roche that its DME Strips were being sold to cash payers and to third parties for ultimate sale to pharmacy beneficiaries.

182.     These statements of fact and material omissions were false and misleading. Additionally, these statements and omissions were negligent because Defendants did not exercise reasonable care in verifying the accuracy of these statements or in ensuring that they did not fail to make material disclosures.

183.     The Binson's Defendants did not take any affirmative steps to correct their materially false statements or material omissions.

184.     The Binson's Defendants had a duty to provide Roche with accurate information because they knew and intended that Roche would rely on their false representations and material omissions in continuing to sell DME Strips to Binson's and Northwood and in providing Binson's and Northwood with discounts.

185.     Roche reasonably relied upon these misrepresentations and material omissions and was unaware that they were false.

186.     As a result of the Binson's Defendants' conduct, Roche has been injured in an amount not less than $89 million.

## SIXTH CLAIM FOR RELIEF

**Breach of Contract**
**(Against Binson's and Northwood)**

187.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 141 above as if set forth fully herein.

188.    As set forth above, Binson's and Northwood violated sections 5.10 and 6.6 of the Agreement.

189.    As a result of these breaches, Roche was injured in an amount not less than $89 million.

## SEVENTH CLAIM FOR RELIEF

**Unjust Enrichment**
**(Against all Defendants)**

190.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 141 above as if set forth fully herein.

191.    As set forth above, Defendants made or caused to be made false representations to Roche and the Pharmacy Plans and omitted material facts from Roche and the Pharmacy Plans.

192.    As a result of these false representations and material omissions, Defendants wrongfully obtained a monetary benefit to which they were not legally entitled.

193.    Each individual Defendant personally benefitted as a result of the additional profits the corporate Defendants made as a result of the diversion scheme.

194.    Defendants have no right to retain these unjust gains.

195.    If Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

### EIGHTH CLAIM FOR RELIEF

**Tortious Interference With Contract**
**(Against the J&B Defendants)**

196.     Roche hereby repeats and realleges the allegations in paragraphs 1 to 141 above as if set forth fully herein.

197.     Roche entered into a contractual relationship with Binson's and Northwood via the February 2011 Agreement and its amendments.

198.     The J&B Defendants knew that Binson's and Northwood had a contract with Roche to purchase DME Strips.  The J&B Defendants became aware of this no later than May 2014, when, on information and belief, Fasse and Dickstein began to negotiate with Chris Shaya and Mankopf to arrange for the diversion of Roche DME Strips.

199.     Moreover, the J&B Defendants had knowledge of the relevant specifics of the Agreement because J&B had entered into a substantively similar contract with Roche in 2008. Under the 2008 contract between Roche and J&B, J&B was required to sell Roche DME Strips exclusively to Blue Cross DME beneficiaries (either directly or through pre-approved intermediaries who were named in the contract).

200.     In 2010, Roche terminated the contract because J&B was breaching its contract by selling to ineligible patients.

201.     The J&B Defendants urged the Binson's Defendants to violate the Agreement by entering into an agreement with the J&B Defendants to divert Roche's DME Strips through shell companies created by the J&B Defendants (Olympus and Delta).

202.     The conduct of the J&B Defendants was malicious and without justification.

203.     As a result of the J&B Defendants' conduct, Roche has been injured in an amount not less than $89 million.

-42-

## NINTH CLAIM FOR RELIEF

### Civil Conspiracy
### (Against all Defendants)

204.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 141 above as if set forth fully herein.

205.    Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to defraud Roche and the Pharmacy Plans.  All Defendants adopted the goal of furthering and facilitating this conspiracy.

206.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

207.    Roche was directly and proximately injured by Defendants' conspiracy and suffered losses of at least $89 million.  As a result of their misconduct, Defendants are jointly and severally liable to Roche for these losses.

### PRAYER FOR RELIEF

WHEREFORE, Roche demands judgment against all Defendants as follows:

(a)  an order entering judgment in favor of Roche against Defendants, jointly and severally;

(b)  an order awarding Roche damages in an amount to be determined, but in no event less than $89 million;

(c)  an order awarding Roche treble damages, attorney fees, and other costs prescribed by Indiana Code § 34-24-3-1;

(d)  an order awarding Roche pre-judgment and post-judgment interest;

(e)  an order awarding Roche punitive damages;

(f)  for such additional relief as the Court finds just and appropriate.


DATED:   <u>April 5, 2017</u>                              Respectfully submitted,


                                                         <u>/s/ David O. Tittle</u>
                                                         David O. Tittle, Esq.
                                                         Jessica Whelan, Esq.
                                                         BINGHAM GREENEBAUM DOLL LLP
                                                         2700 Market Tower
                                                         10 West Market Street
                                                         Indianapolis, IN 46204
                                                         Tel: 317-635-8900
                                                         Fax: 317-236-9907
                                                         dtittle@bgdlegal.com
                                                         jwhelan@bgdlegal.com

                                                         *Attorneys for Plaintiffs*
                                                         *Roche Diagnostics Corp. and*
                                                         *Roche Diabetes Care, Inc.*

*Of Counsel*

Geoffrey Potter, Esq.
Aron Fischer, Esq.
Joseph R. Richie, Esq.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel: 212-336-2000
Fax: 212-336-2222
gpotter@pbwt.com
afischer@pbwt.com
jrichie@pbwt.com


*18236702_1*