UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROCHE DIAGNOSTICS CORP., and<br>ROCHE DIABETES CARE, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 1:17-cv-00949-LJM-DML |
| | ) | |
| BINSON'S HOSPITAL SUPPLIES, INC., | ) | |
| NORTHWOOD, INC., | ) | |
| OLYMPUS GLOBAL, LLC, | ) | |
| DELTA GLOBAL, LLC, | ) | |
| ALPHA XE LLC, | ) | |
| J&B MEDICAL SUPPLY CO., INC., | ) | |
| KENNETH G. FASSE, | ) | |
| DONNIE E. DICKSTEIN, | ) | |
| JAMES E. BINSON, | ) | |
| JAMES E. BINSON II, | ) | |
| NICHOLAS B. BINSON, | ) | |
| ROBERT A. BINSON, | ) | |
| CHRISTOPHER F. SHAYA, | ) | |
| FAWZI B. SHAYA, | ) | |
| MARY E. SHAYA, | ) | |
| DANIEL  GLADYS, | ) | |
| JEREMIAH  MANKOPF, and | ) | |
| PHARMACY JOHN DOES 1-50, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER ON MOTIONS TO DISMISS</u>

This matter comes before the Court on four distinct Motions to Dismiss filed by the

defendants in this action.  In their motions, Defendants Binson's Hospital Supplies, Inc.

("Binson's"), Northwood, Inc. ("Northwood"), Kenneth G. Fasse ("Fasse"), Donnie E.

Dickstein ("Dickstein"), James E. Binson, James E. Binson II, Nicholas B. Binson, and

Robert Binson (collectively, the "Binson's Defendants"), and Defendant Jeremiah

Mankopf ("Mankopf"), seek to dismiss Plaintiffs', Roche Diagnostics Corp. and Roche

Diabetes Care, Inc. (collectively, "Roche's"), Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(2) ("Rule 12(b)(2)") and 12(b)(6) ("Rule 12(b)(6)"). Dkt. No. 61; Dkt. No. 66. Defendants Olympus Global, LLC ("Olympus"), Delta Global, LLC ("Delta"), Alpha XE LLC ("Alpha"), Christopher F. Shaya ("Christopher"), and Daniel Gladys ("Gladys," and together with Olympus, Delta, Alpha, and Christopher, the "Olympus-Delta Defendants"), however, move to dismiss Roche's Amended Complaint as it relates to them only under Rule 12(b)(2) by asserting that this Court lacks personal jurisdiction over them. Dkt. No. 57. Furthermore, Defendants', J&B Medical Supply Co. ("J&B"), Fawzi B. Shaya, and Mary E. Shaya (collectively, the "J&B Defendants"), motion to dismiss only seeks to dismiss Roche's Amended Complaint as it relates to them pursuant to Rule 12(b)(6), by arguing that Roche has not pleaded with sufficient particularity to state a claim against them. Dkt. No. 64.

For the reasons stated herein, the Court **GRANTS in part and DENIES in part** the Binson's Defendants' and the J&B Defendants' motions to dismiss. The Court also **GRANTS** the Olympus-Delta Defendants' and Mankopf's motions to dismiss.

## I. BACKGROUND

Roche is a leading manufacturer of blood glucose test strips used by diabetes patients. Dkt. No. 12 ("Am. Compl."), ¶ 37. Roche sells its test strips in two ways to provide them to patients with different kinds of insurance plans: (1) for sale at retail pharmacies ("Retail Strips"); and (2) for sale by durable medical equipment (DME) providers ("DME Strips"). *Id.* at ¶ 38. Whenever patients purchase any of Roche's test strips through their insurance providers, the sellers of those test strips obtain payment

from the insurers, rather than the individual patients, and must submit reimbursement claims to the insurers to receive payment. *Id.* at ¶ 44.

Roche's Retail Strips may be sold to anyone at retail pharmacies; however, more than 90% of Retail Strips are purchased by patients with insurance plans that reimburse the pharmacies. *Id.* at ¶ 38. Roche sells its Retail Strips directly to wholesalers for about $71 per 50-strip vial, who then sell the Retail Strips to retail pharmacies for about $75 per 50-strip vial. *Id.* at ¶ 39. When Retail Strips are purchased by a patient with a Pharmacy Plan insurance policy, the patient's insurer reimburses the retail pharmacy at a rate of about $78 per 50-strip vial. *Id.* at ¶ 39. After the insurer reimburses the retail pharmacy, Roche then pays the insurer rebates of about $50 per 50-strip vial. *Id.*; Dkt. No. 83 at 4. As a result, Roche obtains a net revenue of about $21 per 50-strip vial for the sale of its Retail Strips. Am. Compl., ¶ 39.

In contrast, Roche sells its DME Strips directly and exclusively to mail-order DME distributors ("DME Distributors") for less than $20 per 50-strip vial. *Id.* at 40. Based on their contractual agreements with Roche, the DME Distributors purchasing the DME Strips may only sell the DME Strips to patients benefitting from DME insurance plans, including Medicare and other commercial insurers, or to other DME Distributors. *Id.* DME Distributors are contractually prohibited from selling their DME Strips to any patients benefitting from Pharmacy Plans or those without insurance, which allows Roche to sell the DME Strips to DME Distributors at a substantially lower price than its Retail Strips. *Id.* at ¶ 41. If a patient with a commercial DME insurance plan purchases DME Strips from a DME Distributor, the commercial DME insurer reimburses the DME Distributor at

a rate of about $30 per 50-strip vial.  *Id.* at ¶ 40.  However, Roche does not pay any rebates to any insurers following the sale of DME Strips.  *Id.*

