IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ROCHE DIAGNOSTICS CORP., and
ROCHE DIABETES CARE, INC.,

                  Plaintiffs,

v.

BINSON'S HOSPITAL SUPPLIES, INC.,
and NORTHWOOD, INC.,

                  Defendants.

_____/

Case No.: 1:17-cv-949-TWP-DML

**Jury Trial Demanded**

**BINSON'S HOSPITAL SUPPLIES, INC.'S AND NORTHWOOD, INC.'S
ANSWER, AFFIRMATIVE DEFENSES, JURY DEMAND AND COUNTER-COMPLAINT**

Defendants, Binson's Hospital Supplies, Inc. and Northwood, Inc. (collectively the

"Binsons Defendants"), by counsel, for their answer to the Second Amended

Complaints state as follows:

**<u>NATURE OF THE ACTION</u>**

1.    Roche[1], a manufacturer of medical equipment for patients with diabetes,

including blood glucose test strips, brings this action seeking compensation for

damages caused by Defendants'[2] fraud and other wrongful actions.

---

[1] The term "Roche" or "Plaintiffs" collectively refers to both Roche Diagnostics Corp. and Roche Diabetes Care, Inc.
[2] Roche's use of the term "Defendants" refers to the Binsons Defendants, J&B Medical Supply, Co., Inc., Fawzi B. Shaya and Mary E. Shaya.  The Binsons Defendants are only filing this Answer on behalf of its own actions and does not answer the Second Amended Compliant on behalf of J&B Medical Supply, Co., Inc., Fawzi B. Shaya, and Mary E. Shaya (collectively the "J&B Defendants").  Subsequent to the filing of this Second Amended Complaint, the J&B Defendants were voluntarily dismissed from this matter by Plaintiffs.

**Answer:**      The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 1 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

2.      Defendants participated in a brazen scheme to defraud Roche. Defendants conspired to obtain blood glucose test strips manufacture red by Roche and intended for sale only to beneficiaries of insurance plans that cover test strips under a durable-medical-equipment benefit ("DME Plans").  Instead Defendants diverted the test strips for retail sale to beneficiaries of insurance plans that cover test strips under a pharmacy benefit ("Pharmacy Plans").

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 2 of the Second Amended Complaint.

3.      By doing this, Defendants illegally exploited the substantial difference in wholesale list price and insurance reimbursement rates between test strips intended for DME Plans and Pharmacy Plans.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 3 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof, but deny any allegations of illegal actions or wrongdoing.

4.      Test strips paid for by Pharmacy Plans have a substantially higher list price and are reimbursed by insurance at a correspondingly higher rate than test strips paid for by DME Plans.  However Pharmacy Plans that pay the higher reimbursement rates receive large rebates from Roche, whereas DME Plans do not.  As a result of these rebates paid to Pharmacy Plans, Roche's net revenues from test strips paid for by

2

the two types of plans-and the net costs to the consumers who use the two types of plans-are comparable, notwithstanding the substantial difference in list price and insurance reimbursement rates.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 4 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

5.      By purchasing strips from Roche at the lower DME list price and diverting them for sale in channels where they would be reimbursed at the much higher Pharmacy Plan rate, Defendants and their co-conspirators made millions of dollars in illicit profits.  Importantly, Defendants' profit did not result from offering lower prices to consumers, the vast majority of whom pay a fixed out-of-pocket amount set by their insurance plans.  Rather, the profits resulted from causing Roche to pay substantial rebates to Pharmacy Plans for products that were intended for sale through DME Plans.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 5 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof, but deny any allegations of wrongdoing, that the Binsons Defendants gained illicit profits or engaged in a conspiracy to have Roche pay the Binsons Defendants substantial rebates to Pharmacy Plans.

6.      Because of security measures put in place by Roche, such as having separate packaging and product codes for Pharmacy and DME strips, there is no legitimate way to engage in a profitable diversion scheme as Defendants did.   In order to make their illicit profits, Defendants and their business partners conspired to defraud Roche in multiple ways.

3

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 6 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof, but deny any allegations that the Binsons Defendants engaged in a diversion scheme to make illicit profits, defrauded Roche or conspired to defraud Roche.

7.     For example, the Binson's Defendants, acting in concert with the J&B Defendants, their employees Christopher Shaya and Daniel Gladys, and business partners and corporate entities of Christopher Shaya and Gladys (together with the J&B Defendants, the "J&B Entities"), falsely induced Roche to sell them test strips intended for sale through DME channels by promising that they would distribute them only through these channels.  The Binson's Defendants never had any intention of keeping these promises.

**ANSWER:**   The Binsons Defendants deny the allegations contained in paragraph 7 of the Second Amended Complaint.

8.     Subsequently, the Binson's Defendants covered up their wrongdoing by providing Roche with fraudulent quarterly sales reports.  The Binson's Defendants sent Roche fabricated quarterly sales reports that claimed, among other things, that Defendant Northwood was fulfilling a certain specified number of patient prescriptions with its sale of Roche test strips.  But the Binson's Defendants simply made up these numbers.  Northwood did not deliver any test strips to patients.  It sold them all to the J&B Entities, who diverted them to pharmacies.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 8 of the Second Amended Complaint.

9.     Because almost all purchaser of Roche's test strips use insurance, the pharmacies that sold the diverted Roche DME test strips to patients submitted them to insurance companies for reimbursement.  In doing so, these pharmacies claimed to the patients' insurers that the Roche DME test strips being sold *were in fact retail strips*. The pharmacies thus fraudulently obtained the higher reimbursement rate for Pharmacy Plans.    The  difference  between  the  fraudulently  obtained  Pharmacy  Plan reimbursement rate and the rightful DME reimbursement rate is approximately $48 per box.  A share of the illicit profits from this scheme was passed back up the chain to all participants in this conspiracy among Defendants and other to profit from the insurance fraud.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 9 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof, but deny taking part in any conspiracy to make illicit profits via insurance fraud or receiving any profits from illicit activities or due to the alleged conspiracy.

10.     Profiting  from  this  insurance  fraud  was  the  driving  motivation  for Defendants to divert Roche's DME test strips.  Without the outsized profits obtained by fraudulent exploiting both the price different and reimbursement rates between retail and DME test strips, the Defendants would never have been able to sell the volume of test strips and earn the profits that they did.

**ANSWER:**    The Binsons Defendants deny the allegations set forth in paragraph 10 of the Second Amended Complaint.

11.     Defendants' fraudulent scheme caused Roche to wrongfully pay millions of dollars in rebates and deprived Roche of over $100 million in legitimate sales of its retail test strips.  Defendants' fraud damaged Roche in an amount of not less than $89 million plus interest.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 11 of the Second Amended Complaint.

## PARTIES

12.     Plaintiff Roche Diagnostics Corp. is a corporation organized under the laws of the State of Indiana, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.  Roche Holding AG is the ultimate parent company of Roche Diagnostics Corp.

**ANSWER:**   The Binsons Defendants neither admit nor deny the  allegations set forth in paragraph 12 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

13.     Plaintiff Roche Diabetes Care, Inc. is a corporation organized under the law of the State of Delaware, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.    Roche Diagnostics Corp. included Roche's U.S. commercial diabetes business until November 2015, when the U.S. commercial diabetes business was transferred to a separate legal entity, Roche Diabetes Care, Inc. Roche Diabetes Care, Inc. is engaged in the business of manufacturing and marketing blood glucose test strips.  Roche Holding AG is the ultimate parent company or Roche Diabetes Care, Inc.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 13 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

14.   Defendant Binson's Hospital Supplies, Inc. is a corporation organized under the laws of the State of Michigan, with its principal place of business at 26834 Lawrence Avenue, Centerline, Michigan 48015.  Binson's is a mail-order distributor of medical equipment, including blood glucose test strips, and also maintains several brick-and-mortar stores in Michigan and Florida, where it is possible to purchase medical equipment in person.

**ANSWER:**   Binson's Hospital Supplies, Inc. (individually referred to as "Binsons") admits the allegations set forth in paragraph 14 of the Second Amended Complaint. In further answer, Binsons states that it is a full service retail, home delivery and medical supply company.

15.   Defendant Northwood, Inc. is a corporation organized under the laws of the State of Michigan, with its principal place of business at 26834 Lawrence Avenue, Centerline, Michigan 48015.  Northwood is a subsidiary of Binson's and is a mail-order distributor of medical equipment, including blood glucose test strips.

**ANSWER:**   Northwood, Inc. (individually referred to as "Northwood") denies the allegations that it is a mail-order distributor of medical equipment.  As to the remaining allegations set forth in paragraph 15 of the Second Amended Complaint, Northwood admits.   Further answering, Northwood is a third party administrator and DME benefit manager working with a network of DME and other service providers.

7

16.     Defendant J&B Medical Supply Co., Inc. is a corporation organized under the laws of the State of Michigan, with its principal place of business at 50496 West Pontiac Trail, Wixom, Michigan 48393.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 16 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

17.     Defendant Fawzi B. Shaya is a Michigan citizen, having an address at 3066 Partridge Drive, Wixom, Michigan 48393.  Fawzi B. Shaya is part-owner, Director, and Chairman of J&B.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 17 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

18.     Defendant Mary E. Shaya is a Michigan citizen, having an address at 3066 Partridge Drive, Wixom, Michigan 48393.  Mary E. Shaya is a part-owner and President of J&B.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 18 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1).

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegation set forth in paragraph 19 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

20.   The amount of damages at issue exceeds $75,000, exclusive of interest and costs.

**ANSWER:**   The Binsons Defendants deny the allegation set forth in paragraph 20 of the Second Amended Complaint.

21.   This Court has personal jurisdiction over the Binson's Defendants because this action arises in part out of false and misleading statements made by agents of the Binson's Defendants to Roche in Indiana, and which foreseeably caused injury in Indiana.   The Court further has jurisdiction over the Binson's Defendants because the action arises in part out of their breach of a contract which was negotiated in part in Indiana and which is governed by Indiana law.   This Court further has jurisdiction over the Binson's Defendants because the events giving rise to this action concern the Binson's Defendants' reselling of productions that they had purchased from Indiana.   Furthermore, the Binson's Defendants consent to personal jurisdiction by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b) without challenging personal jurisdiction.

**ANSWER:**   The Binsons Defendants admit that the underlying agreement which Roche fails to attach to its Second Amended Complaint is governed by Indiana law. Further answering, the Binsons Defendants deny the remaining allegations set forth in paragraph 21 of the Second Amended Complaint.   Additionally, the Binsons Defendants

9

deny that there has been a waiver of their ability to challenge personal jurisdiction and specifically reserve its rights under the Federal Rules of Civil Procedure below.

22.     This Court has personal jurisdiction over the J&B Defendants because the action arises in part out of their intentional and tortious interference with a contract governed by Indiana law, that was negotiated in part in Indiana, which governs the purchase of products from Indiana, and out of fraudulent statements intentionally transmitted by the J&B Defendants to Roche (via the Binson's Defendants) in Indiana, which foreseeably caused injury in Indiana.   Furthermore, the J&B Defendants consented to personal jurisdiction by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b) without challenging personal jurisdiction.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 22 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

23.     Venue is proper in the Southern District of Indiana pursuant to 28 U.S.C. §1391(a) in that a substantial part of the events or omissions giving rise to the claim occurred in this district, and one or more of the Defendants is subject to personal jurisdiction in this district.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 23 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

## <u>FACTS COMMON TO ALL CLAIMS</u>

### <u>Roche's Blood Glucose Test Strips</u>

24.     Roche is one of the leading manufacturers of blood glucose test strips. Millions of people with diabetes depend on Roche's test strips to monitor their blood sugar.  Diabetes patients use Roche's test strips by placing a drop of blood on a strip and inserting the strip into a meter, which provides a blood glucose reading.

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 24 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

25.     Roche sells its blood glucose test strips in different packages sold through different distribution channels targeted to patients with different types of insurance coverage.   There are two distribution channels for Roche blood glucose test strips relevant here: the test strips intended for retail sale ("Retail Strips") and test strips intended for sale by provides of durable medical equipment ("DME Strips").  Roche's Retail Strips are intended for sale at retail pharmacies.  The Retail Strips may be sold to anyone, including people who do not have insurance and pay cash.  However, over 90% of purchasers of Roche's retail Strips use insurance, which reimburses the pharmacies under Pharmacy Plans.

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 25 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

26.     Roche sells its Retail Strips to wholesalers for approximately $71 per 50-strip vial.  The wholesalers sell the Retail Strips to retail pharmacies for about $75 per vial.  When a Pharmacy Plan beneficiary purchaser Roche Retail Strips, the patient's insurance plan reimburses the pharmacy approximately $78 per 50-strip vial.   Under

contracts with the insurers, Roche pays rebates of about $50 for every 50-strip vial of Retail Strips that is reimbursed by a Pharmacy Plan, so Roche's net revenue per vial of retail Strips is substantially less than the $71 wholesale price.

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 26 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

27.    By contrast, Roche sells its DME Strips to mail-order distributors, all of which are contractually obligated to sell only to DME beneficiaries or to other, specifically approved DME distributors who will only sell to DME beneficiaries.  Insurers who cover test strips under DME Plans include Medicare and "commercial" (non-Medicare) insurers.  Roche sells its DME Strips to mail-order distributors for under $20 per 50-strip vial, and commercial DME plans reimburse the mail-order distributors, on average, approximately $30 per 50-strip vial.

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 27 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

28.    Roche's DME mail-order distributors are contractually prohibited from selling the DME Strips to Pharmacy Plan beneficiaries (or cash payers).  Because these contractual provisions prevent DME Strips from being reimbursed by insurers that received rebates from Roche, Roche is able to sell DME Strips to DME providers at a lower price than it sells Retail Strips to pharmacy providers.  These lower prices are offered in return for and in reliance on the DME mail-order distributors' compliance with the terms of their contracts with Roche, called "Product and Pricing Agreements."

12

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 28 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

29.   Each of Roche's test strip products has a different National Drug Code ("NDC") printed on its package.  An NDC is a unique numerical identifier recorded by the U.S. Food and Drug Administration, which regulates these devices.  As an example, one of Roche's most widely used blood glucose test strip products is the Accu-Chek Aviva Plus, most commonly sold in 50-strip vials.  The NDC for the DME version of this product is 65702-0436-10, while the NDC for the retail version is 65702-0407-10.  The NDC is printed on each vial's package.