## A. ROCHE'S AGREEMENTS WITH BINSON'S AND NORTHWOOD

On February 10, 2011, Roche entered into an agreement (the "Agreement") with Binson's and its subsidiary, Northwood, whereby Roche would sell its DME Strips to Binson's, and Binson's and Northwood would distribute Roche's DME Strips to DME insurance plan beneficiaries.  *Id.* at ¶ 51.  Binson's and Northwood are both Michigan corporations with principal places of business in Michigan.  *Id.* at ¶¶ 14-15.  In the Agreement, Roche agreed to sell DME Strips to Binson's and Northwood at net rates between $5 and $17 per 50-strip vial, based on Binson's and Northwood's prospective volume commitments and Roche's market share of DME Distributors' total sales.  *Id.* at ¶¶ 52-53.  However, the Agreement required that Binson's and Northwood sell the DME Strips exclusively to patients benefitting from DME insurance plans.  *Id.* at ¶ 52.  Binson's and Northwood were also required to provide Roche with quarterly or monthly Market Share Reports and Utilization Reports in order to receive their rebates.  *Id.* at ¶ 54.  Market Share Reports indicate Roche's market share of the total sales made by Binson's and Northwood over a given period of time.  *Id.*  In contrast, Utilization Reports track the prescription numbers and sale dates for each individual sale of DME Strips made by Binson's and Northwood to ensure that sales of DME Strips are made only to DME insurance plan beneficiaries or other appropriate DME Distributors.  *Id.*

On July 21, 2014, Binson's and Northwood negotiated with Roche to amend the Agreement (the "Amended Agreement"), through which Roche agreed to sell its DME Strips directly to Northwood, rather than Binson's, at a flat, discounted rate of $10.67 per

50-strip vial and without any need to make rebate claims. *Id.* at ¶¶ 57, 61-62. While negotiating the Amended Agreement, Fasse, the Executive Vice President and Chief Operating Officer for Binson's and Northwood, and Dickstein, the Director of Northwood, told Roche that Northwood had a large number of customers that were covered by commercial DME insurance plans, in addition to its customer base covered by Medicare. *Id.* at ¶¶ 58-60. Fasse and Dickstein further assured Roche that Northwood would only sell Roche's DME Strips to individual DME insurance plan beneficiaries. *Id.* at ¶ 98. Dickstein also provided Roche a list of DME insurance plans that would be covered when selling the DME Strips. *Id.* at ¶ 99.

After the Amended Agreement went into effect, Northwood saw a dramatic spike in its sales of Roche's DME Strips. *Id.* at ¶ 63. However, despite this intense sales increase, Northwood stopped providing its Utilization Reports to Roche after the Amended Agreement went into effect. *Id.* at ¶ 64. Fasse and Dickstein explained Northwood's rapidly growing sales by telling Roche that Northwood was selling Roche's DME Strips to its large base of patients benefitting from commercial DME insurance plans who had previously used different test strip brands. *Id.* at ¶¶ 65-66.

In light of Northwood's uncharacteristic and dramatic increase in sales, Roche grew suspicious. *Id.* at ¶ 68. In the spring of 2015, Roche hired private investigators to go to Binson's brick-and-mortar locations in Michigan and Florida and attempt to purchase Roche's DME Strips with cash, rather than through a DME insurance plan. *Id.* at ¶ 69. Upon their arrival to Binson's stores, the private investigators easily purchased DME Strips in cash without insurance. *Id.* at ¶¶ 70-71. Based on the private investigators' findings, Roche repeatedly requested that Binson's and Northwood provide Roche with

Utilization Reports between June and September 2015. *Id.* at ¶ 71. Although Binson's provided its Utilization Report to Roche on September 11, 2015, Northwood failed to provide any such report before September 24, 2015. *Id.* at ¶ 73. As a result, Roche contacted Northwood on the same day and informed Fasse and Dickstein that Roche was stopping all shipments to Northwood until it provided Roche with its Utilization Reports and told them that Roche knew Binson's had been selling the DME Strips for cash. *Id.* at ¶ 74. Dickstein claimed that Northwood was selling Roche's DME Strips to several companies in Florida, rather than to individual DME insurance plan beneficiaries as was required by the Amended Agreement. *Id.* at ¶ 75.

On September 28, 2015, Roche's Senior Counsel, Julie Dilts ("Dilts"), sent a letter to Fasse, indicating that Binson's and Northwood were in breach of the Amended Agreement. *Id.* at ¶ 78. Dilts' letter further demanded that Binson's and Northwood provide to Roche their 2015 Utilization Reports, a list of the individuals and other entities that purchased Roche's DME Strips from Binson's and Northwood in breach of the Amended Agreement, and an explanation for Northwood's dramatic sales growth. *Id.*

On October 6, 2015, Fasse responded via email to Dilts' letter by stating that Binson's had sold Roche's DME Strips for cash at its retail locations but that "management was unaware of this problem prior to receiving your letter." *Id.* at ¶¶ 79, 101-102. Fasse further indicated that such cash sales at their retail facilities were discontinued. *Id.* Fasse also attached a "complete list of all retail cash sales of [Roche] Products sold for the period of February 2011-present" with his response. *Id.* at ¶ 80. On October 7, 2015, Fasse sent another email to Dilts, in which Fasse admitted that Northwood had been selling Roche's DME Strips to third parties since July 2014, and the

third parties then sold the DME Strips to various other DME Distributors. *Id.* at ¶ 82. Fasse also attached Binson's Utilization Reports to this October 7 email but explained that similar Utilization Reports for Northwood were unavailable. *Id.* at ¶ 81.