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 29 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

30.   The package for the DME version of Roche's Aviva Plus test strips features the following warnings, printed in easy-to-read, bolded black lettering on a yellow background: "Not for Sale in Retail Outlets" and "Exclusively for Mail Order Use." These warnings are of course not printed on the package for the retail version of Aviva Plus test strips.

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 30 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

31.   When patients with insurance purchase Roche blood glucose test strips, sellers are paid by the patient's insurers instead of by the patients themselves.  To

obtain payment, the seller must submit a reimbursement claim to the insurer.  When the patient is a DME Plan beneficiary, the seller is required to seek the appropriate DME reimbursement (around $30 per vial for non-Medicare plans).  When the patient is a Pharmacy Plan beneficiary, the seller is required to seek the appropriate Pharmacy Plan reimbursement (around $78 per vial).

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 31 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

32.    When the patient is a Pharmacy Plan beneficiary, the test strip seller must submit the product's NDC to the patient's insurance plan as part of the reimbursement claim.  This is necessary because Pharmacy Plans only cover specific pharmaceuticals and medical devises, listed by NDC, that are on the plan's formulary.   Products not listed on the Pharmacy Plan's formulary are not entitled to any reimbursement.

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 32 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

33.    Because of the significant differences in how Retails Strips and DME Strips are sold and paid for, it is crucial for fairness and functioning of the marketplace that the test strips be sold only within their intended channels. Diversion of DME Strips into the retail channel not only deprives Roche of retail sales, it also cause an out-of-pocket loss on each vial of DME Strips that is paid for through a Pharmacy Plan, because the rebates Roche pays Pharmacy Plans (about $50 per vial) are higher than the price Roche receives for DME Strips (under $20 per vial).

14

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 33 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

34.   Because of this potential for harm, Roche and the insurance companies that pay for its blood glucose test strips have implemented systems that are intended to prohibit distributors from diverting blood glucose test strips outside their intended channels.  The only way for distributors to do so is to violate a contractual obligation and/or commit fraud.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 34 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

35.   Because reimbursement by a Pharmacy Plan requires that the seller submit a reimbursement claim with a valid retail NDC, it would be fraudulent for a test strip seller to obtain the approximately $78 retail reimbursement rate by claiming reimbursement for Retail Strips (by submitting the retail NDC), when DME Strips are in fact being sold.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations  set forth in paragraph 35 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof. Further answering, the Binsons Defendants did not submit a reimbursement claim on these products.

36.   It would also be fraudulent, as well as a breach of contract, for a DME distributor to inform Roche it was distributing to DME beneficiaries when it was in fact selling to pharmacies or pharmacy suppliers.

15

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 36 in the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

37.   Unfortunately, Defendants and their business partners have engaged in these acts of fraud and breach of contract.

**ANSWER:**   The Binsons Defendants deny any acts of fraud or breach of contract.   As to the remaining allegations set forth in paragraph 37 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

**Roche's Agreement With Binson's/Northwood**

38.   On February 10, 2011, Roche entered into a Product and Pricing Agreement (the "Agreement") with Defendant Binson's, which contracted on behalf of itself and its subsidiary, Defendant Northwood.   The Agreement was amended on February 10, 2011, July 1, 2013, October 1, 2013, February 1, 2014, and July 21, 2014. The Agreement and its amendments permitted Binson's and Northwood to purchase DME Strips from Roche and to distribute them, either on their own or through certain designated "Durable Medical Equipment Providers," to DME beneficiaries only.   The contractually designated "Durable Medical Equipment Providers" included Binson's and Northwood themselves as well as certain specified affiliates of Binson's and Northwood.

**ANSWER:**   The Binsons Defendants admit that they entered into the Agreement and amendments with Roche.   The Binsons Defendants deny any allegations that it breached the contract.   As to the remaining allegations contained in paragraph 38 of the

16

Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

39.      In exchange for Binson's and Northwood's agreement to sell Roche DME Strips to DME beneficiaries only, Roche provided a low price to Binson's and Northwood.  Roche provided Binson's and Northwood with net prices (after rebates) of between $5 and $17 per 50-strip vial.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 39 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

40.      The price at which Binson's and Northwood could purchase Roche DME Strips varied with each contractual amendment and depended on Binson's and Northwood's prospective volume commitments and Roche's market share of the total sales made by Binson's, Northwood, and the other designated "Durable Medical Equipment Providers" to DME beneficiaries.  The higher Roche's market share, the higher the rebate Roche agreed to pay Binson's and Northwood per vial.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 40 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

41.      Roche required Binson's and Northwood to submit two types of reports to receive their rebates: market Share Reports and Utilization Reports and Utilization Reports (also referred to as "sales tracings").  Market Share Reports stated Roche's market share in the previous month or quarter.  The more fine-grained Utilization Reports included data on each individual sale of Roche DME Strips by Binson's,

Northwood, and other "Durable Medical Equipment Providers" to individual DME beneficiaries.   These Utilization Reports included individual patients' prescription numbers and dates of sale.  Utilization Reports verified that Binson's and Northwood's customers were in fact DME beneficiaries.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 41 of the Second Amended Complaint as being untrue in the manner and form alleged. Further answering, Binsons supplied Utilization Reports which are also known as patient tracing reports to Plaintiffs on a continuous basis as required by the Agreement and subsequent amendments.  Northwood was never required to provide patient tracing reports, in addition to the market share reports, to Plaintiffs.

42.   Roche required Binson's and Northwood to submit Utilization Reports regarding individual sales to DME beneficiaries in part to corroborate the information in the Market Share Reports.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 42 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

43.   From 2011 until July 2014, Binson's and Northwood maintained a steady business in Roche DME Strips, with average sales of approximately 5,000-10,000 vials per month.  During this time, Binson's and Northwood submitted Market Share Reports and Utilization Reports showing their sales were to DME beneficiaries.

**ANSWER:**   The Binsons Defendants neither admit nor deny the  allegations set forth in paragraph 43 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

**The Binson's Defendants' Fraudulent Diversion Scheme**

44.    In July 2014, when Binson's and Northwood renegotiated the Agreement with Roche, they fraudulently induced Roche to sell DME Strips directly to Northwood (rather than through Binson's, as before) at a flat discounted price without the need for rebate claims.   Binson's and Northwood negotiated these changes so that they could divert DME Strips to the J&B Entities as part of a fraudulent scheme to exploit the price and reimbursement difference between DME Strips and Retail Strips.

**ANSWER:**   The Binsons Defendants admit that the Agreement was amended for Roche to sell DME Strips at a flat price without the need to submit rebate claims.  The Binsons Defendants deny that they fraudulently induced Roche to amend the Agreement or negotiated the amendment of the Agreement as part of a fraudulent scheme.   As to the remaining allegations contained in paragraph 44 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

45.    Before July 2014, most of the patients who purchased Roche DME Strips from Binson's were Medicare recipients. However, as alleged in more detail below, Binson's and Northwood executives Kenneth G. Fasse and Donnie E. Dickstein, acting on behalf of Binson's and Northwood, repeatedly told Roche employees that Northwood had a large base of customers covered by "commercial" (*i.e.*, non-Medicare) DME plans. Fasse is Executive Vice President and Chief Operating Officer of Binson's as well as President of Northwood. Dickstein is Director of Northwood.

**ANSWER:**   The Binsons Defendants admit that Fasse is the Executive Vice President and Chief Operating Officer of Binsons as well as the President of Northwood and

Dickstein is the Director of Northwood.  As to the remaining allegations set forth in paragraph 45 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leaves Plaintiffs to their strict proofs thereof.

46.    As alleged in more detail below, Fasse and Dickstein, acting on behalf of Binson's and Northwood, told Roche that if Northwood could purchase Roche DME Strips at a low price without rebate, they would be able to move their base of commercial DME patients from competitors' test strips to Roche test strips.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 46 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

47.    These statements were false. Northwood had no base of customers it planned to move to Roche test strips from other brands. Instead, Northwood intended to sell Roche DME to shell companies controlled by the J&B Entities. Binson's and Northwood made these false statements to Roche for the purpose of inducing Roche to sell them large volumes of DME test strips that they could divert at great profit.

**ANSWER:**    The Binsons Defendants deny the allegations set forth in paragraph 47 of the Second Amended Complaint.

48.    As alleged in more detail below, Christopher Shaya, on behalf of or in concert with the other J&B Entities, assisted the Binson's and Northwood in making these false statements to Roche. This assistance included providing a list of insurers whose patients would supposedly be purchasing Roche DME Strips from Northwood, even though Binson's and Northwood never had any intention of selling Roche's test

20

strips directly to patients and had no way of knowing which insurers would in fact be paying for the strips.

**ANSWER:**   The Binsons Defendants deny any allegations that they took part in any alleged conspiracy to breach the Agreement and amendments or intended to take actions contrary to the Agreement and amendments.   As to the remaining allegations set forth in paragraph 48, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

49.   In reliance on these false representations by agents of Binson's and Northwood, Roche agreed to a July 21, 2014 amendment to the Agreement, contracting with Binson's and Northwood jointly. In the negotiation of the amendment, neither Fasse, Dickstein, nor any other agent of Binson's or Northwood ever told any employee or representative of Roche that Northwood intended to sell Roche DME Strips to anyone besides individual DME beneficiaries.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 49, the Binsons Defendants as untrue.

50.   The July 2014 amendment permitted Northwood (contracting jointly with Binson's) to purchase DME Strips from Roche at a discounted flat rate of $10.67 per 50-strip vial without submitting rebate claims. As before, Northwood was contractually required to sell the DME Strips to DME beneficiaries, either directly or through the specific Northwood-affiliated "Durable Medical Equipment Providers" expressly identified in the Agreement.

**ANSWER:**   The Binsons Defendants admit the allegations as set forth in paragraph 50 of the Second Amended Complaint.

21

51.     After the July 2014 amendment, Northwood's sales rose dramatically, growing from around 16,000 50-strip vials in July 2014 to almost 100,000 vials in January 2015.     Northwood's sales averaged well over 100,000 vials per month throughout the first three quarters of 2015.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations as set forth in paragraph 51 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

52.     Between July 2014 and September 2015, Binson's and Northwood purchased more than 1.5 million vials of test strips from Roche pursuant to the amended agreement. Despite Binson's and Northwood's repeated representations to the contrary, and despite their contractual obligations to the contrary, substantially all of these strips were diverted to the J&B Entities and ultimately to retail pharmacies.

**ANSWER:**   The Binsons Defendants deny any allegations of wrongdoing, including making false statements or diverting test strips.  As to the remaining allegations set forth in paragraph 52 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

**The Binson's Defendants' Fraudulent Concealment of Their Diversion Scheme**

53.     After the July 2014 amendment to the Agreement with Roche, Binson's and Northwood, with the assistance of the J&B Entities, made multiple further misrepresentations to Roche for the purpose of inducing Roche to continue selling Binson's and Northwood DME Strips that they could then divert into retail channels.

**ANSWER:**   The Binsons Defendants deny any allegations of a diversion scheme or fraudulent actions and statements as set forth in paragraph 53 of the Second Amended Complaint.

54.   After the July 14 amendment, Binson's and Northwood stopped providing Roche with Utilization Reports, which would have helped Roche verify that they were selling DME Strips only to individual DME beneficiaries and not to third-party companies.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 54 of the Second Amended Complaint as being untrue in the manner and form alleged. Further answering, Binsons supplied Utilization Reports which are also known as patient tracing reports to Plaintiffs on a continuous basis as required by the Agreement and subsequent amendments.  Northwood was never required to provide patient tracing reports, in addition to the market share reports, to Plaintiffs.

55.   In late 2014, after Binson's and Northwood submitted their Market Share Report for the third quarter of 2014 showing that Northwood had sold over 100,000 50-strip vials that quarter, Roche sales manager Noelle Adams contacted Dickstein by telephone to ask him where Northwood's volume was coming from. Dickstein falsely told Adams that Northwood was selling Roche's DME Strips to Northwood's customer base of DME beneficiaries, many of whom had previously purchased LifeScan test strips, a competitor of Roche's. This was false; in fact, Northwood's sales of LifeScan test strips had increased.

**ANSWER:**   The Binsons Defendants deny that any false statements were made to Roche.   As to the remaining allegations set forth in paragraph 55 of the Second

23

Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their proofs thereof.

56.     On multiple other occasions, as alleged in more detail below, Adams asked Fasse and Dickstein to explain how Northwood had achieved the rapid growth in sales of Roche's DME Strips. Fasse and Dickstein repeatedly told Adams that Northwood was selling Roche's DME Strips to DME beneficiaries. Fasse and Dickstein claimed that some of the Roche DME Strips were being sold to pre-existing Northwood customers who had previously used different test strip brands and that Northwood had also obtained new DME beneficiary customers.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 56 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

57.     Before October 2015, neither Fasse, Dickstein, nor any other employee or representative of Binson's or Northwood ever told any employee or representative of Roche that Northwood was selling Roche's DME Strips to third-party companies.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 57 of the Second Amended Complaint.

**Roche Discovers the Binson's Defendants' Fraudulent Scheme**

58.     Although the growth in Northwood's sales of Roche's DME Strips was fast, Roche personnel initially believed it was legitimate. Given that diabetes patients often use about three vials of blood glucose test strips per month, Northwood's sales of about 100,000 vials per month meant that it was selling Roche's DME Strips to a customer

base of approximately 30,000 people—a plausible number given that over 750,000 adults with diabetes live in Michigan.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 58 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

59.    Nevertheless, because Northwood had so quickly begun to outperform other DME distributors Roche worked with, Roche decided to test the integrity of Northwood's sales figures. In the spring and summer of 2015, Roche retained private investigators to attempt to purchase Roche DME Strips for cash at Binson's brick-and-mortar locations in Michigan and Florida. Given that the same people ran and worked for Binson's and Northwood, any misconduct on Binson's part would also cast suspicion on Northwood.

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 59 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

60.    The private investigators were able to make several cash buys without problems. Indeed, Roche's DME Strips were prominently displayed for sale at Binson's stores. As noted above, the packaging for Roche's DME Strips conspicuously warned that it was "Not for Sale in Retail Outlets" and "Exclusively for Mail Order Use."

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 60 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

61. The ease with which the investigators were able to make cash purchases from Binson's triggered Roche's suspicions as to both Binson's and Northwood. In or about June or July 2015, Adams requested that Binson's and Northwood provide Roche with Utilization Reports showing each individual sale of Roche DME Strips by Binson's and Northwood and including unique numerical patient identifiers. When the representatives of Binson's and Northwood failed to provide the requested information, Adams repeated her request for Utilization Reports several times through July, August, and September of 2015.