## B. THE DIVERSION SCHEME

In May 2014, Fasse and Dickstein began discussing a plan to divert the sales of Roche's DME Strips with Christopher and Mankopf, who were employees of J&B. *Id.* at ¶¶ 84-85. J&B is a Michigan corporation that is owned and operated by Fawzi B. Shaya and Mary E. Shaya. *Id.* at ¶¶ 19, 120. J&B previously contracted with Roche in 2008 to sell Roche's DME Strips exclusively to patients insured by Blue Cross Network of Michigan until the agreement was terminated in 2010. *Id.* at ¶ 86. Roche believes that J&B has sought ways to purchase Roche's DME Strips ever since the termination of its agreement with Roche. *Id.* at ¶ 87.

Christopher, the son of Fawzi B. Shaya and Mary E. Shaya, and Mankopf formed Olympus as a shell company for J&B. *Id.* at ¶¶ 87, 124. Olympus was established as a Michigan limited liability company on March 12, 2013. *Id.* at ¶ 124. Christopher and Mankopf explained to Fasse and Dickstein that Northwood could sell Roche's DME Strips to Olympus, and that Olympus could then resell the DME Strips to a Florida company, Medical Supply Solutions, Inc. ("MSSI"). *Id.* at ¶¶ 88, 90. MSSI would then sell the DME Strips to retail pharmacies. *Id.* at ¶ 91.

All of the parties involved recognized that their scheme would work better if Northwood could purchase the DME Strips at a flat, discounted rate. *Id.* at ¶¶ 89-90. Therefore, based on their discussions with Christopher and Mankopf, Fasse and Dickstein negotiated with Roche to form the Amended Agreement so that Roche would

make all of its sales to Northwood. *Id.* at ¶¶ 89-90, 94. After the Amended Agreement when into effect, Northwood began selling Roche's DME Strips to Olympus, with the intention of Olympus selling the DME Strips to MSSI. *Id.* at ¶¶ 90, 93-94.

Olympus was the sole purchaser of Northwood's DME Strips between July 2014, and January 2015. *Id.* at ¶ 124. On January 16, 2015, Christopher and Gladys, another J&B employee, formed Delta[1] as a Michigan limited liability company to replace Olympus as the sole purchaser of Roche's DME Strips from Northwood. *Id.* at ¶¶ 119, 125. Roche believes Olympus was later dissolved in order to cut Mankopf out of this scheme to divert the sales of Roche's DME Strips. *Id.* at ¶126. Between July 21, 2014, and September 24, 2015, Northwood sold approximately 1,526,688, 50-strip vials of Roche's DME Strips to Olympus and Delta. *Id.* at ¶¶ 93-94. After either Olympus or Delta purchased DME Strips from Northwood, Alpha, a Wyoming limited liability company formed by Christopher, would then make the sales of those DME Strips directly to MSSI. *Id.* at ¶ 94.

### C. PENDING ACTION

Roche filed its initial Complaint on March 28, 2017, Dkt. No. 1, and filed its Amended Complaint on April 5, 2017. *See generally*, Amend. Compl. Roche alleged that the Binson's Defendants defrauded it by indicating that Northwood would sell Roche's DME Strips exclusively to DME insurance beneficiaries while negotiating the Amended Agreement and by providing Roche with fraudulent information relating to Northwood's DME Strips sales, despite having already devised its diversion scheme with J&B and the Olympus-Delta Defendants. *Id.* at ¶¶ 98-100. Roche also asserts that the Binson's Defendants falsely claimed that Binson's management was unaware of the cash sales at

---

[1] Delta was originally registered under the name Invicta LLC. Am. Compl., ¶ 125.

the Binson's retail locations. *Id.* at ¶¶ 101-02. Roche contends that it relied on the Binson's Defendants' false statements when it provided its DME Strips to Binson's and Northwood at discounted rates and by paying rebates for their DME Strips. *Id.* at ¶ 103. Roche further alleges that Binson's and Northwood breached the Amended Agreement by selling Roche's DME Strips to Olympus and Delta, as well as directly to individuals in their retail stores. *Id.* at ¶¶ 134-37. Moreover, Roche contends that Fasse, Dickstein, James E. Binson, James E. Binson II, Nicholas B. Binson, and Robert A. Binson (the "Individual Binson's Defendants") "must have known" about the diversion scheme formed between Binson's, Northwood, J&B, and the Olympus-Delta Defendants in light of their close involvement in Binson's and Northwood's business operations and the importance of the scheme to their businesses. *Id.* at ¶ 116.

Roche further alleges that the J&B Defendants, the Olympus-Delta Defendants, and Mankopf participated in the Binson's Defendants' fraudulent conduct, encouraged Binson's and Northwood to breach the Amended Agreement, and were unjustly enriched by the diversion scheme with the Binson's Defendants. *Id.* at ¶¶ 84, 88, 93-94, 117, 121. In relation to Fawzi Shaya and Mary Shaya, Roche claims that these defendants facilitated the conduct of the Olympus-Delta Defendants and Mankopf by providing them with necessary financial resources and assistance. *Id.* at ¶¶ 120, 128-32.

As a result of these allegations, Roche asserts claims for fraud, aiding and abetting fraud, criminal deception, unjust enrichment, and civil conspiracy against all defendants. *Id.* at ¶¶ 151-78, 190-95, 204-07. Roche also alleges fraudulent inducement and negligent misrepresentation against the Binson's Defendants and a claim of breach of contract against Binson's and Northwood. *Id.* at ¶¶ 142-50, 179-89. Furthermore, Roche

asserts a claim of tortious interference with a contractual relationship against the J&B Defendants, the Olympus-Delta Defendants, and Mankopf. *Id.* at ¶¶ 196-203.