**ANSWER:** The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 61 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

62. Finally, on September 11, 2015, Binson's sent an initial set of Utilization Reports for its own direct sales, covering January through July 2015. However, Northwood, which had far more direct sales than Binson's, did not produce Utilization Reports. When Adams asked when Roche could expect the Northwood Utilization Reports, Dickstein claimed that Northwood was "working on it" and would provide the reports in a "few weeks" but that it would not be possible to do so sooner due to the high volume of Northwood's sales and technical difficulties.

**ANSWER:** The Binsons Defendants deny the allegations set forth in paragraph 62 of the Second Amended Complaint as being untrue in the manner and form alleged. Further answering, the Binsons admits that they submitted Utilization Reports, also known as patient tracing reports to Roche on a continuous basis as required under the Agreement and amendments and Northwood was never required to provide Utilization

26

Reports also known as patient tracing reports, in addition to the market share reports, to

Plaintiffs

63.     Ultimately, Roche could not wait any longer. On September 24, 2015, Roche cut off all shipments of Roche DME Strips to Binson's and Northwood until they could demonstrate their sales were legitimate.

**ANSWER:**   The Binsons Defendants admit that Roche cut off sales to the Binsons Defendants leaving the patients who rely on blood glucose strips without access to their medical supplies.   The Binsons Defendants deny the allegation that their sales were illegitimate.   As to the remaining allegations set forth in paragraph 63 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

64.     The same day, Roche's head of sales, Dan Majestic, contacted Northwood by telephone and told Fasse and Dickstein that Roche would not resume shipments unless Northwood provided the requested sales Utilization Reports. Majestic also told Fasse and Dickstein that Roche knew that Binson's was selling Roche DME Strips for cash and asked Fasse and Dickstein to explain Northwood's high sales volumes.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 64 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

65.     Dickstein claimed that Northwood had been selling Roche DME Strips to between 15 and 25 companies in Florida instead of to individual DME beneficiaries as the Agreement required. This was false. As alleged below, Northwood had been selling

Roche's DME Strips to shell companies controlled by the J&B Entities, not to Florida companies. Dickstein also falsely claimed that the supposed Florida companies were legitimate DME providers that sold to individual DME beneficiaries.

**ANSWER:**   The Binsons Defendants neither admit nor deny the  allegations set forth in paragraph 65 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

66.     Dickstein refused to identify to Majestic the Florida DME providers that were supposedly selling Roche's product.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 66 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

67.     Dickstein's September 2015 communication with Majestic was the first time any employee or representative of Roche had ever been told that Northwood was selling or intended to sell Roche test strips to a third party instead of directly to DME beneficiaries, as required by the Agreement.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 67 of the Second Amended Complaint.

68.     On September 28, 2015, Roche's then Senior Counsel, Julie Dilts, sent Fasse a cease-and-desist letter, formally notifying Binson's and Northwood that they had violated the Agreement. Roche demanded that within ten days, Binson's and Northwood provide Utilization Reports for January through September 2015, a list of all individuals and entities Binson's and Northwood had sold Roche's product to in violation

28

of the Agreement since February 2011, and an explanation for Northwood's explosive sales growth.

**ANSWER:**   The Binsons Defendants deny that Julie Dilts sent a letter to Fasse on September 28, 2015.  Further answering, the Binsons Defendants deny any allegations of wrongdoing, including that they have breached the Agreement and amendments.  As to the remaining allegations set forth in paragraph 68 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

69.   On October 6, 2015, Fasse sent Dilts an email acknowledging that Binson's had been selling Roche DME Strips for cash at its retail locations. Fasse claimed, falsely, that "[m]anagement was unaware of this problem prior to receiving your letter." He wrote that "[a]ll retail locations have removed mail order packaged products from retail sales areas" and that "[c]ash sales of the products have been terminated including on the website. All personnel in the retail areas of each location and patient contact centers have been informed that the products are not available for cash sale . . . . Our information technology group will be deactivating these SKU's from the point of sales system for cash transactions."

**ANSWER:**   The Binsons Defendants admit that Fasse sent Julie Dilts an e-mail on October 6, 2015, but deny that the statements were false.

70.   Fasse attached a spreadsheet to his October 6, 2015 email that he claimed was a "complete list of all retail cash sales of [Roche] Products sold for the period February 2011 - present." The spreadsheet shows Binson's sold 2,557 vials of Roche DME Strips for cash between February 2, 2011 and September 28, 2015.

**ANSWER:**   The Binsons Defendants admit that Fasse attached a spreadsheet to his October 6, 2015 e-mail.  Further answering, the Binsons Defendants neither admit nor deny the remaining allegations set forth in paragraph 70 of the Second Amended Complaint as Fasse's October 6, 2015 e-mail and the spreadsheet attached to the e-mail are the best evidence of its purpose and intent.

71.   On October 7, 2015, Fasse sent Dilts an email attaching Binson's—but not Northwood's—Utilization Reports for January to September 2015. Fasse claimed "Northwood [was] unable to obtain and compile similar information. We did not collected [sic] patient transaction data from providers for the products supplied to patients."

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 71 of the Second Amended Complaint for lack of information as Fasse's October 7, 2015 e-mail is the best evidence of its purpose and intent and leave Plaintiffs to their strict proofs thereof.  Further answering, Northwood was never required to provide patient tracing reports, in addition to the market share reports, to Plaintiffs.

72.   In his October 7 email to Dilts, Fasse admitted that Northwood had been selling Roche DME Strips to a third party since July 2014. Fasse re-asserted the false claim that Northwood had sold the Roche DME Strips to various "DME providers," which in turn sold the DME Strips to individual DME beneficiaries.

**ANSWER:**   The Binsons Defendants deny allegations that they made or caused to be made any false claims to Roche.  As to the remaining allegations set forth in paragraph 72 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

**Roche Discovers the J&B Entities' Involvement in the Scheme**

30

73.     Since October 2015, Roche has been able to uncover additional detail about Binson's and Northwood's fraudulent scheme to divert Roche DME Strips and exploit the price and reimbursement differences between Roche's DME and Retail Strips. This information revealed that the J&B Entities worked closely with Binson's and Northwood to wrongfully divert Roche's DME test strips.

**ANSWER:**   The Binsons Defendants deny any allegations that they conspired with other entities or individuals, conspired to divert test strips, participated in a diversion scheme or took part in any fraudulent activities.   As to the remaining allegations set forth in paragraph 73 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

74.     In or about May 2014, Fasse and Dickstein, on behalf of Binson's and Northwood, began discussions with J&B employee Chris Shaya and his business partner Jeremiah Mankopf regarding a plan to profit from the diversion of Roche's DME Strips.

**ANSWER:**   The Binsons Defendants admit that Fasse and Dickstein spoke with Chris Shaya regarding the sale of test strips to DME providers in conformance with the Agreement and amendments.   The Binsons Defendants deny the allegation that the conversations were about a plan to profit from the diversion of Roche's DME Strips.   As to the remaining allegations set forth in paragraph 74 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave the Plaintiffs to their strict proofs thereof.

31

75.    As Fasse and Dickstein knew, Chris Shaya was employed by Defendant J&B, and Chris Shaya's family members owned and controlled J&B. In correspondence with Fasse, Chris Shaya referred to his family's involvement in his business dealings.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 75 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

76.    In 2008, J&B entered into a contract with Roche under which Roche agreed to sell J&B discounted DME Strips on the condition that J&B sell the strips exclusively to members of the Blue Cross Network of Michigan ("Blue Cross"), either directly or through specified providers. In 2010, after Roche learned that J&B had diverted Roche DME Strips to non-Blue Cross patients, Roche terminated its contract with J&B and cut off its supply of Roche DME Strips.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 76 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

77.    On information and belief, J&B had been looking for a new way to divert Roche DME Strips ever since. Upon further information and belief, in pursuit of that goal, J&B employee Chris Shaya and Mankopf created Olympus Global, LLC ("Olympus"), a shell company co-owned and managed, at least on paper, by Chris Shaya and Mankopf.

**ANSWER:**    The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 77 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

78.     In discussions between May and July 2014, Chris Shaya and Mankopf told Fasse and Dickstein that they could sell large volumes of Roche DME Strips to Medical Supply Solutions, Inc. ("MSSI"), a Florida medical supplies distributor and known diverter. Fasse and Dickstein agreed to sell DME Strips obtained from Roche to Olympus, which would in turn sell them to MSSI.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 78 of the Second Amended Complaint.

79.     Binson's, Northwood, Chris Shaya, and his business partners all knew that Roche would never knowingly permit Binson's or Northwood to sell its DME Strips to third parties like Olympus or MSSI. They also knew that it would be easier to carry out this scheme if Northwood could purchase DME Strips at a flat, discounted price without the need to submit individualized rebate requests for their fraudulent sales.

**ANSWER:**   The Binsons Defendants deny the allegations that they took any part in a diversion scheme to defraud Roche or engaged in any fraudulent activity.  As to the remaining allegations set forth in paragraph 79 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

80.     Once Binson's and Northwood extracted this pricing concession from Roche in the July 2014 contract amendment, Fasse and Dickstein told Chris Shaya and Mankopf that Northwood would sell the Roche DME Strips to Olympus with the understanding that they would then be sold to MSSI.

**ANSWER:**   The Binsons Defendants admit that Roche voluntarily and without reliance on any statements by the Binsons Defendants amended the Agreement.  The Binsons

Defendants deny any allegations of participation in a diversion scheme, that they engaged in any fraudulent acts or knew that the DME Strips would be sold to MSSI.  As to the remaining allegations set forth in paragraph 80 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

81.     Binson's, Northwood, Chris Shaya, and his business partners understood and intended that the DME Strips would eventually be sold to pharmacies, which would in turn sell the DME Strips to pharmacy beneficiaries utilizing the Retail Strip NDC to obtain pharmacy reimbursements. Indeed, the whole point of this diversion scheme was to profit from the wide spread between the discounted flat rate at which Northwood obtained DME Strips from Roche ($10.67 per vial) and the approximately $78-per-vial insurance reimbursements pharmacies could obtain by falsely claiming they were selling Retail Strips. No intermediary would otherwise have purchased the marked-up DME Strips, because they could have bought them more cheaply from Roche itself by agreeing to contractual restrictions and checks (*e.g.*, Utilization Reports and audit rights) to ensure the DME Strips were not sold to pharmacy beneficiaries.

**ANSWER:**   The Binsons Defendants deny any allegations that they conspired with other entities or individuals, conspired to divert test strips, participated in a diversion scheme or took part in any fraudulent activities.   As to the remaining allegations set forth in paragraph 81 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

34

82.     The Agreement allowed for Binson's and Northwood to sell DME Strips to Roche-approved "Durable Medical Equipment Providers," which would in turn sell to DME beneficiaries. Because Roche's objective in doing business with Binson's and Northwood was to increase its DME sales, it would have been receptive to obtaining legitimate new DME distributors through Binson's and Northwood. But Binson's and Northwood hid from Roche that Northwood was selling DME Strips to Olympus. They did this because they did not intend to legitimately sell Roche's DME Strips; they intended to defraud Roche.

**ANSWER:**     The Binsons Defendants deny the allegation that they hid information from Roche, that they did not intend to legitimately sell Roche's DME Strips or had any fraudulent intent in their dealings with Roche.  As to the remaining allegations set forth in paragraph 82 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

83.     From July 2014 to about January 2015, Northwood sold the DME Strips it purchased from Roche to Olympus. Beginning in or about January 2015, Northwood began selling the DME Strips it purchased from Roche to Delta Global, LLC ("Delta"), a shell company controlled by Chris Shaya, by J&B employee Daniel Gladys and, on information and belief, also controlled by J&B, Fawzi Shaya, and Mary Shaya.

**ANSWER:**     The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 83 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

84.    Between July 21, 2014 (when Binson's/Northwood amended its contract with Roche) and September 24, 2015 (when Roche terminated sales to Binson's/Northwood), Northwood sold approximately 1,526,688 50-strip vials of Roche DME Strips to Olympus and Delta. Northwood sold the 50-strip vials at a markup of approximately $2 per vial, profiting by over $3 million.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 84 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

**The J&B Entities Divert Roche DME Strips to MSSI**

85.    The J&B Entities, through Olympus and Delta, purchased approximately 1,526,688 50-strip vials of Roche DME Strips. Then, through Olympus and another shell company created and controlled by the J&B Entities, Alpha XE LLC ("Alpha"), the J&B Entities sold all of these DME Strips to MSSI. The J&B Entities sold Roche DME Strips to MSSI for prices ranging from $15.59 to $20.75 per vial, a substantial markup on the approximately $12.67 the J&B Entities paid for them. On information and belief, the J&B Entities made a total profit of more than $8 million by selling Roche's DME Strips to MSSI.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 85 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

**MSSI Resells the Diverted Roche DME Strips**

86.    MSSI, in turn, sold the Roche DME Strips to the following entities: S.P. Distributors;  NE-Medical  Supply  USA,  Inc.;  Trusted  Medical  Supply;  Masters

Pharmaceutical Inc.; H&H Wholesale Services Inc.; Costal Medical Group, LLC; Acute Management Group; ADW Diabetes LLC; Universal Health Alliance Corp.; Sterling Distributors; MedPlus, Inc.; Dream Cereal; Value Wholesale Inc.; Brookport Inc.; Coastal Medical Group; and MEDxSURG. The largest purchaser, S.P. Distributors, paid MSSI $18.9 million for Roche DME Strips diverted by the Binson's Defendants and J&B Entities.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 86 of the Second Amended Complaint for lack of information.

87.   MSSI made a total profit of at least $6.9 million selling Roche DME Strips diverted by the Binson's Defendants and J&B Entities. MSSI's purchasers paid prices ranging from approximately $18 to approximately $43 per 50-strip vial of Roche DME Strips. These purchasers could have purchased DME test strips more cheaply from Roche, but they would have been contractually required to sell them to DME beneficiaries and would be subject to controls (*e.g.*, Utilization Reports or audit rights) to confirm that they did so. But these prices were markedly cheaper than what the purchasers would have to pay to obtain Roche Retail Strips. MSSI's purchasers, like Binson's, Northwood, the J&B Entities, and MSSI, intended to profit by diverting Roche DME Strips to retail pharmacies, which would obtain an approximately $78 insurance reimbursement for each 50-strip vial by committing insurance fraud.