On May 26, 2017, the Binson's Defendants, J&B Defendants, Olympus-Delta Defendants, and Mankopf each filed their respective motions to dismiss. Dkt. No. 57; Dkt. No. 60; Dkt. No. 63; Dkt. No. 65. In their motion to dismiss, the Binson's Defendants assert that this Court lacks personal jurisdiction over the Individual Binson's Defendants, who are all citizens of Michigan. Dkt. No. 61 at 7-12. Similarly, Mankopf and the Olympus-Delta Defendants also contend that they lack sufficient contacts with Indiana to support this Court's personal jurisdiction over them. Dkt. No. 66 at 7-9; Dkt. No. 57. The Binson's Defendants, the J&B Defendants, and Mankopf each also argue that Roche's claims sounding in fraud were not pled with sufficient particularity. Dkt. No. 61 at 16-26, 31-32; Dkt. No. 64 at 12-33; Dkt. No. 66 at 9-11. Moreover, the Binson's Defendants and Mankopf contend that Roche failed to plausibly plead its remaining claims against them. Dkt. No. 61 at 26-30, 32-34; Dkt. No. 66 at 11-15.

On June 23, 2017, Roche filed its unified Response in Opposition to the defendants' motions to dismiss. Dkt. No. 83. In its Response in Opposition, Roche argues that this Court has personal jurisdiction over all of the defendants because each of the defendants subjected themselves to personal jurisdiction in Indiana by defrauding and harming an Indiana company. *Id.* at 29-33. Roche further contends that this Court has personal jurisdiction over the Individual Binson's Defendants because this Court undeniably has personal jurisdiction over Binson's and Northwood. *Id.* at 27-29. Roche also argues that its allegations sounding in fraud met the particularity standard set forth in Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") because it pled all the necessary

elements of its fraud claims. *Id.* at 3, 6-18. Additionally, even if more specific factual allegations are necessary, Roche contends that it may be excused from this heightened pleading standard if it does not have access to such facts. *Id.* Moreover, Roche asserts that its claims for breach of contract, tortious interference with a contractual relationship, unjust enrichment, civil conspiracy, and negligent misrepresentation are all plausible based on the factual allegations in the Amended Compliant. *Id.* at 4-6, 18-26.

## II. PERSONAL JURISDICTION

When considering a motion advanced under Rule 12(b), the Court examines the sufficiency of the plaintiff's complaint as opposed to the merits of the lawsuit, and directs dismissal only if it appears to a certainty that the plaintiff can establish no basis for asserting personal jurisdiction. Rule 12(b)(2) permits the dismissal of a claim for lack of jurisdiction over a person or entity. In considering a Rule 12(b)(2) motion to dismiss, the Court reviews any affidavits and other documentary evidence that have been filed, as long as factual disputes are resolved in favor of the non-movant – in this case Roche. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520-21 (7th Cir. 1990).

A federal district court exercising diversity jurisdiction over the subject matter of an action has personal jurisdiction only if a court of the state in which it sits would have such jurisdiction. *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997). As the Individual Binson's Defendants, Olympus-Delta Defendants, and Mankopf have all asserted a lack personal jurisdiction here, it then becomes Roche's burden to demonstrate the existence of jurisdiction. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003) (hereinafter, (*"Purdue Research"*). Because no evidentiary hearing was held and the parties are solely relying on written

materials, Roche need only make a *prima facie* showing of personal jurisdiction. *Id.* at 782.

A determination of personal jurisdiction involves two steps. First, the Court must determine whether the state's "long-arm" statute allows jurisdiction and, second, decide whether the exercise of jurisdiction comports with due process. *See NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A.*, 28 F.3d 572, 580 (7th Cir. 1994). Indiana's jurisdiction statute is Indiana Trial Rule 4.4(A). Trial Rule 4.4(A) states as follows: "[A] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States." Accordingly, this Court has personal jurisdiction to the extent allowed by the Due Process Clause of the Fourteenth Amendment.

The Due Process Clause requires that a non-resident defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Personal jurisdiction under Trial Rule 4.4(A) may be either general or specific. *See Alpha Tau Omega v. Pure Country, Inc.*, 185 F. Supp. 2d 951, 956 (S.D. Ind. 2002). General jurisdiction makes a non-resident defendant amenable to suit within a particular forum regardless of the subject matter of the suit, based on a defendant's continuous and systematic contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984).

In contrast, specific jurisdiction makes a non-resident defendant amenable only to suits arising out of or related to its contacts with the particular forum. *Id.* at 414. Specific

jurisdiction may be based on relatively modest contacts with the forum if they have a substantial connection to the plaintiff's action. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-76 (1985). "[E]ach defendant's contacts with the forum State must be assessed individually." *Purdue Research*, 338 F.3d at 784.

For specific jurisdiction, due process requires that a non-resident defendant must have established his contacts with the forum state by purposefully availing himself of the privilege of conducting business there. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (1987). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King*, 471 U.S. at 475 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). In other words, the defendant's conduct and connection with the forum state should be such that he should reasonably anticipate being haled into court in that state. *Id.* at 474. To determine whether personal jurisdiction may be exercised, the Court engages in a three step analysis: (1) identify the contacts the defendant has with the forum; (2) analyze whether these contacts meet constitutional minimums and whether jurisdiction on the basis of these minimum contacts sufficiently comports with fairness and justice; and (3) determine whether the sufficient minimum contacts, if any, arise out of or are related to the causes of action involved in the suit. *GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009).