**ANSWER:**   The Binsons Defendants deny any allegations that they conspired with other entities or individuals, conspired to divert test strips, participated in a diversion scheme or took part in any fraudulent activities.   As to the remaining allegations set forth in paragraph 87 of the Second Amended Complaint, the Binsons Defendants

neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

**The Binson's Defendants' Fraudulent Statements and Material Omissions**

88.    Agents of Binson's and Northwood made, caused to be made, and conspired to make numerous false statements. Roche reasonably relied on these statements, either directly or indirectly, and was damaged as a result.

**ANSWER:**    The Binsons Defendants deny the allegations set forth in paragraph 88 of the Second Amended Complaint.

89.    In an in-person meeting on December 7, 2013, Dickstein, acting as an agent of Binson's and Northwood, told Roche Sales Manager Noelle Adams and her supervisor, Roche Regional Sales Manager Colleen Miller, that Northwood had access to a large group of commercial DME patients that would move to Roche test strips from other brands. This was false. Northwood had no base of DME patients it intended would change to Roche test strips.

**ANSWER:**    The Binsons Defendants deny that an in person meeting took place on December 7, 2013 and further deny that they made or caused to be made any false or misleading statements to Roche.  As to the remaining allegations set forth in paragraph 89, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

90.    In a telephone conference with Adams and Miller on December 23, 2013, Dickstein, acting as an agent of Binson's and Northwood, repeated the false statement that Roche had access to a large group of commercial DME patients.

**ANSWER:**   The Binsons Defendants deny that they made or caused to be made any false or misleading statements to Roche.  As to the remaining allegations set forth in paragraph 90, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

91.    In a conference call on June 24, 2014, Fasse and Dickstein, acting as agents of Binson's and Northwood, told Adams and Miller that if Northwood could purchase DME Strips at a low price without submitting for rebates, Northwood would sell Roche test strips to its large customer base of commercial DME beneficiaries. Fasse and Dickstein repeated this claim to Adams and Miller in a July 14, 2014 phone call. These false statements were made for the purpose of inducing Roche to enter into what became the July 2014 amendment.

**ANSWER:**   The Binsons Defendants deny that they made or caused to be made any false or misleading statements to Roche or that any statements were made to induce Roche to take an action it later voluntarily agreed to do.  As to the remaining allegations set forth in paragraph 91 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

92.    On July 7, 2014, Dickstein, acting as an agent of Binson's and Northwood, sent an email to Miller with a list of DME Plans that Dickstein represented would be paying for the DME Strips sold by Northwood to individual patients after the execution of the July 2014 agreement. This representation was false. Northwood had already made arrangements to sell all Roche's DME Strips to Olympus, not to individual patients, and

Northwood did not know and could not verify which insurance plans would ultimately pay for the strips when they were sold to patients.

**ANSWER:**   The Binsons Defendants deny the allegation that they made or caused to be made any false statements to Roche.   As to the remaining allegations set forth in paragraph 92 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

93.    In an email sent on or about July 15, 2014, Dickstein, acting as an agent of Binson's and Northwood, assured Miller that Northwood would continue to provide sales tracings identifying the DME Plans that were paying for the DME Strips Northwood sold. But by July 2014, Dickstein and Northwood had already made arrangements to sell DME Strips to Olympus, after which they would be sold to MSSI and then to numerous intermediaries, leaving Northwood unaware of which insurers would eventually pay for them. Dickstein's email was a false statement made for the purpose of inducing Roche to enter into what became the July 2014 amendment.

**ANSWER:**   The Binsons Defendants deny the allegation that they made or caused to be made any false statements to Roche, that they committed any fraudulent acts, that they participated in a diversion scheme or that they knew that the DME Strips were being sold to MSSI.   Further answering, Binsons supplied Utilization Reports which are also known as patient tracing reports to Plaintiffs on a continuous basis as required by the Agreement and subsequent amendments.   Northwood was never required to provide patient tracing reports, in addition to the market share reports, to Plaintiffs.   As to the remaining allegations contained in paragraph 93 of the Second Amended

Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

94.      In reliance on the fraudulent statements detailed above, Roche executed an amendment to the Agreement on July 21, 2014. Roche would not have agreed to the amendment but for Binson's and Northwood's fraudulent statements.

**ANSWER:**   The Binsons Defendants deny that they made or caused to be made any fraudulent statements to Roche.  As to the remaining allegations set forth in paragraph 94 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information leave Plaintiffs to their strict proofs thereof.

95.      Binson's and Northwood's fraudulent statements continued after the July 2014 amendment as they covered up the diversion scheme and cause Roche to continue selling them DME Strips, which Binson's and Northwood could then divert to the J&B Entities.

**ANSWER:**   The Binsons Defendants deny the allegations that they made or caused to be made fraudulent statements and participated in a conspiracy or diversion scheme. As to the remaining allegations contained in paragraph 95, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

96.      After the July 2014 amendment, Binson's and Northwood provided Roche with falsified quarterly Market Share Reports. Binson's and Northwood submitted written Market Share Reports indicating the number of Roche 50-strip vials Northwood sold and the number of prescriptions Northwood filled with these sales. In light of the contractual requirement that Northwood sell directly to DME beneficiaries, along with Fasse and

41

Dickstein's repeated representations that Northwood was doing so, Roche reasonably and foreseeably understood the Market Share Reports to confirm that Northwood was indeed selling Roche's DME Strips directly to individual DME beneficiaries. But this was not true. In fact, Northwood was diverting Roche's DME Strips and had no idea how many prescriptions the DME Strips would ultimately fill.

**ANSWER:**   The Binsons Defendants deny the allegations that they made or caused to be made any false or misleading statements, including the allegation that they provided Roche with falsified quarterly Market Share Reports and denies that they were participating in a diversion scheme.   As to the remaining allegations set forth in paragraph 96, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

97.     In late 2014, after Binson's and Northwood submitted their Market Share Report for the first quarter following the July 2014 amendment, Roche sales manager Noelle Adams spoke with Dickstein by phone to ask how Northwood had increased its sales so dramatically. Dickstein, acting as an agent of Binson's and Northwood, falsely told Adams that Northwood was moving patients in its customer base from LifeScan brand test strips (a competitor) to Roche test strips. In fact, Northwood's sales of LifeScan test strips had increased. The increased volume of Roche test strip sales came from diverting the strips to Olympus and Delta.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 97 of the Second Amended Complaint as untrue.

98.     Between July 2014 and October 2015, Fasse and Dickstein, acting as agents of Binson's and Northwood, repeatedly told Adams that Northwood was selling

Roche's DME Strips directly to DME beneficiaries. They told her some of the growth was from conversions from competitors' test strips and some were new customers Northwood had obtained.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 98 of the Second Amended Complaint as untrue.

99.   On December 9, 2014, Dickstein, acting as an agent of Binson's and Northwood, sent Adams an email containing a list of insurers that were purportedly paying for DME Strips Northwood was selling to DME beneficiaries. This was false. In fact, Northwood was selling all of its DME Strips to Olympus and Delta and had no information as to who ultimately purchased the strips or which insurance companies were paying for them.

**ANSWER:**   The Binsons Defendants deny the allegations that they made or caused to be made any false or misleading statements to Roche.   As to the remainder of the allegations set forth in paragraph 99 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

100.   On August 21, 2015, Adams sent Dickstein an email asking how the Binson's had nearly doubled its DME Strips sales from the previous quarter. Dickstein, on behalf of Binson's, responded that same day by email, stating "I've instructed [Binson's] to increase Roche market share. I would think it's a combination of conversions and new patients." This was a false statement. In fact, the sales growth was driven by the Binson's and Northwood's diversion of Roche's DME Strips.

**ANSWER:**   The Binsons Defendants deny the allegation that they made or caused to be made any false or misleading statements to Roche.   As to the remaining allegations set forth in paragraph 100 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

101.   On September 11, 2015, Binson's sent Utilization Reports for its own sales, but not for Northwood's. Dickstein told Adams that Northwood would provide its reports in a "few weeks." This was false. Having sold all its DME Strips to the J&B Defendants via Olympus and Delta, Northwood had no way of creating Utilization Reports.

**ANSWER:**   The Binsons Defendants deny the allegation that they made or caused to be made false or misleading statements to Roche.   Further answering, Northwood denies the allegation or implication that it was required to submit Utilization Reports as Northwood was never required to provide patient tracing reports, in addition to the market share reports, to Plaintiffs.   As to the remaining allegations contained in paragraph 101 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

102.   On September 17, 2015, after Roche had reason to believe the Binson's Defendants may be diverting Roche DME Strips, Adams spoke with representatives of Northwood, who informed her Northwood would provide sales tracings by October 31, 2015 showing Northwood's sales had been to DME beneficiaries. This was a false statement. Northwood's sales had been to Olympus and Global, and it was incapable of

44

providing sales tracings showing which insurers ultimately paid for the DME Strips it diverted.

**ANSWER:**   The Binsons Defendants deny the allegations that they made or caused to be made false or misleading statements to Roche.   Further answering, Northwood denies the allegation or implication that it was required to submit Utilization Reports as Northwood was never required to provide patient tracing reports, in addition to the market share reports, to Plaintiffs.   As to the remaining allegations contained in paragraph 102, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

103.   On September 24, 2015, Roche's head of sales, Dan Majestic, spoke by phone with Fasse and Dickstein and asked about Northwood's high sales volumes. Dickstein claimed Northwood had been selling Roche's DME Strips to between 15 and 25 DME providers in Florida instead of to individual DME beneficiaries. This was false. Northwood had been selling all of Roche's DME Strips to a single company, first Olympus and later Delta, neither of which were DME providers.

**ANSWER:**   The Binsons Defendants deny the allegation that they made or caused to be made false or misleading statements to Roche.   As to the remaining allegations set forth in paragraph 103 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

**Roche's Reliance on the Binson's Defendants' Fraudulent Statements**

104.   The above false statements were made for the purpose of disguising Binson's and Northwood's diversion of Roche DME Strips and causing Roche to

45

continue selling them DME Strips that they could continue to divert. In reasonable reliance on these fraudulent statements, Roche sold Binson's and Northwood DME Strips that it would not otherwise have sold them. Roche also provided discounts and rebates to Binson's and Northwood in reliance on their false claims that they were distributing Roche's DME Strips exclusively to DME beneficiaries. Roche also relied on those false assurances in entering into the Agreement and the amendments thereto and in not cancelling those agreements or stopping sales to Binson's and Northwood until September 2015.

**ANSWER:**   The Binsons Defendants deny the allegations that they made or caused to be made any false statements or made or caused to be made any false statements with the purpose of causing Roche to rely on such statements.   As to the remaining allegations set forth in paragraph 104, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

105.   Until investigators working for Roche purchased Roche DME Strips for cash from Binson's brick-and-mortar locations, Roche did not know that cash sales were happening. And until Fasse and Dickstein admitted to Majestic, on September 24, 2015, that Northwood was diverting Roche DME Strips, Roche did not know that Northwood was doing anything other than selling Roche's DME Strips to individual DME beneficiaries.

**ANSWER:**   The Binsons Defendants deny the allegation that they were diverting Roche DME Strips.   As to the remaining allegations set forth in paragraph 105 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

46

106.   Roche had done business with Binson's for more than fifteen years without any indication that Binson's or its affiliates were not legitimate DME distributors. Indeed, Binson's is well known in Michigan and had a reputation for honest business practices. Until Roche discovered the misconduct described above, it had no reason to believe that Binson's reputation was undeserved.

**ANSWER:**   The Binsons Defendants deny the allegation that they took part in any misconduct.   The Binsons Defendants admit that they act with honest business practices and have a good reputation within the durable medical equipment community. As to the remaining allegations set forth in paragraph 106 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

107.   Roche currently does not have access to all facts constituting Binson's and Northwood's fraud of Roche. Further facts are in the possession of Binson's, Northwood, and other entities, and are not accessible by Roche without discovery. However, the allegations above, including the numerous specific fraudulent statements by Fasse and Dickstein on behalf of Binson's and Northwood, are amply sufficient to constitute fraud and give rise to reasonable suspicion that discovery will further confirm that Binson's and Northwood committed fraud.

**ANSWER:**   The Binsons Defendants deny any allegations of wrongdoing, including making or causing to be made false or misleading statements, any actions which constitute fraud, or participating in a diversion scheme.   Further answering, for Roche to claim that it relied on an allegedly false or misleading statement, Roche must have been communicated that statement and, therefore, would have the allegedly false statement

in its possession without the need for discovery.   As to the remaining allegations set forth in paragraph 107 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict Proofs thereof.

**The J&B Entities' Aiding and Abetting of Fraud**

108.   Chris Shaya, acting in concert with or on behalf of the other J&B Entities, actively assisted Binson's and Northwood in fraudulently inducing Roche into amending the Agreement and then in fraudulently concealing their DME Strips diversion from Roche. Roche reasonably relied on these statements, either directly or indirectly, and was damaged as a result.

**ANSWER:**   The Binsons Defendants deny any allegations of wrongdoing, including any actions of fraud.   As to the remaining allegations set forth in paragraph 108 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

109.   On July 7, 2014, Dickstein wrote to Chris Shaya and stated:

> Roche indicated that their VP will be asking about the health plans we will be submitting on the tracings reports so can you please send me a list of the health plans? . . . The sooner you send the plans the sooner we can proceed.

Shaya responded that same day and provided Dickstein a list of health plans to pass on to Roche. Shaya and Dickstein both understood that they had no way of knowing whether the DME Strips they would divert would in fact be sold to patients of the listed plans. Instead, the list was intended to fraudulently induce Roche into accepting the amendment to the Agreement.   Reflecting his knowledge that the list of companies would be used to mislead rather than inform Roche, Shaya cautioned

48

Dickstein, "I don't know if they are a provider of diabetes for all of them [sic]" and warned that "I would not send the entire list [to Roche] without reviewing as you don't want to send a non diabetes plan."

**ANSWER:**   The Binsons Defendants deny any allegations of wrongdoing, including making or causing to be made false or misleading statements to Roche or making or causing to be made false or misleading statements to Roche with the intent that Roche rely on those statements.  As to the remaining allegations set forth in paragraph 109 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

110.   Later on July 7, 2014, Dickstein emailed Colleen Miller of Roche a list of DME Plans whose patients Northwood would purportedly sell DME Strips to. The list Dickstein sent was assembled from the list Shaya had sent to Dickstein. As described above, Shaya and Dickstein both knew the representations in Dickstein's email to Roche were false and were made for the purpose of inducing Roche to enter into the July 2014 amendment.