The Olympus-Delta Defendants and Mankopf argue that they do not have sufficient contacts with Indiana to support this Court having personal jurisdiction over them. Dkt. No. 57 at 3-11; Dkt. No. 66 at 7-9. The Court agrees. None of these defendants are citizens of Indiana. Olympus and Delta are Michigan limited liability companies with their

principal places of business located in Michigan, and Alpha is a Wyoming limited liability company with its principal place of business in Wyoming. Am. Compl., ¶¶ 16-18. Christopher, Gladys, and Mankopf all reside in Michigan. *Id.* at ¶¶ 26, 29-30. Furthermore, the Amended Complaint alleges that these defendants worked only with Michigan corporations, Binson's and Northwood, to create the diversion scheme for Roche's DME Strips. *Id.* at ¶¶ 84-94, 124-128. Therefore, none of these defendants are alleged to have any direct contacts with Indiana.

Although Roche argues that the Olympus-Delta Defendants and Mankopf had sufficient contacts with Indiana because they participated in a fraudulent scheme to harm an Indiana company, Dkt. No. 83 at 29-33, "[t]he 'mere fact that [a] defendant's conduct affected plaintiffs with connection to the forum State does not suffice to authorize jurisdiction.'" *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014) (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1126 (2014)). Rather, "[t]he relation between the defendant and the forum must arise out of contacts that the defendant *himself* creates with the forum State." *Id.* at 1118 (internal citations omitted) (emphasis in original).

While Roche cites *Commissioning Agents, Inc. v. Long*, 143 F. Supp. 3d 775 (S.D. Ind. 2015), to argue that this Court has personal jurisdiction over the Olympus-Delta Defendants and Mankopf based on the harm they allegedly caused Roche as an Indiana company, this case does not support such a conclusion here. The court in *Long* stated that whether an out-of-state defendant accused of tortious conduct is subject to a court's personal jurisdiction largely depends on "the type of claim alleged and the extent of the defendants' activities in furtherance of the wrongful actions." *Id.* at 792. Although the

*Long* court determined that cases involving fraud-based claims more often determined that the court has personal jurisdiction over an out-of-state defendant, the court also stated that "where the defendants' forum state contacts, made in relation to the tortious actions, were minimal, courts did not find personal jurisdiction." *Id.* Instead, a finding of personal jurisdiction is more likely to be proper where the defendant frequently and aggressively pursued their wrongful actions with the intent of directing those actions at the forum state. *See id.* Because the defendant in *Long* was allegedly involved in fraud-based claims and participated in conduct that the court found "to be particularly aggressive" in light of his employment with the plaintiff company, the court concluded that it had personal jurisdiction over the defendant. *Id.*

Here, the Olympus-Delta Defendants and Mankopf were not alleged to have participated in similarly aggressive conduct to harm Roche in Indiana. Roche alleged only that the Olympus-Delta Defendants and Mankopf worked directly with the Binson's Defendants, all of which are Michigan entities, to create a scheme to divert the sales of Roche's DME Strips. Amended Complaint, ¶¶ 14-30, 84-94, 106-109, 117-126. Roche did not allege that it had any direct contact with the Olympus-Delta Defendants or Mankopf and did not allege that any of these defendants had any other contacts with Indiana beyond the harm they ostensibly caused Roche. Therefore, in light of these minimal contacts with Indiana, this Court lacks personal jurisdiction over the Olympus-Delta Defendants and Mankopf.[2]

_____

[2] The J&B Defendants have not sought to dismiss Roche's Amended Complaint pursuant to Rule 12(b)(2) for lack of personal jurisdiction.

Furthermore, Roche has similarly not alleged sufficient contacts to support personal jurisdiction in this Court for the Individual Binson's Defendants. "[P]ersonal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed." *Cent. States, Se. and Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). Moreover, "the primary purpose of the corporate form is to prevent a company's owners … from being liable for the activities of the company. Where corporate formalities have been observed, a company's owners reasonably expect that they cannot be held liable for the faults of the company" and would "not reasonably anticipate being hailed into a foreign forum to defend against liability for the errors of the corporation." *Id.* at 944. Therefore, the Individual Binson's Defendants would need to have sufficient contacts with Indiana in their personal capacities for this Court to have personal jurisdiction over them.

Although Roche claims that this Court has personal jurisdiction over the Individual Binson's Defendants because they entered into a contractual agreement with Roche, Dkt. No. 83 at 27, only Binson's and Northwood, not the Individual Binson's Defendants personally, contracted with Roche. Am. Compl., ¶¶ 51, 57. Roche's only allegations regarding James E. Binson, James E. Binson II, Nicholas B. Binson, or Robert A. Binson, assert that these defendants own and run Binson's and Northwood, and that they, therefore, "must have known" about Northwood's diversion of Roche's DME Strips. *Id.* at ¶¶ 113, 116. Additionally, Roche identifies Fasse and Dickstein, its main contacts with Binson's and Northwood, as the individuals that directly deceived it while negotiating the Amended Agreement, and as the individuals that participated in the development and execution of the scheme to divert the sales of Roche's DME Strips. *Id.* at ¶¶ 58-61, 65-

67, 74-82, 84, 88, 90, 111-12.  However, all of these allegations involving Fasse and Dickstein appear to relate to their actions on behalf of Binson's and Northwood in their official capacities; Roche fails to make any allegations that clearly allege any wrongful conduct by Fasse or Dickstein in their personal capacities.  As such, Roche has not made a *prima facie* showing that this Court has personal jurisdiction over any of the Individual Binson's Defendants.  *See Purdue Research*, 338 F.3d at 782.