**ANSWER:**   The Binsons Defendants deny the allegations that they made or caused to be made false or misleading statements to Roche or made or caused to be made false or misleading statements to Roche with the intent that Roche rely on those statements. As to the remaining allegations set forth in paragraph 110 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

111.   On December 8, 2014, Chris Shaya again provided Dickstein with a list of health care plans. The next day, Dickstein sent Roche Sales Manager Noelle Adams an

email containing a list of insurers that were purportedly paying for DME Strips Northwood was selling to DME beneficiaries, listing the insurers included in the December 8 Shaya email. This was false, as Northwood was selling all of its DME Strips to Olympus and Delta and had no information as to who ultimately purchased the strips.

**ANSWER:**   The Binsons Defendants deny the allegations that they made or caused to be made false or misleading statements to Roche or made or caused to be made false or misleading statements to Roche with the intent that Roche rely on those statements. As to the remaining allegations set forth in paragraph 111 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

111.   Roche reasonably relied on the fraudulent lists of insurers provided to the Binson's and Northwood by Chris Shaya and relayed to Roche by Binson's and Northwood to sell DME Strips that it would not otherwise have agreed to sell. When these strips were wrongfully diverted to the retail market, Roche was damaged by the fraudulent statements.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 112 of the Second Amended Complaint.

113.   Because the J&B Entities worked directly with Binson's and Northwood (and with each other), and did not communicate directly with Roche in connection with their fraudulent diversion scheme, Roche does not have access to all the facts concerning the J&B Entities' involvement with the fraud. As alleged above, however (¶¶ 109–11), Roche is aware of at least two specific instances in which J&B employee Chris

Shaya provided false information to Binson's and Northwood to be provided to Roche. As also alleged above ((¶¶ 74–83), Roche is aware that the J&B Entities had previously diverted DME Strips from Roche and were intimately involved in the Binson's Defendants' diversion scheme. As detailed below, moreover (¶¶ 114– 28), Roche is aware of numerous facts indicating that Chris Shaya worked in concert with or on behalf of the other J&B Entities. Accordingly, Roche reasonably suspects and believes that discovery will further confirm and reveal the J&B Entities' involvement in the fraud.

**ANSWER:**   The Binsons Defendants deny any wrongdoing, including participation in a diversion scheme, participation in a conspiracy, making or causing to be made false or misleading statements, and making or causing to be made false or misleading statements to Roche with the intent that Roche rely on those statements.   As to the remaining allegations set forth in paragraph 113 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

## The J&B Defendants' Involvement in the Scheme

114.   On information and belief, the J&B Defendants (J&B, Fawzi Shaya, and Mary Shaya) actively and intentionally participated in the scheme to purchase Roche DME Strips that they knew were intended and packaged for DME beneficiaries and divert them to retail pharmacies.

**ANSWER:**   The Binsons Defendants neither admit nor deny  the allegations set forth in paragraph 114 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

115.    Chris Shaya has been continuously employed by J&B since at least 2009. On information and belief, Chris Shaya acted as an agent of J&B at the time of the acts alleged herein. He is the son and business partner of Defendants Fawzi and Mary Shaya. As detailed above, Chris Shaya was intimately involved in the fraudulent scheme alleged here.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 115 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

116.    Defendant Daniel Gladys was and is J&B's Director of Purchasing, Shipping, and Logistics. On information and belief, he acted as an agent of J&B at the time of the acts alleged herein.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 116 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

117.    Defendant J&B was founded by Fawzi and Mary Shaya, who continue to own and hold executive positions at J&B. J&B is a family business run by the Shaya family. Fawzi B. Shaya is a part-owner, Director, and the Chairman of J&B. Mary E. Shaya is a part-owner and the President of J&B.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 117 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

118.    MSSI, the entity to whom Chris Shaya and Gladys sold diverted test strips through their shell companies Olympus and Alpha, was introduced to them through

J&B. Before purchasing Roche DME Strips from Olympus and Alpha, MSSI had been a J&B customer. Chris Shaya was MSSI's contact at J&B.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 118 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

119.   When Roche conducted an audit to investigate J&B's diversion of DME Strips, Chris Shaya was one of the auditors' primary contacts. As such, Chris Shaya's knowledge of Roche's contracts concerning the sale of DME Strips comes from his work on behalf of J&B.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 119 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

120.   During the course of carrying out the fraudulent scheme described herein, Chris Shaya took steps to cut out an outside partner and replace him with J&B insiders. Olympus was established as a Michigan limited liability company on March 12, 2013. Chris Shaya and Jeremiah Mankopf were its members and officers. From about July 2014 until about January 2015, Olympus was Northwood's sole purchaser of Roche DME test strips, all of which it sold to MSSI.

**ANSWER:**   The Binsons Defendants deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 120 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

121.    Delta was established as a Michigan limited liability company in January 2015 (originally registered as Invicta LLC). J&B employees Chris Shaya and Daniel Gladys are Delta's owners and officers. From about January 2015 to the termination of Northwood's Roche Agreement in September 2015, Delta was Northwood's sole purchaser of Roche DME Strips, which were sold to MSSI through Alpha.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 121 of the Second Amended Complaint for lack of information and leaves Plaintiffs to their strict proofs thereof.

122.    Roche has been informed that in late 2014, Chris Shaya told Mankopf that members of Chris Shaya's family was upset about Olympus operating as a side business from J&B, and that as a result Chris Shaya would no longer work with Olympus. Shortly thereafter, Chris Shaya ceased diverting Roche's DME test strips through Olympus and began diverting them through Delta, which was formed by Chris Shaya and senior J&B employee Gladys.

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 122 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

123.    On information and belief, Olympus was dissolved and Delta established because Chris Shaya, J&B, Fawzi Shaya, and Mary Shaya desired to cut Mankopf out of the diversion scheme to keep the profits for themselves. On further information and belief, the dissolution of Olympus and creation of Delta was directed and/or authorized by Chris, Fawzi, and Mary Shaya for this purpose.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth paragraph 123 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

124.   J&B was sued for Medicare fraud in 2008. In 2014, J&B was implicated in a corruption scheme involving Michigan Governor Rick Snyder. As stated above, Roche terminated sales of DME Strips to J&B in 2010 after J&B diverted Roche's DME Strips in breach of its contract with Roche.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 124 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

125.   After learning that J&B employees Chris Shaya and Daniel Gladys had orchestrated an illegal scheme to divert Roche DME Strips to a J&B customer (MSSI), Roche informed J&B, Fawzi Shaya, and Mary Shaya of this fact. They denied participating in the scheme and asserted that Chris Shaya had not acted on their behalf. On information and belief, however, and based on the facts alleged above (including ¶¶ 74–84 & 114–124), discovery and trial will confirm that their denials of involvement are not true.

**ANSWER:**   The Binsons Defendants deny any wrongdoing, including participation in an illegal diversion scheme.  As to the remaining allegations set forth in paragraph 125 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

126.   In addition to the above, Chris Shaya and Daniel Gladys, on information and belief, lack the financial resources to execute multimillion dollar transactions such

as those at issue here without outside financing. On information and belief, Chris Shaya and Gladys obtained this financing from, or with the assistance or authorization of, J&B and Fawzi and Mary Shaya.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 126 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

127.   Despite being informed that Chris Shaya and Gladys participated in a multimillion dollar fraud in concert with a J&B customer (MSSI), J&B and Fawzi and Mary Shaya have not terminated Chris Shaya or Gladys's employment or taken any disciplinary action against them. Rather, both Chris Shaya and Gladys continue to be employees in good standing of J&B. This is inconsistent with the conclusion that Chris Shaya and Gladys acted without the participation of the J&B Defendants.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 127 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

128.   On information and belief, J&B and Fawzi and Mary Shaya, as the employers of Chris Shaya and Gladys (and the parents of Chris), have the ability to direct Chris Shaya and Gladys to provide Roche information pertinent to the allegations herein. If reliable information existed that would contradict Roche's allegations—for example, information about where Chris Shaya and Gladys independently obtained financing—J&B and Fawzi and Mary Shaya would have provided it to Roche, or directed their employees to provide it to Roche. Yet despite Roche's requests, they have not done so. For the above reasons, Roche believes that further discovery and

trial will further confirm that J&B, Fawzi, and Mary Shaya participated in or authorized the wrongdoing alleged above.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 128 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

**Binson's and Northwood Breached the Agreement**

129.   The Agreement between Roche and Binson's/Northwood required Binson's and Northwood to distribute Roche's DME Strips either to individual DME beneficiaries or to certain identified affiliates of Binson's and Northwood (the "Durable Medical Equipment Providers"), which would distribute the product to individual DME beneficiaries. (Agreement § 6.6; *see also id.*, "Whereas" clauses, §§ 1.7–1.8, 1.19, 2.5.)

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 129 of the Second Amended Complaint in the form and manner alleged.  The Agreement is the best evidence of the rights and obligations of the parties.

130.   Specifically, the Agreement and its amendments contemplated that Binson's and Northwood (or the enumerated Durable Medical Equipment Providers) would sell Roche DME Strips to "Eligible Members," that is, DME beneficiaries of certain insurance companies. (*Id.*)  The contract unambiguously prohibited Binson's, Northwood, and the other Durable Medical Equipment Providers from selling Roche product "to entities or persons not specifically contemplated by this Agreement." (*Id.* § 6.6.)

57

**ANSWER:**    The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 130 of the Second Amended Complaint in the form and manner alleged.  The Agreement is the best evidence of the rights and obligations of the parties.

131.   Binson's and Northwood violated section 6.6 of the Agreement by selling Roche DME Strips to cash payers and to Olympus/Delta, the shell companies formed by the J&B Entities in order to divert Roche's product.

**ANSWER:**    The Binsons Defendants deny the allegations set forth in paragraph 131 of the Second Amended Complaint.

132.   The Agreement also prohibited Binson's or Northwood from distributing Roche DME Strips "in any manner that might expose [Roche] to financial risk via duplicate discounting." (*Id.* § 5.10 (as amended by §2.7 of the July 1, 2013 Amendment).) By diverting Roche's DME Strips to pharmacy beneficiaries, Northwood caused Roche to pay rebates to Pharmacy Plans. This amounted to "duplicate discounting," since Roche had already given Northwood a steep discount on the same DME Strips.

**ANSWER:**    The Binsons Defendants deny that they participated in a diversion scheme or exposed Roche to financial risk  via duplicate discounting.  As to the remaining allegations set forth in paragraph 132, the Binsons Defendants deny the allegations as untrue.  Further answering, the Binsons Defendants state that the Agreement is the best evidence of the rights and obligations of the parties.

**Fraud by the Pharmacies that Purchased the Diverted Test Strips**

133.   The test strips diverted by Defendants were ultimately sold to retail pharmacies, who sold them to pharmacy beneficiaries and then submitted

reimbursement claims to Pharmacy Plans. The reimbursement claims were false. In order to profit from the $78 Pharmacy Plan reimbursement, these pharmacies had to falsely input the Retail Strips' NDC in their insurance reimbursement claims. These false reimbursement claims were the reason Defendants' diversion scheme was profitable. On information and belief, all Defendants knew and intended that such false reimbursement claims would be made.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 133 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

134.   It is well known throughout the blood glucose test strip industry that manufacturers, including Roche, pay rebates to Pharmacy Plans. As experienced players in the industry, Defendants knew that the false reimbursement claims submitted by pharmacies would be transmitted to Roche via the Pharmacy Plans' rebate claims and would be relied on by Roche to its detriment. Participants in the industry understand that rebates are the reason insurance companies pay the high pharmacy benefit reimbursements instead of insisting on only covering blood glucose test strips under a DME benefit. By diverting DME Strips to retail channels, therefore, Defendants knowingly caused false reimbursement claims to be submitted to Roche's detriment.

**ANSWER:**   The Binsons Defendants deny that they participated in a diversion scheme, made or caused to be made any fraudulent acts, had knowledge of any fraudulent actions or intended that any fraudulent actions be taken.  As to the remaining allegations set forth in paragraph 134 of the Second Amended Complaint, the Binsons

Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

**Damages Caused by Defendants' Fraudulent Scheme**

135.   Between July 2014 (when Northwood began diverting Roche DME Strips) and September 2015 (when Roche cut off sales to Binson's and Northwood), Roche sold Northwood, contracting jointly with Binson's, 1,526,688 50-strip and 51-strip vials of DME Strips.  Northwood diverted all of those vials.

**ANSWER:**   The Binsons Defendants deny the allegations as set forth in paragraph 135 of the Second Amended Complaint.

136.   The DME Strips that Defendants and their co-conspirators conspired to divert were passed off as Retail Strips and sold to pharmacy beneficiaries. These patients intended to buy, and believed they were buying, Roche's Retail Strips.

**ANSWER:**   The Binsons Defendants deny the allegations as set forth in paragraph 136 of the Second Amended Complaint.  As to the allegations against the other, now dismissed, Defendants and their alleged co-conspirators, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

137.   Had Roche known that its heavily discounted DME Strips would be diverted for retail sale, it would not have sold them to Northwood. The retail beneficiaries who ultimately purchased the diverted DME Strips would have instead purchased Retail Strips. Each sale of diverted DME Strips would have therefore been replaced by a sale of Retail Strips absent Defendants' fraud.

**ANSWER:** The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 137 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

138. Roche is therefore entitled to damages in the amount of the difference between the price for which it sold the diverted DME Strips to Northwood ($10.67 per vial) and the price it would have received for the Retail Strips the patients would otherwise have purchased (about $65 per vial in 2014 and about $71 per vial in 2015). This amounts to no less than $89 million.

**ANSWER:** The Binsons Defendants deny that Roche is entitled to damages and the allegation that the Binsons Defendants participated in a diversion scheme. As to the remaining allegations contained in paragraph 138 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

## FIRST CLAIM FOR RELIEF

**Fraudulent Inducement (Including Aiding & Abetting Fraudulent Inducement and Conspiracy to Fraudulently Induce) (Against Binson's, Northwood, and J&B Medical Supply Co., Inc.)**

139. Roche hereby repeats and realleges the allegations in paragraphs 1 to 138 above as if set forth fully herein.

**ANSWER:** The Binsons Defendants incorporate and reallege their answers to the allegations in paragraphs 1 – 138 above as if set forth fully herein.