### III. <u>**FAILURE TO PROPERLY STATE A CLAIM**</u>

Even if this Court were to have personal jurisdiction over all of the defendants in this action, many of the defendants also assert that Roche failed to sufficiently plead its claims against them.  Specifically, the Binson's Defendants, J&B Defendants, and Mankopf each contend that Roche failed to plead their claims sounding in fraud with sufficient particularity.  Dkt. No. 61 at 16-26, 31-32; Dkt. No. 64 at 12-33; Dkt. No. 66 at 9-11.  The Binson's Defendants and Mankopf further argue that Roche did not sufficiently plead its remaining claims to make them plausible.  Dkt. No. 61 at 26-30, 32-34; Dkt. No. 66 at 11-15.

Under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *See Esekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).  Documents central to the complaint and referred to in it, as well as information that is properly the subject of judicial notice may also be considered.  *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (further citation omitted)).

Under the Supreme Court's directive in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to survive a defendant's motion to dismiss for failure to state a claim upon which relief may be granted, a plaintiff must provide the grounds for its entitlement to relief with more than mere labels, conclusions, or a formulaic recitation of the elements of a cause of action. *Id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The "allegations must be enough to raise a right to relief above the speculative level." *Id.* The touchstone is whether the complaint gives the defendant "fair notice of what the … claim is and the grounds upon which it rests." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Legal conclusions or conclusory allegations are insufficient to state a claim for relief. *McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011).

In accordance with Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." To meet the particularity standard, a party claiming fraud "must do more pre-complaint investigation to assure that the claim is responsible and supported," and "must provide 'the who, what, when, where, and how'" of the allegedly fraudulent activity. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citing *U.S. ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 605 (7th Cir. 2005)). Stated otherwise, a party alleging fraud must "identify the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Wine & Canvas Dev., LLC v. Weisser*, 886 F. Supp. 2d 903, 944 (S.D. Ind. 2012) (internal quotations omitted).

## A. PARTICULARITY PLEADING FOR CLAIMS SOUNDING IN FRAUD

As required by Rule 9(b), claims "sounding in fraud" must be plead with particularity. Fed. R. Civ. P. 9(b); *see also*, *Borsellino*, 477 F.3d at 507. In other words, any claim "that is premised upon a course of fraudulent conduct … can implicate Rule 9(b)'s heightened pleading requirements." *Borsellino*, 477 F.3d at 507. Therefore, Roche's claims for fraud, fraudulent inducement, and aiding and abetting fraud, which indisputably sound in fraud, must be plead with particularity. Furthermore, because Roche's claims for criminal deception, civil conspiracy, and unjust enrichment are based upon the defendants' allegedly fraudulent conduct, these claims must also meet the heightened particularity standard set forth in Rule 9(b). *See id.* (applying Rule 9(b) to a claim for civil conspiracy based on fraud); *see also*, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011) (dismissing an unjust enrichment claim that "was hitched to [a] fraud claim" ); *ABN Amro Mortg. Grp., Inc. v. Maximum Mortg. Inc.*, 429 F. Supp. 2d 1031, 1042 (N.D. Ind. 2006) (determining that claims under Indiana's deception statute, including Ind. Code §§ 34-24-3-1 and 35-43-5-3, "are subject to the particularity requirements of Rule 9(b)" because such claims "are, on their face, anti-fraud statutes"); *Cincinnati Life Ins. v. Grottenhuis*, No. 2:10-cv-00205-LJM-WGH, 2011 WL 1107114, at *8 (S.D. Ind. Mar. 23, 2011) (applying Rule 9(b) to claims for fraud, unjust enrichment, and civil conspiracy).

Roche fails to plead any of these claims with sufficient particularity. Roche's allegations of fraudulent conduct in the Amended Complaint consistently group multiple defendants together by saying that either all of the defendants or a subgroup of defendants made false statements to Roche or caused such false statements to be made.

Am. Compl., ¶¶ 58-61, 66-67, 98, 106-09, 143-48, 152-57, 162-63, 168-75, 191, 205-06. However, "[i]t is not sufficient to 'lump together' all the [d]efendants; instead the [Amended] Complaint must 'specify who was involved in what activity.'" *ABN*, 429 F. Supp. 2d at 1037 (quoting *Vicom, Inc. v. Harbridge Merchant Serv., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)). As such, Roche failed to sufficiently state who made each allegedly fraudulent misrepresentation. Moreover, many of Roche's allegations also failed to identify the time, place, content, or method of communication used for the defendants' allegedly fraudulent misrepresentations. Am. Compl., ¶¶ 58, 60, 65-66, 75, 99-100, 106-09. *See also*, *Weisser*, 886 F. Supp. 2d at 944.

While Rule 9(b)'s requirements may be relaxed if the plaintiff lacks access to all of the facts necessary to properly plead with particularity, the plaintiff must still demonstrate that "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'" *Pirelli*, 631 F.3d at 442-43 (quoting *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992); *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)). Furthermore, "[t]he grounds for the plaintiff's suspicions must make the allegations *plausible*." *Pirelli*, 631 F.3d at 443 (emphasis in original). Because Roche has not provided any reasons why it did not have access to facts constituting fraud or any grounds supporting their suspicions of fraudulent conduct, it is not excused from meeting the heightened particularity standard of Rule 9(b). Therefore, the Court DISMISSES Roche's claims for fraudulent inducement, fraud, aiding

and abetting fraud, criminal deception, unjust enrichment[3], and civil conspiracy without prejudice.[4]

## B. PLAUSIBILTY PLEADING FOR NON-FRAUD CLAIMS

While Roche must plead with particularity its claims sounding in fraud, Roche's remaining claims for breach of contract against Binson's and Northwood; negligent misrepresentation against the Binson's Defendants; and tortious interference with a contractual relationship against the J&B Defendants, Olympus-Delta Defendants, and Mankopf must only meet the general plausibility standard set forth in Rule 8.