140. As alleged above, including in paragraphs 89–94, Binson's and Northwood intentionally made or caused to be made knowingly false representations to

Roche in order to induce Roche to enter into the July 2014 amendment to the Agreement.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche. As to the remaining allegations set forth in paragraph 140 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

141.   Namely, in or before July 2014, Binson's and Northwood made or caused to be made statements to Roche that Binson's and Northwood were only distributing Roche DME Strips to individual DME beneficiaries (either directly or through the approved Durable Medical Equipment Providers) and would continue to do so after the amendment, when in fact Binson's and Northwood intended to divert Roche's DME Strips to third parties, ultimately to be sold to pharmacy beneficiaries.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a diversion scheme.  As to the remaining allegations set forth in paragraph 141 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

142.   Before July 2014, Binson's and Northwood falsely informed Roche they had a large base of DME beneficiaries who would purchase Roche DME Strips if Roche eliminated the need for Northwood to submit rebate requests. In fact, Binson's and Northwood intended to divert Roche's DME Strips to retail pharmacies for sale to retail beneficiaries, and they needed to eliminate the rebates to mask their fraud and contract breaches from Roche.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 142 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

143.   As alleged above, including in paragraphs 108–128, J&B actively assisted and participated with Binson's and Northwood in making false representations to Roche. In particular, J&B employee Chris Shaya repeatedly provided lists of health plans to Binson's/Northwood for the purpose of Binson's/Northwood passing it on to Roche under the false pretense that Binson's/Northwood would sell DME Strips to patients of those plans.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 143 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

144.   Binson's, Northwood, and J&B made or caused to be made these false representations and material omissions with the intent of defrauding Roche. Specifically, these Defendants made or caused to be made these false representations and material omissions (i) to continue to be able to purchase Roche DME Strips, (ii) to continue to receive substantial discounts from Roche, (iii) to eliminate the need for Northwood to submit rebate requests, allowing them to commit fraud and contractual breaches undetected by Roche, and (iv) to profit from retail pharmacies' insurance fraud by selling

Roche DME Strips at a markup no buyer would pay but for the intended insurance fraud.

**ANSWER:**   The Binsons Defendants deny making any false representations or material omissions to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.   As to the remaining allegations set forth in paragraph 144 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

145.   Binson's, Northwood, and J&B intended that Roche would rely on their false representations and material omissions and, as a result, would enter into the July 2014 amendment to the Agreement.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.   As to the remaining allegations set forth in paragraph 145 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

146.   Binson's, Northwood, and J&B never informed Roche of the scheme to obtain Roche DME Strips and divert them to cash payers and pharmacy beneficiaries, and Roche was unaware of the scheme. Roche justifiably relied on these Defendants' misrepresentations and material omissions and was unaware of their fraud.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.   As to the remaining allegations set forth in paragraph 146 of the Second Amended Complaint,

the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

147.   Binson's, Northwood, and J&B each intentionally provided substantial assistance to each other in fraudulently inducing Roche. They could not have perpetrated the fraudulent inducement without each other's substantial and material assistance. Each benefited from the success of the fraudulent inducement.

**ANSWER:**   As to the allegations set forth in paragraph 147 of the Second Amended Complaint against the Binsons Defendants, the Binsons Defendants deny the allegations in the manner and form alleged.  As to the remaining allegations set forth in paragraph 147 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leaves Plaintiffs to their strict proofs thereof.

148.   Binson's, Northwood, and J&B unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to fraudulently induce Roche. They all adopted the goal of furthering and facilitating this conspiracy.

**ANSWER:**   As to the allegations set forth in paragraph 148 of the Second Amended Complaint against the Binsons Defendants, the Binsons Defendants deny the allegations in the manner and form alleged.   As to the remaining allegations, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

149.   Had Roche known the true facts regarding the fraud by Binson's, Northwood, and J&B, it would not have entered into the July 2014 amendment to the Agreement.

**ANSWER:**   The Binsons Defendants deny any participation in a fraudulent scheme to divert Roche DME Strips.   As to the remaining allegations set forth in paragraph 149 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

150.   As a result of Defendants' conduct, Roche was injured in an amount not less than $89 million.

**ANSWER:**   The Binsons deny the allegations set forth in paragraph 150 of the Second Amended Complaint.

## SECOND CLAIM FOR RELIEF

### Fraud (Including Aiding & Abetting Fraud and Conspiracy to Commit Fraud) (Against Binson's, Northwood, and J&B Medical Supply Co., Inc.)

151.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 150 above as if set forth fully herein.

**ANSWER:**   The Binsons Defendants incorporate and reallege their answers to the allegations in paragraphs 1 – 150 above as if set forth fully herein.

152.   As alleged above, including in paragraphs 88–103 and 133–34, Binson's and Northwood intentionally made or caused to be made knowingly false representations to Roche and to the Pharmacy Plans that reimbursed the diverted test strips, and intentionally omitted material facts from Roche and those Pharmacy Plans.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 152 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

66

153.   In particular, Binson's and Northwood made or caused to be made statements to Roche that Binson's and Northwood were only distributing Roche DME Strips to individual DME beneficiaries (either directly or through the approved Durable Medical Equipment Providers) when in fact Northwood diverted over 1.5 million Roche 50-strip vials to Olympus and Delta. On information and belief, Binson's and Northwood also knowingly caused false insurance reimbursement claims to be submitted to Pharmacy Plans.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 153 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

154.   As alleged above, including in paragraphs 108–128, J&B actively assisted Binson's and Northwood in making false representations to Roche. In particular, J&B employee Chris Shaya provided lists of health plans to Northwood for the purpose of Northwood passing them on to Roche along under the false pretense that Northwood would sell DME Strips to patients of those plans. On information and belief, J&B also knowingly caused false insurance reimbursement claims to be submitted to Pharmacy Plans.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 154 of the Second Amended Complaint,

67

the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

155.   Binson's, Northwood, and J&B made or caused to be made these false representations and material omissions with the intent of defrauding Roche. Specifically, they made or caused to be made these false representations and material omissions (i) in order to continue to be able to purchase Roche DME Strips, (ii) in order to continue to receive substantial discounts from Roche, and (iii) to profit from retail pharmacies' insurance fraud by selling Roche DME Strips at a markup no buyer would pay but for the intended insurance fraud.

**ANSWER:**   The Binsons Defendants deny making any false representation to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 155 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

156.   Binson's, Northwood, and J&B knew and intended that the ultimate sellers of the diverted Roche DME Strips, retail pharmacies, would fraudulently claim to Pharmacy Plans that Retail Strips were being dispensed, when in fact it was DME Strips. As all the Defendants knew, these false statements were passed along by the Pharmacy Plans to Roche, which paid the Pharmacy Plans millions of dollars in rebates.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 156 of the Second Amended Complaint,

68

the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

157.   Binson's, Northwood, and J&B never informed Roche of the scheme to obtain Roche DME Strips and divert them to pharmacy beneficiaries.

**ANSWER:**   The Binsons Defendants deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 157 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

158.   Binson's, Northwood, and J&B knew and intended that Roche would rely on their false representations and material omissions and, as a result, would incorrectly provide Binson's and Northwood with discounts, lose sales of Retail Strips, and make rebate payments to the Pharmacy Plans. The entire scheme depended upon Roche continuing to supply heavily-discounted DME Strips to Northwood and paying rebates to Pharmacy Plans, which would not have happened but for the false representations and material omissions of all Defendants.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 158 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

159.   Binson's, Northwood, and J&B each intentionally provided substantial assistance to each other in defrauding Roche. They could not have perpetrated the fraud

without each other's substantial and material assistance. Each benefited from the success of the fraud.

**ANSWER:**   As to the allegations set forth in paragraph 159 of the Second Amended Complaint against the Binsons Defendants, the Binsons Defendants deny the allegations in the manner and form alleged.   As to the remaining allegations, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

160.   Binson's, Northwood, and J&B unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to defraud Roche. They all adopted the goal of furthering and facilitating this conspiracy.

**ANSWER:**   As to the allegations set forth in paragraph 160 of the Second Amended Complaint against the Binsons Defendants, the Binsons Defendants deny the allegations in the manner and form alleged.   As to the remaining allegations, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

161.   Roche justifiably relied on the misrepresentations and material omissions of Binson's, Northwood, and J&B and was unaware of Defendants' fraud.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.   As to the remaining allegations set forth in paragraph 161 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

70

162.   Had Roche known the true facts regarding the fraud, it would not have continued to sell DME Strips to Binson's and Northwood, would not have paid Pharmacy Plans rebates on the DME Strips diverted to pharmacies, and would have made additional sales of Retail Strips.

**ANSWER:**   The Binsons Defendants deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 162 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

163.   As a result of Defendants' conduct, Roche was injured in an amount not less than $89 million.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 163 of the Second Amended Complaint.

### THIRD CLAIM FOR RELIEF

**Criminal Deception Under Ind. Code §§ 34-24-3-1 & 35-43-5-3
(Against Binson's, Northwood, and J&B Medical Supply Co., Inc.)**

164.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 163 above as if set forth fully herein.

**ANSWER:**   The Binsons Defendants incorporate and reallege their answers in paragraphs 1 – 163 above as if set forth fully herein.

165.   Binson's, Northwood, and J&B knowingly or intentionally made false or misleading written statements with intent to obtain property, in violation of Ind. Code § 35-43-53(a)(2). Roche is therefore entitled to treble damages, attorney's fees, costs, and other specified expenses under Ind. Code § 34-24-3-1.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.   As to the remaining allegations set forth in paragraph 165 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

166.   In particular, as alleged above including in paragraphs 92–101, Binson's and Northwood knowingly or intentionally made or caused to be made false or misleading written statements, often by email, to Roche that Binson's and Northwood had a large base of commercial DME patients that would purchase Roche DME Strips if Roche amended the Agreement with Binson's and Northwood to permit Northwood to purchase DME Strips at a discounted flat price without rebates. These false or misleading written statements were made with the intention of obtaining Roche DME Strips and the proceeds from the sale of DME Strips to Olympus and Delta.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.   As to the remaining allegations set forth in paragraph 166 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

167.   In addition, as alleged above including in paragraphs 92–101 and 133–34, Binson's and Northwood knowingly or intentionally made or caused to be made false or misleading written statements to Roche that Binson's and Northwood were only distributing Roche DME Strips to individual DME beneficiaries (either directly or through the approved Durable Medical Equipment Providers) when in fact Northwood diverted

over 1.5 million 50-strip vials to Olympus and Delta. On information and belief, Binson's and Northwood also knowingly caused false insurance reimbursement claims to be submitted, in writing, to Pharmacy Plans.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 167 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

168.   As alleged above, including in paragraphs 108–128 and 133–34, J&B actively assisted Binson's and Northwood in making false or misleading written statements to Roche. In particular, J&B employee Chris Shaya provided written lists of health plans to Northwood for the purpose of Northwood passing them on to Roche under the false pretense that Northwood would sell DME Strips to patients of those plans. On information and belief, J&B also knowingly caused false insurance reimbursement claims to be submitted, in writing, to Pharmacy Plans.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 168 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

169.   Binson's, Northwood, and J&B knowingly or intentionally made or caused to be made these false or misleading written statements with the intent of defrauding Roche.  Specifically, they were made (i) in order to continue to be able to purchase

Roche DME Strips, (ii) in order to continue to receive substantial discounts from Roche, and (iii) to profit from retail pharmacies' insurance fraud by selling Roche DME Strips at a markup no buyer would pay but for the intended insurance fraud.

**ANSWER:** The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips. As to the remaining allegations set forth in paragraph 169 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

170.   Binson's, Northwood, and J&B knew and intended that Roche would rely on their false or misleading written statements and, as a result, would incorrectly provide Binson's and Northwood with discounts, lose sales of Retail Strips, and make rebate payments to the Pharmacy Plans. The entire scheme depended upon Roche continuing to supply heavily-discounted DME Strips to Northwood and paying rebates to Pharmacy Plans, which would not have happened but for the false or misleading written statements of all Defendants.

**ANSWER:** The Binsons Defendants deny making any false representations to Roche and deny any participation in a fraudulent scheme to divert Roche DME Strips. As to the remaining allegations set forth in paragraph 170 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

171.   Roche justifiably relied on the false or misleading written statements by Binson's, Northwood, and J&B and was unaware of their criminal deception.

**ANSWER:**   The Binsons Defendants deny making or causing to be made any false or misleading written statements.  As to the remaining allegations, the Binsons Defendants neither admit nor deny the  allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

172.   Had Roche known the true facts regarding the criminal deception, it would not have continued to sell DME Strips to Binson's and Northwood and therefore would not have paid rebates on the diverted DME Strips to Pharmacy Plans, and it would have made additional sales of Retail Strips.

**ANSWER:**   The Binsons Defendants deny any participation in a fraudulent scheme or acts of criminal deception.  As to the remaining allegations set forth in paragraph 172 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

173.   As a result of the violation of Ind. Code § 35-43-5-3(a)(2) by Binson's, Northwood, and J&B, Roche has been injured in an amount not less than $89 million. Roche is entitled to recover treble damages, attorney's fees, costs, and other specified expenses under Ind. Code § 34-24-3-1.

**ANSWER:**   The Binsons Defendants deny the allegations as set forth in paragraph 173 of the Second Amended Complaint.

## FOURTH CLAIM FOR RELIEF

### Negligent Misrepresentation
### (Against the Binson's Defendants)

174.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 173 above as if set forth fully herein.

**ANSWER:**   The Binsons Defendants incorporate and reallege their answers to the allegations in paragraphs 1 – 173 above as if set forth fully herein.

175.   The Binson's Defendants misrepresented to Roche that Binson's and Northwood were distributing Roche DME Strips only to individual DME beneficiaries, when in fact Binson's sold thousands of Roche 50-strip vials of DME Strips for cash and Northwood sold over 1.5 million 50-Strip vials to Olympus and Delta.

**ANSWER:**   The Binsons Defendants deny making any false representations to Roche. As to the remaining allegations set forth in paragraph 175 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

176.   The Binson's Defendants never told Roche that its DME Strips were being sold to cash payers and to third parties for ultimate sale to pharmacy beneficiaries.

**ANSWER:**   The Binsons Defendants neither admit nor deny the allegations set forth in paragraph 176 of the Second Amended Complaint for lack of information and leave Plaintiffs to their strict proofs thereof.

177.   These statements of fact and material omissions were false and misleading. Additionally, these statements and omissions were negligent because Binson's and Northwood did not exercise reasonable care in verifying the accuracy of their statements or in ensuring that they did not make material omissions.