"Under Indiana law, the elements of a breach of contract actions are [1] the existence of a contract, [2] the defendant's breach thereof, and [3] damages." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 644 (7th Cir. 2015) (internal quotations omitted). Although the Binson's Defendants contend that Roche failed to allege any damages resulting from Binson's and Northwood's purported breach of contract, Dkt. No. 61 at 29-30, the Court disagrees. Roche alleged that Binson's and Northwood breached their contract by selling Roche's DME Strips to the Olympus-Delta Defendants, which later led to their DME Strips being sold at retail pharmacies through the defendants' diversion scheme. Am. Compl., ¶¶ 134-37. Roche further claimed that if its DME Strips,

---

[3] Even if Roche's claim for unjust enrichment was not subject to the particularity standard set forth in Rule 9(b), this claim would still be subject to dismissal as to Binson's and Northwood because Roche did not plead its unjust enrichment claim in the alternative to the existence of a valid contract. *See CoMentis, Inc. v. Purdue Research Found.*, 765 F. Supp.2d 1092, 1102 (N.D. Ind. 2011) ("where an express contract governs the parties' behavior, a claim for unjust enrichment is not cognizable").

[4] Because the Court dismisses Roche's claims sounding in fraud without prejudice and allows Roche the opportunity to amend their Amended Complaint, the Binson's Defendants' pending Motion for Sanctions under Rule 11 is **DENIED as premature**. Dkt. No. 58.

which were sold to Northwood at a discounted price, had not been available at retail pharmacies as a result of the diversion scheme, patients purchasing these DME Strips would have otherwise purchased Roche's Retail Strips, entitling Roche to substantially higher profits. *Id.* at ¶¶ 138-41. Based on these allegations, Roche sufficiently alleged that it suffered significant financial harm as a result of Binson's and Northwood's breach of contract. Therefore, the Court cannot dismiss Roche's breach of contract claim against Binson's and Northwood.

Roche further asserts a claim for negligent misrepresentation against the Binson's Defedants. *Id.* at ¶¶ 179-86. Indiana law recognizes "liability for the tort of negligent misrepresentation, where there is a direct relationship between the plaintiff and defendant." *Passmore v. Multi-Management Serv., Inc.*, 810 N.E.2d 1022, 1025 (Ind. 2004) (citing *Darst v. Ill. Farmers Ins. Co.*, 716 N.E.2d 579 (Ind. Ct. App. 1999); *Eby v. York-Division, Borg Warner*, 455 N.E.2d 623 (Ind. Ct. App. 1983)). A defendant may be held liable for negligent misrepresentation in Indiana if the following four elements are met:

> (1) the defendant, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions; (2) the defendant fails to exercise reasonable care or competence in obtaining or communicating the information; (3) the plaintiff justifiably relies upon the information supplied by the defendant; and (4) the plaintiff suffers pecuniary loss as a result.

*Harrison Mfg., LLC v. Bienias*, No. 4:11-cv-00065-TWP-WGH, 2013 WL 6486668, at *6 (S.D. Ind. Dec. 10, 2013) (citing *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 747 (Ind. 2010); Restatement (Second) of Torts § 552). No intent to deceive is

necessary to establish a claim for negligent misrepresentation. *See Bienias*, 2013 WL 6486668 at *6.

Although the Binson's Defendants argue that a valid claim for negligent misrepresentation can only exist in the narrow context of an employer-employee relationship, Dkt. No. 61 at 26-27, the Indiana Supreme Court has determined that the tort of negligent misrepresentation can apply in a broader context. *See U.S. Bank*, 929 N.E.2d at 747. "A professional may owe a duty to a third party with whom the professional has no contractual relationship, but the professional must have actual knowledge that such third persons will rely on his professional opinion." *Id.* Furthermore, the Indiana Court of Appeals indicated that the tort of negligent misrepresentation may apply to "professionals" including, but not limited to, brokers, attorneys, abstractors, and surveyors. *See Jeffrey v. Methodist Hosp.*, 956 N.E.2d 151, 156, n.7 (Ind. Ct. App. 2011); *see also, Bienias*, 2013 WL 6486668 at *5. Therefore, because the tort of negligent misrepresentation does not apply only in the limited context of an employer-employee relationship, and because Roche has sufficiently plead the elements for negligent misrepresentation in the Amended Complaint, the Court DENIES the Binson's Defendants' motion to dismiss Roche's negligent misrepresentation claim pursuant to Rule 12(b)(6).[5]

In addition to its claims for breach of contract and negligent misrepresentation, Roche also brought a claim for tortious interference with a contractual relationship against

---

[5] Although Roche's claim for negligent misrepresentation was sufficiently pled under Rule 8, this claim is still dismissed as to the Individual Binson's Defendants, pursuant to Rule 12(b)(2), because this Court lacks personal jurisdiction over these defendants. *See supra* Part II.