**ANSWER:**   The Binsons Defendants deny making any false representations or material omissions to Roche.  As to the remaining allegations set forth in paragraph 177 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

76

178.   The Binson's Defendants did not take any affirmative steps to correct their materially false statements or material omissions.

**ANSWER:**   The Binsons Defendants deny making any false representations or material omissions to Roche.  As to the remaining allegations set forth in paragraph 178 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

179.   The Binson's Defendants had a duty to provide Roche with accurate information because they knew and intended that Roche would rely on their false representations and material omissions in continuing to sell DME Strips to Binson's and Northwood and in providing Binson's and Northwood with discounts.

**ANSWER:**   The Binsons Defendants deny making any false representations or material omissions to Roche.  As to the remaining allegations set forth in paragraph 179 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

180.   Roche reasonably relied upon these misrepresentations and material omissions and was unaware that they were false.

**ANSWER:**   The Binsons Defendants deny making or causing to be made any false representations or material omissions to Roche.  As to the remaining allegations set forth in paragraph 180 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

181.   As a result of the Binson's Defendants' conduct, Roche has been injured in an amount not less than $89 million.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 181 of the Second Amended Complaint.

## FIFTH CLAIM FOR RELIEF

**Breach of Contract
(Against the Binson's Defendants)**

182.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 181 above as if set forth fully herein.

**ANSWER:**   The Binsons Defendants incorporate and realleges their answers to the allegations in paragraphs 1 – 181 above as if set forth fully herein.

183.   As set forth above, Binson's and Northwood breached the Agreement, including sections 5.10 and 6.6 of the Agreement.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 183 of the Second Amended Complaint.  Further answering, the Binsons Defendants state that the Agreement is a written document and speaks for itself.

184.   As a result of these breaches, Roche was injured in an amount not less than $89 million.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 184 of the Second Amended Complaint.

## SIXTH CLAIM FOR RELIEF

**Unjust Enrichment
(Against the J&B Defendants)**

185.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 184 above as if set forth fully herein.

**ANSWER:**   The Binsons Defendants incorporate and reallege their answers to the allegations in paragraphs 1-184 above as if set forth fully herein.

186.   As set forth above, Binson's, Northwood, J&B, and their co-conspirators made or caused to be made false representations to Roche and the Pharmacy Plans and omitted material facts from Roche and the Pharmacy Plans. Binson's and Northwood also knowingly breached their contractual obligations to Roche.

**ANSWER:**   The Binsons Defendants deny making or causing to be made any false representations or material omissions to Roche and/or the Pharmacy Plans.  Further answering, the Binsons Defendants deny the allegation that they breached any of their contractual obligations with Roche.  As to the remaining allegations set forth in paragraph 186 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

187.   As a result of these false representations and material omissions, knowing breach of contract, and other inequitable behavior alleged above, the J&B Defendants wrongfully obtained a monetary benefit to which they were not legally entitled.

**ANSWER:**   The Binsons Defendants deny making any false representations or material omissions to Roche, deny breaching their contractual obligations and deny any participation in a fraudulent scheme.  As to the remaining allegations set forth in paragraph 187 of the Second Amended Complaint, the paragraph states allegations against a party other than the Binsons Defendants and a response from the Binsons Defendants is therefore not required.

188.   The J&B Defendants have no right to retain these unjust gains.

**ANSWER:**   The Binsons Defendants state that the allegations set forth in paragraph 188 of the Second Amended Complaint state a claim against a party other than the Binsons Defendants and a response from the Binsons Defendants is not required.

189.   If the J&B Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

**ANSWER:**   The Binsons Defendants state that the allegation set forth in paragraph 189 of the Second Amended Complaint states a claim against a party other than the Binsons Defendants and a response from the Binsons Defendants is not required.

## SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against Binson's and Northwood, in Alternative to the Breach of Contract Claim)

190.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 189 above as if set forth fully herein.

**ANSWER:**   The Binsons Defendants incorporate and reallege their answers to the allegations in paragraph 1-189 above as if set forth fully herein.

191.   As set forth above, Binson's, Northwood, J&B, and their co-conspirators made or caused to be made false representations to Roche and the Pharmacy Plans and omitted material facts from Roche and the Pharmacy Plans.

**ANSWER:**   The Binsons Defendants deny making any false representations or material omissions to Roche and deny any participation in a fraudulent scheme.  As to the remaining allegations set forth in paragraph 191 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

192.   As a result of these false representations and material omissions and other inequitable behavior alleged above, Binson's and Northwood wrongfully obtained a monetary benefit to which they were not legally entitled.

**ANSWER:**   As to the allegations set forth in paragraph 192 of the Second Amended Complaint against the Binsons Defendants, the Binsons Defendants deny the allegations in the manner and form alleged.   As to the remaining allegations, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

193.   Binson's and Northwood breached their contractual obligations to Roche and Roche is entitled to compensation for their breach of contract. However, in the event that Binson's and Northwood are not found liable for breach of contract, it would be manifestly unjust for them to keep the material benefits they have gained from the conduct alleged above.

**ANSWER:**   The Binsons Defendants deny that they breached their contractual obligations or that Roche is entitled to any damages, whether contractually based or not. As to the remaining allegations set forth in paragraph 193, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

194.   Accordingly, Roche asserts, in the alternative to its breach of contract claim, a claim for unjust enrichment against Binson's and Northwood.

**ANSWER:**   The Binsons Defendants deny the allegations set forth in paragraph 194 of the Second Amended Complaint.

## EIGHTH CLAIM FOR RELIEF

81

**Tortious Interference With Contract**
**(Against the J&B Defendants)**

195.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 194 above as if set forth fully herein.

**ANSWER:**   The Binsons Defendants incorporate and reallege their answers to the allegations in paragraph 1-194 above as if set forth fully herein.

196.   Roche entered into a contractual relationship with Binson's and Northwood via the February 2011 Agreement and its amendments.

**ANSWER:**   The Binsons Defendants admit the allegations as set forth in paragraph 196 of the Second Amended Complaint.

197.   The J&B Defendants knew that Binson's and Northwood had a contract with Roche to purchase DME Strips. The J&B Defendants became aware of this no later than May 2014, when, on information and belief, Fasse and Dickstein began to negotiate with Chris Shaya and Mankopf to arrange for the diversion of Roche DME Strips.

**ANSWER:**   The Binsons Defendants deny any participation in a fraudulent scheme. As to the remaining allegations set forth in paragraph 197 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

198.   Moreover, the J&B Defendants had knowledge of the relevant specifics of the Agreement because J&B had entered into a substantively similar contract with Roche in 2008. Under the 2008 contract between Roche and J&B, J&B was required to sell Roche DME Strips exclusively to Blue Cross DME beneficiaries (either directly or through pre-approved intermediaries who were named in the contract).

**ANSWER:**   The Binsons Defendants state that the allegations set forth in paragraph 198 state a claim against a party other than the Binsons Defendants and a response from the Binsons Defendants is not required.

199.   In 2010, Roche terminated the contract because J&B was breaching its contract by selling to ineligible patients.

**ANSWER:**   The Binsons Defendants state that the allegations set forth in paragraph 199 state a claim against a party other than the Binsons Defendants and a response from the Binsons Defendants is not required.

200.   The J&B Defendants urged the Binson's Defendants to violate the Agreement by entering into an agreement with the J&B Defendants to divert Roche's DME Strips through shell companies created by the J&B Defendants (Olympus and Delta).

**ANSWER:**   The Binsons Defendants deny any participation in a fraudulent scheme to divert Roche DME Strips.  As to the remaining allegations set forth in paragraph 200 of the Second Amended Complaint, the Binsons Defendants neither admit nor deny the allegations for lack of information and leave Plaintiffs to their strict proofs thereof.

201.   The conduct of the J&B Defendants was malicious and without justification.

**ANSWER:**   The allegations set forth in paragraph 201 of the Second Amended Complaint are against a party other than the Binsons Defendants and a response from the Binsons Defendants is therefore not required.

202.   As a result of the J&B Defendants' conduct, Roche has been injured in an amount not less than $89 million.

**ANSWER:**   The allegations set forth in paragraph 202 of the Second Amended Complaint are against a party other than the Binsons Defendants and a response from the Binsons Defendants is therefore not required.   Further answering, the Binsons Defendants deny that Roche is entitled to any recovery.

WHEREFORE, Defendants, Binsons Hospital Supplies, Inc. and Northwood, Inc., respectfully requests that this Honorable Court dismiss the Plaintiffs' Second Amended Complaint and grant all other just and proper relief.

### BINSON'S HOSPITAL SUPPLIES, INC. AND NORTHWOOD, INC.'S AFFIRMATIVE DEFENSES AND RESERVATION OF RIGHTS

Defendants, Binson's Hospital Supplies, Inc. and Northwood, Inc., (collectively the "Binsons Defendants"), have not yet had the opportunity to conduct its investigation and discovery and will rely upon all of the following defenses as may prove applicable after discovery and at trial.

1.       Discovery and/or investigation may reveal that Plaintiff's Complaint fails to state a claim, in whole or in part, against the Binsons Defendants upon which relief can be granted.  In such an event, the Binsons Defendants reserve their right to file a motion pursuant to Fed. R. Civ. P. 12.

2.       Discovery and/or investigation may reveal that Plaintiffs have failed to join a party.  In such an event, the Binsons Defendants reserve the right to file a motion pursuant to Fed. R. Civ. P. 12.

3.       Discovery and/or investigation may reveal that Plaintiffs have failed to plead with specificity pursuant to Fed. R. Civ. P. 9.  In such an event, the Binsons Defendants reserve the right to file a motion pursuant to Fed. R. Civ. P. 12.

4.      Plaintiffs have failed to state a claim of fraud where fraud alleged is based on a material omission.

5.      The Binsons Defendants did not make any material misrepresentations to Plaintiffs.

6.      The Binsons Defendants' statements were truthful.

7.      The Binsons Defendants' written statements were truthful.

8.      The Binsons Defendants did not intend to deceive Plaintiffs.

9.      The Binsons Defendants did not take part in a fraudulent scheme to defraud Plaintiffs and divert DME Strips.

10.     The Binsons Defendants' statements did not induce Plaintiffs to take any action.

11.     The Binsons Defendants were not the proximate cause of the injury alleged by Plaintiffs.

12.     The Binsons Defendants acted in accordance with the Agreement and subsequent amendments.

13.     Plaintiffs' alleged damages do not arise from the alleged breach of the Agreement and subsequent amendments by the Binsons Defendants.

14.     The Binsons Defendants fulfilled all duties and obligations to Plaintiffs.

15.     The Binsons Defendants fulfilled all duties and obligations to Plaintiffs under the Agreement and subsequent amendments.

16.     Plaintiffs did not rely on the statements made by the Binsons Defendants to enter into the Agreement or any subsequent amendments.

17.     Plaintiffs' claim of aiding and abetting fraud fails where the Binsons Defendants did not commit fraud.

18.     Plaintiffs' claim of conspiracy to commit fraud fails where Defendant Northwood, Inc. is the only remaining Defendant alleged to have participated in the fraud.

19.     Plaintiffs' claim of aiding and abetting fraud fails where Defendant Northwood, Inc. is the only remaining Defendant alleged to have participated in the fraud.

20.     Plaintiffs' claim of unjust enrichment fails where both parties agree that there is an Agreement which governs the transaction.

21.     Plaintiffs' claim of unjust enrichment, even when pled in the alternative, fails as a matter of law where there is an Agreement which governs the transaction.

22.     Plaintiffs would have entered into an amendment to the Agreement due to Plaintiffs' admitted ongoing and steady business relationship.

23.     Superseding and/or intervening acts caused Plaintiffs' alleged damages, including acts of Plaintiffs and other individuals and/or entities which Plaintiffs have failed to join to this action, and preclude any liability to the Binsons Defendants.

24.     To the extent Plaintiffs seek equitable, exemplary, punitive or treble damages, the same are not recoverable in this action.

25.     Plaintiffs' claims are barred by the legal and equitable doctrines of waiver, estoppel, unclean hands and laches.

26.     Plaintiffs' damages are the result of acts or omissions of others.

27.     The Binsons Defendants were not the cause of the injury alleged by Plaintiffs.

28.     Plaintiffs are the proximate cause of their own damages by failing to maintain any internal controls for the payment of submitted rebates.

29.     Plaintiffs' alleged injuries were caused in totality or in part by Plaintiffs' own negligence or Plaintiffs caused or contributed to their alleged injuries.

30.     Plaintiffs' failed to make every reasonable effort to mitigate, prevent and/or reduce their alleged damages and injuries.

31.     The Binsons Defendants' duty, if any, under any Agreement or subsequent amendment with Plaintiffs was waived or failed to mature because of Plaintiffs' prior material breach and failure to substantially perform according to the terms of the Agreement and/or subsequent amendments, and therefore, the Plaintiffs are barred from their requested relief.

32.     Plaintiffs' claims are barred as to the Binsons Defendants due to an intervening-superseding cause.

33.     Plaintiffs did not reasonably rely on any statement of the Binsons Defendants.

34.     Plaintiffs are not entitled to liquidated damages where Plaintiffs have failed to plead a claim for liquidated damages.

35.     Plaintiffs are not entitled to liquidated damages where liquidated damages are an unenforceable penalty.

36.     Plaintiffs are not entitled to the full amount of damages claimed due to offset of monies and damages owed to the Binsons Defendants.

37.    The Binsons Defendants expressly reserve the right to add or to amend these affirmative defenses, as additional information becomes known to the Binsons Defendants though discovery and investigation.

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER, LLP

By:    /s/ Tracy N. Betz
Tracy N. Betz (24800-53)
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Direct: 317.713.3544
TBetz@taftlaw.com

Kitch Drutchas Wagner
Valitutti & Sherbrook

/s/ John M. Sier
JOHN M. SIER (P39336)
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-2915
John.sier@kitch.com

/s/ Carina M. Kraatz
CARINA M. KRAATZ (P73773)
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-7647
Carina.kraatz@kitch.com

Dated:  December 4, 2017

**JURY DEMAND**

Defendants, Binson's Hospital Supplies, Inc. and Northwood, Inc., respectfully demand a trial by jury on all issues and claims so triable.