the J&B Defendants, the Olympus-Delta Defendants, and Mankopf.  Am. Compl., ¶¶ 196-203.  To properly bring a claim for tortious interference with a contractual relationship, a plaintiff must allege "(1) the existence of a valid and enforceable contract; (2) the defendants' knowledge of the existence of the contract; (3) the defendants' intentional inducement of breach of the contract; (4) the absence of justification; and (5) resultant damages."  *Sheets v. Birkey*, 54 N.E.3d 1064, 1072 (Ind. Ct. App. 2016).  *See also, Craftsman Chemical Corp. v. IVC Indust. Coatings, Inc.*, No. 2:15-cv-00425-LJM-MJD, 2017 WL 365815, at *6 (S.D. Ind. Jan. 25, 2017).  In the Amended Complaint, Roche clearly alleges that it had a valid contract with Binson's and Northwood, in which it agreed to sell Binson's and Northwood its DME Strips so that they could distribute the DME Strips to DME insurance plan beneficiaries.  Am. Compl., ¶¶ 51-55, 197.  Roche also claims that the J&B Defendants, the Olympus-Delta Defendants, and Mankopf knew about Roche's agreements with Binson's and Northwood and that they sought to interfere with the agreements by devising the diversion scheme and by urging Binson's and Northwood to amend the Agreement and sell Roche's DME Strips through Olympus, Delta, and Alpha.  *Id.* at ¶¶ 84, 87-91, 94, 198-99, 201.  Roche further asserts that the J&B Defendants, the Olympus-Delta Defendants, and Mankopf acted without justification and that it suffered $89 million in damages as a result of their interference.  *Id.* at ¶¶ 202-03.  Therefore, in light of these allegations within the Amended Complaint, Roche's claim for tortious interference with a contractual relationship was sufficiently plead under Rule 8.[6]

---

[6] Even though Roche's claim for tortious interference with a contractual relationship meets the pleading standard in Rule 8, this claim is still dismissed as to the Olympus-Delta Defendants and Mankopf, pursuant to Rule 12(b)(2), because this Court lacks personal jurisdiction over these defendants.  *See supra* Part II.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** the Motions to Dismiss filed by Defendants Binson's Hospital Supplies, Inc., Northwood, Inc., Kenneth G. Fasse, Donnie E. Dickstein, James E. Binson, James E. Binson II, and Robert A. Binson and Defendants J&B Medical Supply Co., Fawzi B. Shaya, and Mary E. Shaya, **without prejudice**. Dkt. No. 60; Dkt. No. 62. The Court **GRANTS** Defendant Jeremiah Mankopf's Motion to Dismiss, Dkt. No. 63, and **GRANTS** Defendants', Olympus Global, LLC, Delta Global, LLC, Alpha XE LLC, Christopher F. Shaya, and Daniel Gladys, Motion to Dismiss, **without prejudice**. Dkt. No. 56. Furthermore, the Court **DENIES** the Motion for Sanctions under Rule 11 filed by Defendants, Binson's Hospital Supplies, Inc., Northwood, Inc., Kenneth G. Fasse, Donnie E. Dickstein, James E. Binson, James E. Binson II, and Robert A. Binson, **as premature**. Dkt. No. 58. The Court **GRANTS** Roche leave to amend its Amended Complaint within 21 days days from the date of this Order.

Additionally, the Court *sua sponte* **DISMISSES** this action as to Pharmacy John Does 1-50 for failure to state a claim upon which relief may be granted. *See Wudtke v. Davel*, 128 F.3d 1057, 1060 (7th Cir. 1997) ("it is pointless to include lists of anonymous defendants in federal court; this type of placeholder does not open the door to relation back under Fed.R.Civ.P 15, nor can it otherwise help the plaintiff") (internal citations omitted). If through discovery, the plaintiffs are able to learn the name of the unknown defendants, they may seek leave to add a claim against those individuals.

IT IS SO ORDERED this 18th day of September, 2017.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution:

David O. Tittle
BINGHAM GREENEBAUM DOLL LLP
dtittle@bgdlegal.com

Jessica Whelan
BINGHAM GREENEBAUM DOLL LLP
jwhelan@bgdlegal.com

Andrew W. Hull
HOOVER HULL TURNER LLP
awhull@hooverhullturner.com

Jason L. Fulk
HOOVER HULL TURNER LLP
jfulk@hooverhullturner.com

Wayne C. Turner
HOOVER HULL TURNER LLP
wturner@hooverhullturner.com

Jennifer Van Dame
KIGHTLINGER & GRAY LLP
jvandame@k-glaw.com

Robert M. Kelso
KIGHTLINGER & GRAY LLP
rkelso@k-glaw.com

Carina M. Kraatz
KITCH DRUTCHAS WAGNER VALITUTTI &
SHERBROOK
carina.kraatz@kitch.com

John M. Sier
KITCH DRUTCHAS WAGNER VALITUTTI &
SHERBROOK
john.sier@kitch.com

Aron R Fischer
PATTERSON BELKNAP WEBB & TYLER
LLP
afischer@pbwt.com

Joseph R. Richie
PATTERSON BELKNAP WEBB & TYLER
LLP
jrichie@pbwt.com

Geoffrey Potter
PATTERSON BELKNAP WEBB &TYLER LLP
gpotter@pbwt.com

Tracy Nicole Betz
TAFT STETTINIUS & HOLLISTER LLP
tbetz@taftlaw.com

Danila V. Artaev
THE MIKE COX LAW FIRM
dartaev@mikecoxlaw.com

Donna A. Heiser
THE MIKE COX LAW FIRM
dheiser@mikecoxlaw.com

Michael Anthony Cox
THE MIKE COX LAW FIRM, PLLC
mc@mikecoxlaw.com

Ernest J. Essad
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, PC
eje@wwrplaw.com

Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, PC
mrjames@wwrplaw.com