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER, LLP

By:   */s/ Tracy N. Betz*
Tracy N. Betz (24800-53)
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Direct: 317.713.3544
TBetz@taftlaw.com

Kitch Drutchas Wagner
Valitutti & Sherbrook

*/s/ John M. Sier*
JOHN M. SIER (P39336)
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-2915
John.sier@kitch.com

*/s/ Carina M. Kraatz*
CARINA M. KRAATZ (P73773)
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-7647
Carina.kraatz@kitch.com

Dated:  December 4, 2017

**BINSON'S HOSPITAL SUPPLIES, INC.'S AND NORTHWOOD, INC.'S COUNTER-COMPLAINT AGAINST ROCHE DIAGNOSTICS CORP. AND ROCHE DIABETES CARE, INC. AND JURY DEMAND**

Defendants, Binson's Hospital Supplies, Inc. and Northwood, Inc. (collectively the "Binsons"), by counsel, for its Counter-Complaint against Plaintiffs, Roche Diagnostics Corp. and Roche Diabetes Care, Inc. (collectively "Roche") states as follows:

## NATURE OF THE CASE

1.      This is an action against Roche for breach of contract, unjust enrichment, tortious interference with contract and tortious interference with business relationship. Binsons' counter-claims arise from a Product and Pricing Agreement (the "Agreement") entered into on February 10, 2011.  The Agreement was subsequently amended on February 10, 2011, July 1, 2013, October 1, 2013, February 1, 2014 and July 21, 2014. Roche's failed to perform all of its obligations pursuant to the Agreement by failing to pay rebates rightfully owed to Binsons.  Roche has also tortiously interfered with other contracts and known business relationships which the Binsons had with durable medical equipment ("DME") suppliers/manufacturers.   Roche's illegal actions have caused Binsons damages consisting of lost profits, the amount of the owed rebate, attorneys fees and costs.

## THE PARTIES, JURISDICTION AND VENUE

2.      Binson's Hospital Supplies, Inc. is a corporation organized under the laws of the State of Michigan, with its principal place of business in Macomb County. Binson's Hospital Supplies, Inc. is a supplier of a broad range of DME, including blood-glucose test strips.

3.      Northwood, Inc. is a corporation organized under the laws of the State of Michigan, with its principal place of business in Macomb County, Michigan.  Northwood,

Inc. is a subsidiary of Binson's Hospital Supplies, Inc. and is a DME benefit manager, third party administrator and manages networks of providers who distribute medical equipment and supplies, including blood-glucose test strips.

4.      Roche Diagnostics Corp. is a corporation organized under the laws of the State of Indiana, with its principal place of business located in Indianapolis, Indiana. Roche Holding AG is the ultimate parent company of Roche Diagnostics Corp.

5.      Roche Diabetes Care, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Indianapolis, Indiana.   Roche Diagnostics Corp. included Plaintiffs' U.S. commercial diabetes business until November 2015, when the U.S. commercial diabetes business was transferred to a separate legal entity, Roche Diabetes Care, Inc.  Roche Holding AG is the ultimate parent company of Roche Diabetes Care, Inc.

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) because Binsons and Roche are citizens of different states and Roche is assert claims against Binsons in excess of $75,000, exclusive of interest and costs.

7.      Venue is proper in this Federal District pursuant to 28 U.S.C. §1391(b) because Roche maintains its corporate offices in Indianapolis, and thus, resides in this Federal District.

## **BACKGROUND**

8.      Roche is a manufacturer of blood-glucose test strips.   These blood-glucose test strips, while the same, are packaged differently whether the blood-glucose test strips are intended from DME beneficiaries ("DME Packaged Strips") or intended for distribution to pharmacies ("Pharmacy Packaged Strips").

9.      On or about February 10, 2011, Roche and Binsons entered into a Pricing and Product Agreement (the "Agreement").

10.     This Agreement was subsequently amended on February 10, 2011, July 1, 2013, October 1, 2013, February 1, 2014 and July 21, 2014.

11.     The Agreement and February 10, 2011 amendment included rebates which would be remitted to Northwood, Inc. to facilitate and drive utilization of Roche products versus other branded manufacturers.

12.     From 2011 to 2013, Roche, via its representatives Rich Vogel, Noelle Adams and Colleen Miller, pushed to have Roche as Binsons' primary branded product for the commercial and Medicare business lines.

13.     In February 2013, Ms. Adams informed Binsons that Roche was no longer able to offer DME for Medicare due to profitability concerns.   Binsons sought other suppliers in order to offer major branded products to Binsons' Medicare patients.

14.     On information and belief, due to concerns over lost profit share and stagnant business lines, Ms. Adams, on behalf of Roche, reached out to Binsons in order to restart negotiations over the price of the Medicare mail order product and commercial strips and bring Binsons' business back from other known manufacturers. These negotiations resulted in the July 1, 2013 amendment to implement the new pricing tiers.

15.     The July 1, 2013 amendment also revised the rebate reporting requirement for Binsons from monthly to quarterly.

92

16.     The October 1, 2013 amendment added an additional rebate tier and revised the pricing of blood-glucose test strips to $9.49 per box (net of rebate) for non-Medicare and $6.50 per box (net of rebate) for Medicare.

17.     An amendment on February 1, 2014 was agreed to after Binsons reviewed their lower-than-projected volumes and approached Roche about further lowering the Medicare pricing at the expense of increasing the non-Medicare pricing. After some negotiations, Roche agreed to a price of $5.00 per box (net of rebate) for Medicare and $10.67 per box (net of rebate) for non-Medicare. Even with this price adjustment for the Medicare lines, Roche was still priced higher than its competitors.

18.     The February 1, 2014 amendment also revised Binsons' volume commitment from a box count to a market share percentage with annual minimum volume, eliminated a prompt pay discount and provided a six-month grace period to increase non-Medicare business market share requirement of 32.5%.

19.     For the first few years of the Agreement, Roche paid Binsons the regularly scheduled rebates.  Then without warning or reason, Roche stopped paying Binsons its owed rebates.

20.     Rebates owed by Roche to Binsons are currently outstanding.

21.     Binsons has requested the payment of the rebate from Roche to Binsons and Roche has failed to pay the required rebate.

22.     In response to Binsons' requests for payment of the rebate from Roche to Binsons, Roche stated in writing that it was researching the outstanding  rebate owed to Binsons.

93

23.   In response to Binsons' requests for payment of the rebate from Roche to Binsons, Roche stated in writing that payment would be forthcoming.

24.   Roche's written statements to Binsons were false as Roche never intended to fulfill its obligations under the Agreement and subsequent amendments to pay Binsons the outstanding rebate owed.

25.   Roche's written statements to Binsons were false as Roche never intended to research the outstanding rebate owed to Binsons.

26.   Roche is not entitled to the rebate it is withholding from Binsons.

27.   Binsons has been damaged due to Roche's failure to pay Binsons the rebates owed.

## <u>COUNT I – BREACH OF CONTRACT</u>

28.   Binsons incorporates and realleges its above allegations as though set forth in full in this paragraph.

29.   Binsons and Roche entered into the Agreement and subsequent amendments.

30.   The Agreement and subsequent amendments were supported by valid consideration.

31.   Binsons satisfied fully its contractual obligations under the Agreement and subsequent amendments.

32.   Roche owed specific duties to Binsons, including the payment of rebates as stated by example in paragraph 11 above and more fully stated by the Agreement and subsequent amendments, which is incorporated by this reference.

33.     Roche materially breached the Agreement and subsequent amendments by failing to pay the required amount of rebates to Binsons.

34.     As a direct result of Roche's breach of contract, Binsons has suffered direct damages in excess of $200,000.

WHEREFORE, Binsons respectfully requests that this Honorable Court enter a judgment against Roche and in favor of Binsons for the full amount of Binsons' damages, plus costs, interest and attorney's fees.

### COUNT II – UNJUST ENRICHMENT
### (ALTERNATIVELY PLEAD TO BINSONS' BREACH OF CONTRACT CLAIM)

35.     Binsons incorporates and realleges its above allegations as though set forth in full in this paragraph.

36.     Binsons conferred a benefit onto Roche at the express request of Roche by purchasing Roche's product.  After Binsons' purchase of Roche's product, Roche was to rebate a predetermined portion of the purchase price to Binsons.

37.     Roche has failed to rebate to Binsons the required predetermined portion of the purchase price of Roche's product causing the purchase price to be higher than expected.

38.     Roche is unjustly retaining the rebate owed to Binsons which Roche is not entitled to retain.

39.     Binsons has requested payment of the outstanding rebate and Roche has denied Binsons' payment requests.

40.     Allowing Roche to retain the benefit of the rebate owed to Binsons without restitution would be unjust.

95

41.     Due to the actions of Roche, Binsons has suffered damages in excess of $200,000.

WHEREFORE, Binsons respectfully requests that this Honorable Court enter a judgment against Roche and in favor of Binsons for the full amount of Binsons' damages, plus costs, interest and attorneys fees.

## COUNT III – CONVERSION

42.     Binsons incorporates and realleges its above allegations as though set forth in full in this paragraph.

43.     Binsons has a possessory or proprietary interest in the outstanding rebate owed to Binsons.

44.     The rebates owed by Roche are the property of Binsons.

45.     Roche is not in lawful possession of Binsons property.

46.     Despite several requests for Roche to submit Binsons' rebates to Binsons, Roche has failed to submit the rebates to Binsons.

47.     Roche is exerting and has exerted unauthorized control over the property of Binsons.

48.     Binsons has been damaged in an amount of not less than $200,000

WHEREFORE, Binsons respectfully requests that this Honorable Court enter a judgment against Roche and in favor of Binsons for the full amount of Binsons' damages, plus costs, interest and attorney's fees.

## COUNT IV – CRIMINAL DECEPTION UNDER
## IND. CODE §§ 34-24-3-1 & 35-43-5-3

49.     Binsons incorporates and realleges its above allegations as though set forth in full in this paragraph.

96

50.    Roche made false or misleading statements to Binsons in writing.

51.    Roche made false or misleading written statements to Binsons regarding Roche's obligation to issue a rebate to Binsons.

52.    Roche made the false or misleading written statements to Binsons knowingly or intentionally.

53.    Roche made the false or misleading written statements with the intent to obtain and retain rebates owed to Binsons.

54.    Binsons has been damaged by Roche's criminal deception in an amount not less than $200,000.  Binsons is entitled to recover treble damages, attorney's fees, costs and other specified expenses under Ind. Code §34-24-3-1.

WHEREFORE, Binsons respectfully requests that this Honorable Court enter a judgment against Roche and in favor of Binsons for the full amount of Binsons' damages, treble damages, specified expenses under Ind. Code §34-24-3-1 , plus costs, interest and attorney's fees.

## COUNT V - TORTIOUS INTERFERENCE WITH CONTRACT

55.    Binsons incorporates and realleges its above allegations as though set forth in full in this paragraph.

56.    Binsons had other supplier contracts in order to offer major branded products to Binsons' patients.

57.    As a supplier in the industry and due to direct communications with Roche, Roche had direct knowledge of Binsons' other contracts with major brands to bring those brands' products to Binsons' patients.

97

58.     On information and belief, Roche communicated with the other major brands to intentionally induce the other major brands to breach or terminate their contracts with Binsons.

59.     On information and belief, Roche has caused other major brands to breach or terminate their contracts with Binsons.

60.     On information and believe, Roche has caused other major brands to breach or terminate their contracts with Binsons by failing to pay Binsons for returned products and/or DME supplies.

61.     There was no justification for the contact or initiation of the breach of the contract by Roche.

62.     Binsons has suffered damages including, but not limited to, lost profits, attorney's fees and costs.

WHEREFORE, Binsons respectfully requests that this Honorable Court enter a judgment against Roche and in favor of Binsons for the full amount of Binsons' damages, plus costs, interest and attorney's fees.

## **COUNT VI - TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP**

63.     Binsons incorporates and realleges its above allegations as though set forth in full in this paragraph.

64.     Binsons have multiple business relationships with other suppliers, included branded suppliers, of DME.

65.     Roche, as an active participate in the DME industry, knew of Binsons' multiple business relationships with other suppliers of DME.

98

66.    Roche had direct knowledge of Binsons' multiple business relationships with other suppliers of DME.

67.    Roche intentionally interfered with Binsons' business relationships.

68.    Roche intentionally interfered with Binsons' business relationships through illegal means, including directly contacting a Binsons' branded supplier and causing the branded supplier relationship to degrade.

69.    For example, a major brand supplier has refused to further its business relationship with Binsons, upon information and belief, due to the illegal actions of Roche.

70.    There was no justification for the business relationship between Binsons and the manufacturer to degrade other than Roche's unfounded allegations and illegal actions.

71.    Binsons' actions did not cause the supplier business relationship to degrade.

72.    Binsons has suffered damages including but not limited to lost profits, attorney's fees and costs.

WHEREFORE, Binsons respectfully requests that this Honorable Court enter a judgment against Roche and in favor of Binsons for the full amount of Binsons' damages, plus costs, interest and attorney's fees

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER,
LLP

By:  _/s/ Tracy N. Betz_____
Tracy N. Betz (24800-53)
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Direct: 317.713.3544
TBetz@taftlaw.com


Kitch Drutchas Wagner
Valitutti & Sherbrook

_/s/ John M. Sier_____
JOHN M. SIER (P39336)
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-2915
John.sier@kitch.com

_/s/ Carina M. Kraatz_
CARINA M. KRAATZ (P73773)
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-7647
Carina.kraatz@kitch.com

Dated:  December 4, 2017

### JURY DEMAND

Defendants, Binson's Hospital Supplies, Inc. and Northwood, Inc., respectfully demand a trial by jury on all issues and claims contained in the counter-complaint so triable.

<div style="margin-left:40%">

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER, LLP

By:   */s/ Tracy N. Betz*
      Tracy N. Betz (24800-53)
      One Indiana Square, Suite 3500
      Indianapolis, Indiana 46204-2023
      Direct: 317.713.3544
      TBetz@taftlaw.com

Kitch Drutchas Wagner
Valitutti & Sherbrook

*/s/ John M. Sier*
JOHN M. SIER (P39336)
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-2915
John.sier@kitch.com

*/s/ Carina M. Kraatz*
CARINA M. KRAATZ (P73773)
One Woodward Avenue, Suite 2400
Detroit, MI 48226-5485
313-965-7647
Carina.kraatz@kitch.com

</div>

Dated:  December 4, 2017

## **CERTIFICATE OF SERVICE**

I certify that on December 4, 2017, a copy of the foregoing was filed

electronically using the ECF system.   Service of this filing will be made on all ECF-

registered counsel by operation of the Court's electronic filing system. Parties may

access this filing through the Court's system.

/s/ Tracy N. Betz